**UNITED STATES of America, Plaintiff,**
v.
**DALLAS COUNTY COMMISSION, et al., Defendants.**

Civ. A. No. 78–578–H.

United States District Court,
S. D. Alabama, S. D.

Sept. 3, 1982.

See also, D.C., 549 F.Supp. 875.

---

W. A. Kimbrough, Jr., U. S. Atty., Mobile, Ala., J. Gerald Hebert and Ellen M. Weber, Voting Section, Civ. Rights Div., Dept. of Justice, Washington, D. C., for plaintiff.

Joe T. Pilcher, Jr., Selma, Ala., for Dallas County Bd. of Educ., et al.

Cartledge W. Blackwell, Jr., W. McLean Pitts, William T. Faile, Selma, Ala., for Dallas County, Alabama, et al.

Edward S. Allen, Birmingham, Ala., for Robert Douglas, etc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Chief Judge.

This action was filed by the United States, as Plaintiff, against Dallas County, Alabama; John W. Jones, Jr., as Judge of Probate and as Chairman Ex-Officio of the Dallas County Commission; the Dallas County Commission and its members; and the Dallas County Board of Education of Dallas County, Alabama, and its officers and members. The Chairmen of the Dallas County Democratic Executive Committee and the Dallas County Republican Executive Committee were joined as Defendants for relief purposes only, but did not participate in the trial of this Action.

The Plaintiff has alleged that the members of the Dallas County Commission and the Dallas County Board of Education are elected under an at-large electoral system which unlawfully dilutes the voting strength of the black electorate in Dallas County in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 1971, 42 U.S.C. Section 1973, and the 14th and 15th Amendments to the Constitution of the United States. This Court has jurisdiction over the claims of the Plaintiff under 28 U.S.C. Section 1345, 42 U.S.C. Section 1971, 42 U.S.C. Section 1973j(d), and 28 U.S.C. Section 1343. This Court also has jurisdiction of Plaintiff's claims for declaratory relief under 28 U.S.C. Section 2201.

The Defendants filed various Motions to Dismiss, all of which were denied by the Court. Thereafter, the Defendants filed their answers to the Complaint, in which they generally denied jurisdiction, and denied the Plaintiff's claims for relief.

The Plaintiff and the Defendants made and entered into a joint Pre-Trial Order which was entered by the Court and which constitutes the final statement of the issues involved, governed the conduct of the trial, and constitutes the basis for any relief afforded by the Court. In that Pre-Trial Order the parties were unable to agree as to the jurisdiction and the propriety of the parties, and those issues were certified to the Court for resolution. In the Pre-Trial Order the parties also stipulated to a number of uncontested facts, which stipulations were adopted by the Court and constitute a part of the Findings of Fact hereinafter made. The Plaintiff and the Dallas County Board of Education and its members also stipulated, agreed, and consented in the Pre-Trial Order that the Court shall and may take judicial notice of the entire record and proceedings in Civil Action No. 5945–70–H pending in this Court and styled: *Anthony T. Lee, et al., Plaintiff, United States of America, et al., Plaintiff-Intervenor, v. Dallas County Board of Education, et al., Defendants.* Said parties stipulated and agreed that the Court may take judicial notice of all documents, evidence, and testimony taken and received into evidence in that action, and that any and all orders and trial exhibits admitted into evidence in that action may be considered as evidence in this action. Pursuant to that stipulation, agreement, and consent of said parties, the Court has considered and taken judicial notice of the entire record and proceedings in said Civil Action No. 5945–70–H, including all documents, evidence, and testimony taken and received into evidence therein.

In and by the terms of that Pre-Trial Order, the parties also stipulated, agreed, and admitted that the following were and constituted all of the Contested Issues of Fact in this action:

a. Whether as a result of the at-large electoral system used to elect the members of the Dallas County Commission and the Dallas County Board of Education, black citizens of the county have less opportunity than do white citizens to participate in the political process and to elect members of their choice to these governing bodies.

b. Whether the at-large electoral system unlawfully dilutes the voting strength of black voters, and whether black voters are

largely concentrated in certain geographic areas of the county.

c. Whether voting for state, district, county, and local offices in Dallas County has followed racial lines.

d. Whether black candidates have ever been elected to the Dallas County Commission or the Dallas County Board of Education.

e. Whether a black person has ever been the nominee of the Democratic party or the Republican party for a position on the Dallas County Commission or the Dallas County Board of Education.

f. Whether there has been a lack of responsiveness by the Dallas County Commission and the Dallas County Board of Education to the needs of the black citizens and voters of Dallas County.

g. Whether the State of Alabama and Dallas County have in the past unlawfully discriminated against black residents of Dallas County by disenfranchising black voters through the use of discriminatory devices such as literacy tests, and poll taxes, and by applying more stringent registration requirements to black prospective voters.

h. Whether black voters of Dallas County have also been the subject of unlawful discrimination in education, employment, housing, public accommodations and public facilities.

i. Whether there is a past history of racial discrimination in Dallas County by state, local, and party officials, particularly with respect to public education and minority participation in the electoral process, and if so, whether the same adversely affects minority participation in the political process.

j. Whether there is a firm, long-standing state policy favoring the at-large election of the Dallas County Commission.

k. Whether there is a firm, long-standing state policy favoring the at-large election of the Dallas County Board of Education as stipulated and specified in Chapter 8 of Title 16 of the 1975 Code of Alabama.

l. Whether there is a firm, long-standing state policy favoring the at-large election of members of the County Commissioners or other county governing bodies in the State of Alabama.

m. Whether there is a firm, long-standing state policy favoring the at-large election of members of county Boards of Education in the State of Alabama.

n. Whether the at-large electoral method adversely affects minority participation in the electoral process.

o. Whether the majority vote requirement for primary elections, residency districts for members of the Dallas County Commission, and numbered places and staggered terms for the members of the Dallas County Board of Education dilute minority voting strength in the context of the at-large electoral system.

p. Whether black citizens of Dallas County have full and complete access to the process of slating and electing candidates for nomination and election to the Dallas County Commission and the Dallas County Board of Education and other elective offices of Dallas County.

q. Whether the Dallas County Commission and its defendant members have been responsive to the particularized interests and needs of black citizens of Dallas County.

r. Whether the Dallas County Board of Education and its defendant members have been responsive to the particularized needs of black students within the school system and black citizens of Dallas County.

s. Whether the policy and general laws of the State of Alabama favor and prescribe at-large elections for members of the Dallas County Board of Education and other County Boards of Education.

t. Whether the policy and general laws of the State of Alabama favor and prescribe at-large elections for members of the county governing bodies.

u. Whether there has been any past discrimination against black citizens of Dallas County which now precludes the effective participation of black citizens in the election system.

v. Whether there has been racially motivated discrimination or action by any of the Defendants that infringes on the constitutional rights of black citizens of Dallas County.

w. Whether there is or has been any invidious racial motivation or at-large scheme to deny black citizens effective participation in the election of members of the Dallas County Commission or the Dallas County Board of Education.

x. Whether intentional and invidious racial discrimination was a motivating factor in the enactment of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission.

y. Whether intentional and invidious racial discrimination was a motivating factor in the enactment of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Board of Education.

z. Whether intentional and invidious racial discrimination was a motivating factor in the maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission.

aa. Whether intentional and invidious racial discrimination was a motivating factor in the maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Board of Education.

bb. Whether as a matter of law intentional racial discrimination as a motivating factor in the maintenance of the laws and procedures of the State of Alabama which prescribe and govern the election of members of the Dallas County Board of Education and the Dallas County Commission would afford Plaintiffs any cause of action or right to relief in this action, even should such be found to have existed.

On November 26, 1979, this action came on for trial before the Court, without a jury, pursuant to and on the basis of the issues made and stipulated by the Pre-Trial Order. Trial proceedings were held on November 26, 27, 28, 29, and 30, 1979, and were then recessed without date. Thereafter, trial proceedings were resumed on March 10, 1980, and were held on March 10, 11, 12, 13, 14, 17, 18, and 19, 1980.

On March 12, 1980, the Plaintiff completed the presentation of its evidence, and rested. At that time, the Defendants, Dallas County Board of Education of Dallas County, Alabama and its members, William R. Martin, as Chairman and member, John J. Grimes, Sr., as Vice-Chairman and member, and Martin Chance, Joe K. Rives, and James N. Priestley, as members (said School Board and its said members and officers are hereinafter collectively called the School Board) filed their Motion for Involuntary Dismissal under Rule 41(b) of the Federal Rules of Civil Procedure, seeking a dismissal of the Complaint and the action on the ground that upon the facts and the law the Plaintiff has shown no right to relief. Similar Motions for Involuntary Dismissal were also filed at that time on behalf of the Probate Judge and the Dallas County Commission and its members.

The Court has carefully considered said Motion for Involuntary Dismissal filed by the School Board Defendants, together with the Complaint; the Answer of the School Board Defendants; the Pre-Trial Order, including the Stipulations of all parties as to jurisdiction, propriety of parties, uncontested facts, and contested issues of fact; all testimony, documents, and exhibits received as evidence by the Court; the entire record and proceedings in the aforesaid Civil Action No. 5945–70–H pending in this Court, including all documents, evidence, trial exhibits, and testimony taken and received into evidence in that action; the arguments of counsel heard orally by the Court; the briefs and law offered by the parties and considered herein; and the entire record in this action. The Court is of the opinion that said Motion for Involuntary Dismissal filed by the School Board Defendants is well taken and should be granted, and that this action and all claims asserted against the School Board Defendants should be dis-

missed pursuant to and as required by Rule 41(b) F.R.C.P. The Court expressly reserves its ruling on the Motion for Involuntary Dismissal filed by other Defendants herein, and this Order by its terms is intended only to dispose of the claims asserted by Plaintiff against the School Board Defendants.

The Court, as trier of the facts, has determined the facts and the law with respect to all claims asserted against the School Board Defendants, and is of the opinion that the Court should render judgment on the merits against the Plaintiffs. The Court now makes the following Findings of Fact and Conclusions of Law, as provided and required by Rules 41(b) and 52(a), F.R.C.P.:

## FINDINGS OF FACT

1. The Defendant, Dallas County Commission, is a body established under the laws of the State of Alabama with all powers conferred upon it by the statutes and laws of the State of Alabama.[1]

2. John W. Jones is the Probate Judge of Dallas County and serves as Chairman Ex-officio of the Dallas County Commission, and is responsible for exercising certain powers and duties associated with conducting elections in Dallas County, Alabama, for the Dallas County Commission and the Dallas County Board of Education as well as for other public offices.[2]

3. L. Seawell Jones, William H. Kendrick, C. Stanley Baldwin, and Gene Norris reside in Dallas County, Alabama, and are the duly elected members of the Dallas County Commission.[3]

4. The Defendant, Dallas County Board of Education, is the body established under the laws of the State of Alabama which is responsible for governing and administering the Dallas County public school system pursuant to the laws of the State of Alabama.[4]

5. The Defendants, Martin Chance, James N. Priestley, John J. Grimes, Sr., William R. Martin, and Joe K. Rives are residents of Dallas County, Alabama, and were the duly elected members of the Dallas County Board of Education,[4a] with the Defendant, William R. Martin, serving as Chairman and the Defendant John J. Grimes, Sr., serving as Vice-Chairman.[5]

6. The composition, election, and qualifications of the Dallas County Board of Education are governed by the provisions of Chapter 8 of Title 16 of the 1975 Code of Alabama, as are the County Boards of Education of the following 35 counties of the State of Alabama: Baldwin, Barbour, Bibb, Bullock, Calhoun, Cherokee, Chilton, Coffee, Colbert, Covington, Dale, Dallas, Elmore, Escambia, Fayette, Franklin, Greene, Houston, Lamar, Lee, Lowndes, Macon, Marshall, Monroe, Perry, Pike, Randolph, Russell, Shelby, Saint Clair, Sumter, Talladega, Tallapoosa, Tuscaloosa, and Wilcox.[6]

7. The Superintendents of Schools for Greene County, Lowndes County, Macon County, Perry County, and Bullock County are black, and their names are as follows:[7]

| COUNTY | SUPERINTENDENT OF SCHOOLS |
| --- | --- |
| Greene County | Mr. Robert Brown |
| Lowndes County | Mrs. Uralee Haynes |
| Macon County | Mr. Alonzo Harvey |
| Perry County | Mr. Earnest Palmer |
| Bullock County | Mr. Conrad Newman |

8. The County Boards of Education for the following counties in Alabama have one

1. Paragraph 4(a)1, Pretrial Order.

2. Paragraph 4(a)2, Pretrial Order.

3. Paragraph 4(a)3, Pretrial Order.

4. Paragraph 4(a)4, Pretrial Order.

4a. The Court notes that since the completion of Plaintiff's evidence, there have been 2 recent changes in the membership of the School Board. Martin R. Chance has been succeeded by Elton R. Ralston (a white male), and James N. Priestley has been succeeded by Dr. Catherine Bozeman (a black female). These 2 changes do not appear of record, and thus have not been considered by the Court. In any event, those changes would not alter the Court's decision.

5. Paragraph 4(a)5, Pretrial Order.

6. Paragraph 4(a)6, Pretrial Order.

7. Paragraph 4(a)7, Pretrial Order.

or more black members, and the composition, election, qualification, and terms of office of said County Boards of Education are governed by Chapter 8 of Title 16 of the 1975 Code of Alabama:[8]

| COUNTY | NUMBER OF BLACK BOARD MEMBERS |
|---|---|
| Bullock County | 5 |
| Elmore County | 1 |
| Greene County | 5 |
| Lowndes County | 4 |
| Macon County | 4 |
| Perry County | 4 |
| Sumter County | 2 |

9. The Defendant, Earl Goodwin, resides in Dallas County, Alabama, and is Chairman of the Dallas County Democratic Executive Committee and as such is responsible to provide to the Probate Judge the names of all Democratic candidates nominated to county office.[9]

10. The Defendant, Robert Douglas, resides in Dallas County, Alabama, and is Chairman of the Dallas County Republican Executive Committee and as such is responsible to provide to the Probate Judge the names of all Republican candidates nominated to county office.[10]

11. The members of the Dallas County Board of Education are presently elected pursuant to Chapter 8 of Title 16 of the 1975 Code of Alabama and other laws of the State of Alabama generally governing elections.[11]

12. Under the terms of the Alabama Code, Section 16–18–1 et seq., each member of the Dallas County Board of Education is elected by the qualified voters of Dallas County on an at-large basis, by numbered places, to six-year terms which are staggered.[12]

13. There are no majority vote requirements in any general elections held in the State of Alabama. The laws governing primary elections require a majority vote for nomination.[13]

14. Political parties have the opportunity under the laws of the State of Alabama to nominate candidates by means of caucus and convention.[14]

15. There are no anti-single shot voting provisions in the general election laws governing the election of members of the Dallas County Commission, the Dallas County Board of Education, and other elective offices in Alabama. Candidates for nomination and election to the Dallas County Commission and the Dallas County Board of Education run for a single office or position.[15]

16. There are no anti-single shot voting provisions in the primary election for the nomination of candidates for the election of members of the Dallas County Commission, the Dallas County Board of Education, and other elective offices in Alabama. Candidates for nomination and election to the Dallas County Commission and the Dallas County Board of Education run for a single office or position.[16]

17. Prior to the Voting Rights Act of 1965, requirements for registering to vote in the State of Alabama included a literacy test, a poll tax, and a voucher of good character from a registered voter.[17]

18. The total population, the total number and percentage of white persons, and the total number and percentage of black persons in Dallas County, Alabama, according to the 1970 Census, are as follows:[18]

| | | |
|---|---|---|
| White: | 26,330 | 47.6% |
| Black: | 28,892 | 52.3% |
| Other: | 74 | .1% |
| TOTAL Pop. | 55,296 | |

8. Paragraph 4(a)8, Pretrial Order.

9. Paragraph 4(a)9, Pretrial Order.

10. Paragraph 4(a)10, Pretrial Order.

11. Paragraph 4(a)13, Pretrial Order.

12. Paragraph 4(a)14, Pretrial Order.

13. Paragraph 4(a)15, Pretrial Order.

14. Paragraph 4(a)16, Pretrial Order.

15. Paragraph 4(a)17, Pretrial Order.

16. Paragraph 4(a)18, Pretrial Order.

17. Paragraph 4(a)19, Pretrial Order.

18. Paragraph 4(a)22, Pretrial Order.

19. The total voting age population, the total number and percentage of white persons of voting age, and the total number and percentage of black persons of voting age in Dallas County, Alabama, according to the 1970 Census, are as follows: [19]

| | | |
|---|---|---|
| White: | 17,611 | 53% |
| Black: | 15,456 | 47% |
| TOTAL Pop. | 33,116 | |

20. The population for the following counties as of July 1, 1976, is substantially and approximately as shown below and by population estimates prepared by the University of Alabama for each of the aforesaid thirty-five counties whose County Boards of Education are elected and governed pursuant to the provisions of Chapter 8 of Title 16 of the 1975 Code of Alabama: [20]

| County | White Pop. | % | Non-White Pop. | % | Total Pop. |
|---|---|---|---|---|---|
| Baldwin | 58,026 | 83.49 | 11,474 | 16.51 | 69,500 |
| Barbour | 14,701 | 56.33 | 11,399 | 43.67 | 26,100 |
| Bibb | 10,450 | 73.59 | 3,750 | 26.41 | 14,200 |
| Bullock | 4,023 | 34.68 | 7,577 | 65.32 | 11,600 |
| Calhoun | 94,658 | 83.33 | 18,942 | 16.67 | 113,600 |
| Cherokee | 16,637 | 91.41 | 1,563 | 8.59 | 18,200 |
| Chilton | 24,685 | 87.23 | 3,615 | 12.77 | 28,300 |
| Coffee | 30,128 | 84.39 | 5,572 | 15.61 | 35,700 |
| Colbert | 41,430 | 83.87 | 7,970 | 16.13 | 49,400 |
| Covington | 29,733 | 84.71 | 5,367 | 15.29 | 35,100 |
| Dale | 36,430 | 87.36 | 5,270 | 12.64 | 41,700 |
| Dallas | 28,448 | 50.62 | 27,752 | 49.38 | 56,200 |
| Elmore | 29,874 | 74.87 | 10,026 | 25.13 | 39,900 |
| Escambia | 24,766 | 68.99 | 11,134 | 31.01 | 35,900 |
| Fayette | 14,395 | 87.24 | 2,105 | 12.76 | 16,500 |
| Franklin | 25,346 | 95.29 | 1,254 | 4.71 | 26,600 |
| Greene | 2,892 | 27.03 | 7,808 | 72.97 | 10,700 |
| Houston | 54,303 | 77.91 | 15,397 | 22.09 | 69,700 |
| Lamar | 13,521 | 86.67 | 2,079 | 13.33 | 15,600 |
| Lee | 54,657 | 78.42 | 15,043 | 21.58 | 69,700 |
| Lowndes | 3,340 | 24.93 | 10,060 | 75.07 | 13,400 |
| Macon | 5,043 | 18.96 | 21,557 | 81.04 | 26,600 |
| Marshall | 58,371 | 97.94 | 1,229 | 2.06 | 59,600 |
| Monroe | 12,289 | 56.37 | 9,511 | 43.63 | 21,800 |
| Perry | 5,893 | 43.98 | 7,507 | 56.02 | 13,400 |
| Pike | 15,955 | 68.48 | 7,345 | 31.52 | 23,300 |
| Randolph | 14,849 | 78.57 | 4,051 | 21.43 | 18,900 |
| Russell | 26,242 | 56.31 | 20,358 | 43.69 | 46,600 |
| Shelby | 43,723 | 84.73 | 7,877 | 15.27 | 51,600 |
| St. Clair | 29,965 | 87.36 | 4,335 | 12.64 | 34,300 |
| Sumter | 7,079 | 39.99 | 10,621 | 60.01 | 17,700 |
| Talladega | 47,161 | 69.46 | 20,739 | 30.54 | 67,900 |
| Tallapoosa | 25,810 | 72.30 | 9,890 | 27.70 | 35,700 |
| Tuscaloosa | 97,243 | 77.73 | 27,857 | 22.27 | 125,100 |
| Wilcox | 5,667 | 37.78 | 9,333 | 62.22 | 15,000 |

21. The election of members of the County Board of Education of the following counties are governed by local acts and are not governed by the provisions of Chapter 8, Title 16, of the 1975 Code of Alabama: Autauga, Blount, Butler, Chambers, Choctaw, Clarke, Clay, Cleburne, Conecuh, Coosa, Crenshaw, Cullman, Dekalb, Etowah, Geneva, Hale, Henry, Jackson, Jefferson, Lauderdale, Lawrence, Limestone, Madison,

**19.** Paragraph 4(a)23, Pretrial Order.

**20.** Paragraph 4(a)24, Pretrial Order.

802

Marengo, Marion, Mobile, Montgomery, Morgan, Pickens, Walker, Washington, and Winston.[21]

22. There is a firm, long-standing state policy favoring the at-large election of the Dallas County Board of Education.[22] This preference for at-large elections originated with the establishment of the first public school system for the State of Alabama as a whole in 1854 (Acts of Alabama 1853–54, p. 8), and this preference has been perpetuated in Alabama laws since that time. Act No. 47, Acts of Alabama 1855–56, provided for the at-large election of the County Superintendent of Education and trustees in each township. Act No. 188, Acts of Alabama 1876–77, provided for the appointment of the County Superintendent of Education by the State Superintendent of Education, but continued the provision for the at-large elections of trustees in each township. That same system was perpetuated by Act No. 115, Acts of Alabama 1878–79. In 1883, an additional school district was created in Dallas County, with the County Superintendent being appointed by the State Superintendent as in other counties. Act No. 256, Acts of Alabama 1882–83. In 1889, State law was modified by providing for the at-large election of County Superintendents of Education throughout the State of Alabama, but excluding 21 counties (including Dallas). Act No. 261, Acts of Alabama 1888–89. However, in 1890 that law was changed to provide for the at-large election of the County Superintendent of Education in Dallas County. Act No. 66, Acts of Alabama 1890–91. That same year, the Legislature provided for the appointment of township trustees by the County Superintendent of Education, who was elected at-large. Act No. 250, Acts of Alabama 1890–91. In 1901, the Legislature again created separate school districts in

Dallas County, and provided that the County Superintendent would again be appointed by the State Superintendent. Act No. 268, Acts of Alabama 1900–01. However, in 1903 the Legislature restructured the school system by redistricting the public schools, and establishing both County Boards of Education and Township Boards of Education, utilizing the at-large method of election for both. Act No. 365, Acts of Alabama 1903. That law was amended in 1907, but the at-large method of election was continued. Act No. 358, Acts of Alabama 1907. In 1915 the Alabama Legislature adopted the State law which is the forerunner of the present law codified in Chapter 8 of Title 16 of the 1975 Code of Alabama. Act No. 220, Acts of Alabama 1915. That Act contains substantially the same language as is still found in the 1975 Code, and provided for the election of five (5) members of County Boards of Education who would in turn appoint the County Superintendent. That same method was continued by subsequent enactments. See Act No. 442, Acts of Alabama 1919; Act No. 524, Acts of Alabama 1923; Articles 8 and 9, Code of Alabama 1907. In 1927, the Legislature adopted the 1927 Alabama School Code. Acts No. 416 and 283, Acts of Alabama 1927. That School Code codified the provisions of the 1915 Act. Those same provisions requiring the at-large election of County School Boards in Alabama were recodified as Tit. 52, Section 63, Code of Alabama 1940; Tit. 52, Section 63, Code of Alabama Re-Complied 1958; and Section 16–8–1, 1975 Code of Alabama. The Court therefore finds that not only is there a firm, long-standing State policy favoring the at-large election of County Boards of Education, but that there is also a firm, long-standing State policy favoring five (5)

21. Paragraph 4(a)25, Pretrial Order.

22. See Acts of Ala. 1853–54, p. 8; Act No. 47, Acts of Ala. 1855–56; Act No. 188, Acts of Ala. 1876–77; Act No. 115, Acts of Ala. 1878–79; Act No. 256, Acts of Ala. 1882–83; Act No. 261, Acts of Ala. 1888–89; Act No. 66, Acts of Ala. 1890–91; Act No. 250, Acts of Ala. 1890–91; Act No. 268, Acts of Ala. 1900–01; Act No. 365, Acts of Ala. 1903; Act No. 358, Acts of

Ala. 1907; Act No. 220, Acts of Ala. 1915; Act No. 442, Acts of Ala. 1919; Act No. 524, Acts of Ala. 1923; Articles 8 and 9, Code of Ala. 1907; Act No. 283, Acts of Ala. 1927; Act No. 416, Acts of Ala. 1927; Title 52, Section 63, Code of Ala. 1940; Title 52, Section 63, Code of Ala., Recompiled 1958; and Section 16–8–1, 1975 Code of Ala.

member Boards of Education. See *Corder v. Kirksey,* 639 F.2d 1191, 1195 (5th C.C.A., 1981).

23. The School Board Defendants filed Motions seeking to dismiss the Complaint on grounds, *inter alia,* that the Plaintiff challenged the constitutionality of the State law governing the composition, election, qualifications, and terms of office of the School Board, but had failed to join as necessary and indispensable parties certain State officials and the members of the other 34 County Boards of Education whose composition, election, qualification, and terms of office are governed and prescribed by that same State law. To avoid the impact of Rule 19, F.R.C.P., counsel for the Plaintiff advised and represented to the Court that the Plaintiff does not challenge the constitutionality of Section 16-8-1 of the 1975 Code of Alabama, nor the at-large method of election therein prescribed for the other 34 counties whose County Boards of Education are elected under and pursuant to that statute. Instead, counsel for the Plaintiff stated and represented to the Court that the Plaintiff in this action challenges only the election structure in Dallas County and the method and manner whereby Section 16-8-1 of the 1975 Code of Alabama has been applied in Dallas County.[23] In written briefs as well as in oral argument, counsel for the Plaintiff repeatedly advised and represented to this Court that the Plaintiff does not challenge in this action the at-large method of election of School Boards in any other county in Alabama.[24] Instead, Plaintiff contends that Section 16-8-1 of the 1975 Code of Alabama, although constitutional, has been unconstitutionally applied in Dallas County in a method or manner different from that by which it has been applied in the other 34 Alabama counties whose School Boards are governed by that same statute.[25] In fact, in its written Brief served on January 17, 1979, in opposition to the School Board's Motion to Dismiss for Failure to Join Necessary Parties, counsel for the Plaintiff represented and stated to this Court:[26]

"... this action does not allege the unconstitutionality of any Alabama statute. As we stated in our first response to defendants' Motions to Dismiss filed on December 7, 1978 (pages 2–3) and as we reiterated at the January 3rd hearing, this lawsuit challenges the at-large election structure only in Dallas County, Alabama. Although the Dallas County Board of Education is elected pursuant to the same statute that sets forth the election provisions for other county boards of education throughout Alabama, this lawsuit does not challenge the provisions of that statute, except as applied in Dallas County."

In reliance on that representation, this Court denied the Motions to Dismiss filed by the School Board Defendants, but cautioned counsel for the Plaintiff that the burden of proof which Plaintiff had assumed could pose substantial problems at trial. Following that ruling, the School Board Defendants filed their Answer, which still included as a defense the failure of Plaintiff to join as necessary and indispensable parties (under Rule 19, F.R.C.P.) certain State officials and members of the County Boards of Education in the other 34 Alabama counties whose County Boards of Education are elected pursuant to Section 16-8-1.[27] The Pre-Trial Order preserved and set forth that contention of the School

---

**23.** See Plaintiff's Response to Defendant's Motion to Dismiss served December 4, 1978, pp. 1–3; Plaintiff's Second Response to Defendant's Motion to Dismiss served January 17, 1979, pp. 13–14; Transcript, p. 23; and Transcript, pp. 114–115. Comparable representations were also made by counsel for Plaintiff in oral arguments on January 3, 1979, which have not been transcribed at this time.

**24.** Id.

**25.** Id.

**26.** Plaintiff's Second Response to Defendants' Motion to Dismiss served January 17, 1979, pp. 13–14.

**27.** See Fourth Defense, Fifth Defense, and Paragraphs 8 and 10(1) of Seventh Defense, of the Answer of School Board Defendants.

Board,[28] and the parties certified that issue to the Court for resolution at the commencement of the trial proceedings.[29] At those trial proceedings, on November 26, 1979, this Court again denied the School Board's Motion to Dismiss the action for failure to join necessary parties.[30] At that hearing, counsel for the Plaintiff again stated and represented to the Court that the Plaintiff does not challenge the constitutionality of the State law (Section 16–8–1), but instead contends only that the state-wide statute has been applied differently in Dallas County.[31] By the aforesaid representations to this Court, counsel for the Plaintiff has admitted that Section 16–8–1 of the 1975 Code of Alabama and the at-large method of election therein prescribed is not unconstitutional, and therefore that there is and has been no intentional or invidious racial discrimination as a motivating factor in the enactment of that State statute. Plaintiff has also admitted that said state-wide statute has not been maintained for discriminatory purposes in any of these other 34 Alabama counties. Thus Plaintiff offered no evidence showing any discriminatory purpose in either the enactment of that state-wide law or its maintenance, impact, or effect in these other 34 counties. The only evidence before the Court relating to these other 34 counties is that which appeared in the Pre-Trial Order as admitted and uncontested facts. That evidence shows that 7 of those counties have black school board members, with 5 of those counties having either 4 or 5 black members,[32] and that as of July 1, 1976, 14 (40%) of these 35 counties had black populations which comprised less than 17% of the total population, while more than half (18) had black populations which comprised less than 22.5% of the total population.[33] Plaintiff has therefore failed to produce any evidence relating to these other 34 Alabama counties to establish that blacks have been denied equal access to the political process, or that past discrimination has the present effect of discouraging participation by blacks in the political process, or that the at-large system of election is rooted in racial discrimination, or that their School Boards are unresponsive to blacks. There is therefore absolutely no evidence of any facts or circumstances in these 34 counties upon which the Court might make any specific Findings of Fact to support an inference of a discriminatory intent in the enactment or maintenance of Section 16–8–1, Code of Alabama 1975. To the contrary, the admitted and uncontested facts shown by the Pre-Trial Order show that blacks have been elected to the County Boards of Education in 7 of those counties,[34] and that blacks serve as Superintendents in 5 of those counties.[35] The Court therefore finds that the Plaintiff has failed to establish by a preponderance of the evidence that Section 16–8–1 unlawfully dilutes the black vote in any of those other 34 Alabama counties.

Plaintiff has also failed to offer any evidence showing the intent or purpose of the Alabama legislature, or of any legislator, in enacting or maintaining Section 16–8–1 as a state-wide law, or in maintaining its application to Dallas County. Furthermore, Plaintiff offered no evidence to show that since 1915 any legislation has ever been introduced, considered, or defeated which would have amended Section 16–8–1 or removed Dallas County from its application, or that there has been any conscious, deliberate, or affirmative decision by the Alabama legislature to maintain Section 16–8–1 or the at-large election system thereby prescribed for Dallas County. The Court therefore finds that the evidence preponderates against any finding that Section 16–8–1 has been maintained by the Legisla-

28. Paragraphs 2(a) and 2(b), Pretrial Order.

29. Paragraph 2(c), Pretrial Order.

30. Transcript, pp. 22–24.

31. Transcript, pp. 23–24.

32. Paragraphs 4(a)7 and 4(a)8, Pretrial Order.

33. Paragraph 4(a)24, Pretrial Order.

34. Paragraph 4(a)8, Pretrial Order.

35. Paragraph 4(a)7, Pretrial Order.

ture for discriminatory purposes, either as a state-wide statute or as applied to Dallas County.

24. The Complaint was filed in this Action on October 19, 1978; the School Board's Motions to Dismiss were denied on March 9, 1979; the Pre-Trial Order was submitted on November 16, 1979; the trial was commenced on November 26, 1979; and the Plaintiff completed the presentation of its evidence on March 12, 1980, at which time the School Board Defendants filed their Motions for Involuntary Dismissal. Although this Action was litigated before the decisions of the United States Supreme Court in *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), it was filed and tried after the decisions in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Nevett v. Sides,* 571 F.2d 209 (5th C.C.A., 1978). At all stages of this litigation, as well as in the Pre-Trial Order, all parties (including Plaintiff) recognized that proof of intentional discrimination was an essential element of the Plaintiff's claims.[36] It is apparent that the parties, as well as the Court, correctly anticipated how the intent requirement established in *Washington v. Davis* and *Arlington Heights* would be applied to this voting dilution case without the necessity for the Supreme Court's later opinions in *Bolden* and *Rogers.* (See *Lodge v. Buxton,* 639 F.2d 1358, (5th C.C.A., 1981), aff'd. *Rogers v. Lodge, supra.* Thus counsel for Plaintiffs, in oral argument before the Court at the hearing held January 3, 1979,[37] and in written Brief served January 17, 1979,[38] acknowledged that a showing of intentional discrimination is required in voting dilution suits based on the 14th Amendment, but argued that the required intent could be established either by proof that the voting plan was enacted with a discriminatory motive, or by proof supporting an inference from circumstantial evidence under the *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) *Nevett,* and *Kirksey,* criteria that such plan was maintained for a discriminatory purpose in Dallas County. In the Pre-Trial Order, the parties recognized as a contested issue of fact whether intentional and invidious racial discrimination was a motivating factor in the enactment and maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission and the Dallas County Board of Education.[39] In the presentation of its case at trial, the Plaintiff attempted to prove those criteria set forth in *Zimmer, Nevett,* and *Kirksey,* offering such evidence against all Defendants. The Plaintiff also attempted to prove that intentional and invidious racial discrimination was a motivating factor in the enactment and maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission. However, the Plaintiff—having admitted the constitutionality of Section 16–8–1 of the 1975 Code of Alabama and the at-large electoral system thereby prescribed—made a deliberate decision and offered no evidence to establish that intentional and invidious racial discrimination was a motivating factor in either the enactment or the maintenance of

**36.** See Paragraphs 4(b)23, 4(b)24, 4(b)25, 4(b)26, 4(b)27, and 4(b)28, Pretrial Order; Answer of School Board Defendants, Paragraph 10 of Seventh Defense; Second Response of Plaintiff to Motions to Dismiss served January 17, 1979, pp. 3–6 (discussing 42 U.S.C. 1971(a)(1)), pp. 7–9 (discussing 42 U.S.C. 1973), and pp. 10–12 (discussing the intent requirement as established in *Nevett v. Sides,* 571 F.2d 209 (5th C.C.A., 1979).

**37.** This hearing has not been transcribed. See Second Response of Plaintiff to Motions to Dismiss served January 17, 1979, pp. 10, 13–14.

**38.** See Second Response of Plaintiff to Motions to Dismiss served January 17, 1979, pp. 10–12, wherein counsel for Plaintiff argue the intent requirement established by the Court of Appeals in *Nevett v. Sides, supra.*

**39.** Paragraphs 4(b)22, 4(b)23, 4(b)24, 4(b)25, 4(b)26, 4(b)27, and 4(b)28 of Pretrial Order.

that state-wide Alabama law.[40] Thus Plaintiff attempted to prove its claims against the School Board Defendants merely by arguing and attempting to show that this state-wide law had been unconstitutionally applied in Dallas County in a manner different from that by which it had been applied in other counties.[41] Plaintiff also attempted to prove a discriminatory purpose by inference from evidence offered under the *Zimmer* criteria to show that the impact or effect of this State law in Dallas County produced an unconstitutional result.[42]

25. The Plaintiff, at trial, offered evidence against all of the Defendants, including the Probate Judge and other members of the Dallas County Commission (hereinafter County) as well as the School Board Defendants. A large part of the testimony was offered against all of the Defendants—especially evidence relating to Plaintiff's claims of past discrimination in Dallas County and the alleged denial to blacks of equal access to the political process in Dallas County. However, a substantial amount of the evidence (especially that relating to the issue of responsiveness) related only to either the County or the School Board, but not both.[43] Since these Findings of Fact relate only to the claims asserted against the School Board—and not the claims asserted against the County—it is appropriate to review the nature of the exhibits, testimony, and other evidence offered by the Plaintiff as proof of its claims against the School Board Defendants. This evidence consisted of exhibits which were identified in the Pre-Trial Order and stipulated as

admissable as well as those exhibits marked and received in evidence at trial; the testimony of witnesses; the deposition of Frank Earnest, Jr., Superintendent of the Dallas County Board of Education; and (by stipulation) the record and proceedings in Civil Action No. 5945–70–H (in which the Plaintiff as well as the School Board Defendants were parties).

26. As required by the Order and Local Rules of this Court, the parties conferred prior to trial and marked and identified in the Pre-Trial Order all exhibits which they proposed to offer at trial (except exhibits to be used solely for the purpose of impeachment).[44] Exhibits marked for identification as Government Exhibits 15, 17, 18–A, 18–B, 18–C, 19, 21, 22, 30, 39, 40, 41, 48, and 51 were withdrawn by Plaintiff, and were neither received nor considered by the Court. Government Exhibits No. 5, 5–A, 6–B–1, 6–B–2, 6–B–3, 13–A, 13–B, 14, 16, 20, and 49 were offered and received only against the County, but not the School Board. Exhibits 1, 2, 3, 4, 6–A–1, 6–A–2, 6–A–3, 8–A, 8–B, 9, 11, 47, 52–A, 140, 141, and 53–139 related primarily to census, highways, demographic, and election information, and these exhibits were received and considered against the School Board as well as the County. Exhibits No. 10, 23, 27, 28, and 50 consisted of cases, statutes, or other laws of which this Court may take judicial notice, but which were nonetheless marked and received in evidence. Exhibits 10, 11, 12, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 42, 43, 44, 45, 46, and 50 consisted of a mass of historical documents, official re-

---

**40.** See Transcript, pp. 22–24.

**41.** See Transcript, pp. 22–24; Plaintiff's Response to Defendants' Motions to Dismiss served December 4, 1978, pp. 1–3; Plaintiff's Second Response to Defendant's Motion to Dismiss served January 17, 1979, pp. 13–14.

**42.** See Second Response of Plaintiff to Motions to Dismiss served January 17, 1979, pp. 10–12, wherein counsel for Plaintiff acknowledged in Brief: "The Court of Appeals for the Fifth Circuit has recently held that a showing of intentional discrimination is required in voting dilution suits based on the Fourteenth and Fifteenth Amendments. *Nevett v. Sides,* 571 F.2d

209 (5th Cir. 1978). The court recognized that intent could be established in two ways. The first approach proves that the voting plan was enacted with a discriminatory motive while the second approach infers intent from circumstantial evidence. . . .".

**43.** An inordinate amount of time and testimony was consumed by testimony and arguments concerning the condition and location of county roads.

**44.** See Transcript, pp. 6–22, 24–26, 26–34, 151–160, 163–167, 1265–1309, 1497–1509, and 1536–1556.

ports, cases, laws, and constitutional proceedings (including those of which this Court may take judicial notice), all of which were offered by Plaintiff in an effort to prove past discrimination or its effect, or an alleged denial to blacks of equal access to the political process, or an alleged lack of responsiveness on the part of the School Board. Exhibits 7 and 52 were marked for identification, but were not received in evidence by the Court. The Court has carefully weighed, considered, and evaluated each and all of those exhibits which have been admitted in evidence against the School Board Defendants, and has considered their probative value, weight, and significance in making and rendering these Findings of Fact.

27. The Plaintiff called a number of witnesses in the presentation of its case against the Defendants. The testimony of a number of these witnesses related primarily to the *Zimmer* issues (as more fully set forth in the Pre-Trial Order) of whether blacks have equal access to the political process in Dallas County, and whether past discrimination has any present effect in discouraging participation by blacks in the political process in Dallas County. Such testimony was, of course, directed against all Defendants, including the School Board. On those issues the Court considered the testimony of Mr. Harold J. Avinger, Rev. F. D. Reese, Mrs. Marie Foster, Rev. Fairro Brown, Mr. Samson Crum, Mr. Edwin L. Moss, Mr. Gerald O. Harvin, Mr. J. C. Davis, Sr., Mr. Cleophus Hobbs, Mrs. Ethel Lena Dixon, Mrs. Esther Snyder, Rev. Seaborn Powell, Mr. J. L. Chestnut, Jr., Mr. Percy Harrell, Mr. Joseph Pettway, Mr. Joseph Sappey, Mrs. Joyce McBride, Dr. Charles Cottrell (including his work papers introduced as School Board Exhibits 1 and 2), and Mr. Frank Earnest, Jr. (including his deposition admitted in evidence). Many of the foregoing witnesses also testified at considerable length with respect to Plaintiff's claims that the County was unresponsive to the needs of blacks. Much of this

testimony related to the location and condition of County roads within the Dallas County road system, and none of this testimony was directed against the School Board Defendants. In reviewing the testimony, the Court finds very little testimony relevant to or directed at the issue of whether the School Board was responsive to the needs of blacks. Other than the deposition and testimony of Mr. Frank Earnest, Jr., the only other witnesses whose testimony even remotely touched on the issue of the responsiveness of the School Board were Mr. Samson Crum, Mr. Edwin L. Moss, Mr. Gerald O. Harvin, Mr. J. C. Davis, Sr., Mr. Cleophus Hobbs, Mrs. Esther Snyder, Mr. J. L. Chestnut, Jr., and Mr. Percy Harrell. The Court has considered and will discuss all such testimony relating to Plaintiff's claim that the School Board has not been responsive to the needs of black citizens and residents of Dallas County.

28. At the conclusion of Plaintiff's case, the Court took under advisement the Motions for Involuntary Judgment filed by the Defendants, and directed the County to proceed with the presentation of its testimony.[45] The County then called as an expert witness Dr. James E. Voyles, who testified at length with respect to those issues which had been covered by Dr. Cottrell.[46] The County also called as witnesses Mr. B. A. Riddle, Mr. Ray Bass, Mr. Terry Benton, Mrs. Pauline Bryant, Mrs. Catherine Revel, Dr. Clyde R. Walker, Mr. Richard Ray, Mr. Cassidy Bender, Dr. Sam Waldrop, Mr. Julian Lilienthal, Mr. Larry Lewis, Mr. Andrew Calhoun, Mr. Ralph Harris, Mr. John Cecil Campbell, Mr. W. H. Kendrick, Mr. Gene Norris, Mr. Malloy Chandler, and Mr. C. Stanley Baldwin. None of the testimony offered by the County related to the issue of whether the School Board was responsive to the needs of black (as those issues were framed in the Pre-Trial Order), except for testimony by Mr. Andrew Calhoun (a former County Commissioner) that he had done work on schools and school facilities in

---

**45.** Transcript, p. 1715.

**46.** Transcript, pp. 1716–1911.

Dallas County,[47] and the testimony of Mr. B. A. Riddle concerning qualifications of black applicants for secretarial jobs.[48] The Court announced its decision to grant the School Board's Motion for Involuntary Dismissal on July 24, 1981, and the School Board has not been a party to any subsequent trial proceedings since that time.[49] The Court has considered the testimony and evidence offered by the County before that date only to the extent that it might be relevant to establish the claims of the Plaintiff against the School Board, but has not considered any of that testimony for the purpose of refuting, impeaching, or diminishing Plaintiff's evidence against the School Board. In ruling on the Motion for Involuntary Dismissal of the School Board Defendants, the Court has considered all of Plaintiff's evidence, aided by any and all of the County's evidence received prior to July 24, 1981, that might be favorably considered to help establish Plaintiff's claims against the School Board.

29. The provisions of Chapter 8 of Title 16 of the 1975 Code of Alabama (and specifically Section 16–8–1) constitute State laws of general application throughout the State of Alabama, and by their terms apply to and control the composition, terms of office, qualifications, and method of election of the County Boards of Education of 35 Alabama counties (including Dallas). Plaintiff contends that this State law has been unconstitutionally applied in Dallas County in a discriminatory fashion and differently from the manner in which it has been applied in the other 34 counties.[50] Plaintiff has failed to establish that claim by any credible evidence. To the contrary, the Plaintiff has admitted (in response to the School Board's Request for Admissions) that the method of electing members to the Dallas County Board of Education, i.e., the at-large method of election, does not differ from the method of election used to elect school board members in those other 34 Alabama counties.[51] Furthermore, the evidence offered by Plaintiff at trial affirmatively shows that this state-wide statute has been applied in Dallas County in substantially the same way that it has been applied in every other Alabama county to which it applies.[52] While it is true that members of the School Board have staggered terms, this result has not been caused or motivated by any improper or discriminatory scheme or purpose. To the contrary, these staggered terms are required by and are the result of the language of the Alabama statutes creating the present state-wide at-large system. The present state-wide at-large system was originally established in 1915 pursuant to Act No. 220, Acts of Alabama 1915. Section 2 of that Act provided for the at-large election of 5 members, and stipulated that the 5 persons receiving the highest number of votes from the county at-large would be elected. That Act expressly stated that the 2 members receiving the highest number of votes would then hold office for 6 years; that the 2 members receiving the next highest number of votes would hold office for 4 years; and that the member receiving the lowest number of votes would hold office for 2 years. That Act took effect with the General Election of November, 1916, with the aforesaid staggered

47. Transcript, pp. 2276–2281.

48. Mr. Riddle had "no idea" where the applicants had attended public school and none of this testimony was related to the School Board Defendants. See Transcript, pp. 2073–2075.

49. The Court has deferred entry of Final Judgment, awaiting further clarification as to the impact of *Bolden, supra.* The later opinions of *Lodge v. Buxton, supra,* and *Rogers v. Lodge, supra,* have clarified the applicable legal standards and have been applied by the Court in these Findings of Fact and Conclusions of Law.

50. See n. 31 and n. 41, *supra.*

51. See Response Seven of Plaintiff's Answer to Request for Admissions by The Dallas County Board of Education served November 15, 1979.

52. Plaintiff made no efforts at trial to establish any uneven application of the law in Dallas County. See, e.g., Testimony of Rev. F. D. Reese, at pp. 243–247 of Transcript, and Testimony of J. L. Chestnutt, Jr., at pp. 1134, et seq., of Transcript. Also, see Response Seven of Plaintiff's Answer to Request for Admissions by The Dallas County Board of Education served November 15, 1979.

terms of those members elected commencing upon their election. That Act further provided that in the November, 1918, election, and biennially thereafter, members whose terms expired would be filled by election for a new 6 year term. This 1915 state-wide law prescribed and resulted in staggered terms for all Alabama school boards, and the staggered terms thus created have continued until this date. The 1915 Act was amended by Act No. 442, Acts of Alabama 1919, which continued the at-large method of election. That Act also provided for elections for new 6 year terms to fill vacancies as the terms of present members expired. The 1923 Act amended the 1919 Act, to provide a method whereby every revenue district would have at least 1 member of the County Board of Education, but to be elected at-large. Act No. 524, Acts of Alabama 1923. The 1927 School Code continued the method which was originally adopted in 1915, and provided that new members would be elected for 6 year terms to succeed the member or members whose terms of office expire at that time. There have been no statutory changes since the 1927 School Code, except for recodifications, so that Alabama law still prescribes staggered terms not only for Dallas County, but also for the other 34 counties subject to the provisions of Section 16–8–1 of the 1975 Code of Alabama. There is a firm, long-standing state policy favoring staggered terms for members of Alabama's County Boards of Education (including the School Board Defendants). Plaintiff's claim that Alabama law is applied differently in Dallas County, and that the staggered terms in Dallas County are the result of some discriminatory purpose, are clearly without merit and are rejected by the Court. The Court attaches no significance to the fact that election officials in Dallas County have apparently assigned numbers to the various School Board positions, since it is inconsequential whether such numbers appear on the ballot or not. The significant fact is that by State law School Board members are required to run at-large, with staggered terms, not only in Dallas County but in the other 34 counties subject to Section 16–8–1, Alabama Code 1975. In any event, Plaintiff failed to offer any evidence to show that the other 34 counties do not also have numbered places, and thus failed to prove that a different practice is followed in Dallas County from that followed elsewhere. Plaintiff offered no other evidence, and made no other claims, of any other differences in the method or manner whereby this State law has been applied in Dallas County. The Plaintiff has therefore failed to establish its claim that this state-wide law has been unconstitutionally applied in Dallas County in a manner different from that applied in the other 34 counties. To the contrary, the evidence shows that this state-wide statute has been fairly and uniformly applied in Dallas County as well as the other 34 counties, and that the method of electing the School Board Defendants does not differ from the method of election used to elect school board members in those other 34 counties.[53]

30. By stipulation and agreement of the parties, the Court has taken judicial notice of the entire record and proceedings in Civil Action No. 5945–70–H pending in this Court, together with all documents, evidence, and testimony taken and received into evidence in that school desegregation case.[54] That Action was originally initiated against the Macon County Board of Education in 1963, and was amended in 1964 to include appropriate State officials. *Lee v. Macon*, 231 F.Supp. 743, (D.C.Ala.1964). The United States originally participated actively as *amicus curiae* in 1963, and has been a Plaintiff-Intervenor pursuant to Title IX of the Civil Rights Act of 1964, 42 U.S.C. 2000h, since August 31, 1963. Following the enactment of the Civil Rights Act of 1964, the Dallas County Board of Education adopted a voluntary desegregation plan on August 16, 1965, which was

---

**53.** See, e.g., n. 51 and n. 52, *supra.*

**54.** See Paragraph 4(a)27 of Pretrial Order. See also stipulations of counsel at p. 7 of deposition

of Frank Earnest, Jr., (admitted in evidence at pp. 1508–09 of Transcript) and also at p. 1515 of Transcript.

approved by the United States Department of Health, Education, and Welfare (HEW) under the provisions of Title VI of the Civil Rights Act of 1964. The School Board was one of only ten Alabama School Systems which adopted and submitted voluntary desegregation plans. This early voluntary plan conformed to the requirements of HEW, and was phased in over a period of three (3) years with concurrent publicity throughout Dallas County. The School Board's voluntary plan not only conformed to the requirements of HEW, but also contained many of the principal features of the Model Desegregation Plan later adopted by the Three Judge Panel in its Order of March 22, 1967. The School Board was not a party to the original *Lee* case. That Action, as amended, challenged the constitutionality of certain Alabama laws and certain practices of Alabama officials that encouraged and compelled racial segregation in local school systems. After enjoining enforcement of such laws and continuation of such practices, 231 F.Supp. at 754–55, the Three Judge Panel directed, *inter alia,* that the State officials obtain desegregation plans from all school districts in the State not then involved in other litigation. *Lee v. Macon,* 267 F.Supp. 458 (M.D.Ala., 1967), 478, 480–91, *aff'd Wallace v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422. Because the School Board had previously adopted a voluntary plan, it was not involved in these proceedings at that time. After the Supreme Court decision in *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the School Board and its Superintendent, Frank Earnest, Jr., were added as defendants on August 25, 1969, along with other school systems in Alabama. On October 23, 1969 the Three Judge Panel entered an Order requiring the School Board and other Alabama school systems to file desegregation plans prior to January 15, 1970, to be effective with the beginning of the 1970–71

school year. In that Order, the Three Judge Panel specifically ordered "that the United States, through the use of educational experts of the Office of Education, Department of Health, Education and Welfare, study the operation of each of the ... school systems and confer with and assist each of said systems in formulating the required plan". The School Board was specifically ordered "to cooperate fully with the representatives of the Office of Education, Department of Health, Education and Welfare, and to make available all information and records in their possession necessary to the development of the plans ...". The Office of Education, HEW, was given fifteen days from the date of submission of the Plan to submit an alternative plan, "in the event the Plan as submitted will not realistically and effectively disestablish the dual system based upon race". In response to that Order, the School Board utilized the University of South Alabama to formulate, prepare, and submit to HEW and the Justice Department a new plan of desegregation (The University of South Alabama was one of two institutions in the State of Alabama designated and funded by HEW to perform such services). The Board adopted its Plan, with the approval of HEW and the Justice Department, and the Three Judge Panel by its Order of February 23, 1970 approved the Plan (with certain modifications contained in that Order) and ordered that it be placed into effect at the beginning of the 1970–71 school year.[55] In that Order, the Three Judge Panel also ordered the School Board to file a projection of enrollment in each of the schools prior to August 1, 1970,[56] and also a report on the actual enrollment prior to September 30, 1970.[57] By an Order of March 31, 1970 the Three Judge Panel transferred all aspects of the case involving Dallas County and four other school districts to this Court, at which time the proceedings involving the

**55.** See Order at p. 1 of Record on Appeal to the Court of Appeals in No. 77–3426, decided August 28, 1978, *Lee v. Dallas County Board of Education,* 578 F.2d 1177 (5th C.C.A., 1978). Said Record on Appeal is hereinafter called "Record on Appeal".

**56.** See Record on Appeal, p. 8.

**57.** See Record on Appeal, p. 10.

School Board were assigned Civil Action No. 5945–70–H and were assigned to this District Judge. This Court has actively handled that litigation and has supervised the School Board since that time, and is intimately familiar with the *Lee* case as well as the School Board and its responsiveness to this Court and its Orders.

31. The Dallas County School System operates in a predominately rural area. Approximately 75% of its enrollment is comprised of black students.[58] Prior to the adoption of the 1970 approved Plan of Desegregation, the Board operated fifteen schools, most of which had been operated as black schools under the former dual system.[59] Prior to the adoption of the 1970 approved Plan, the Board had (in 1965) adopted a voluntary Plan in compliance with HEW requirements.[60] That earlier voluntary Plan had already produced some degree of desegregation in the three former all white schools.[61] Under the terms of the approved Plan,[62] the County was divided into three high school zones (Western, Northeastern, and Southern), which in turn were subdivided into elementary zones and junior high school zones. The actual physical boundaries of these zones were then and are now generally defined and limited by considerations of geography. The Alabama River separates the Southern Zone from the other two, and the Western and Northeastern Zones are generally defined and separated by the City of Selma, hilly terrain, the Cahaba River, and limitations imposed by transportation arteries. The population of the Western Zone is comprised primarily of blacks, while the other two zones have a high proportion of whites.[63] However, both races are dispersed, and reside in all geographical areas of the County.[64] The original Plan of Desegregation took into consideration all of the factors involved, and represented the best judgment and best efforts of the School Board, the University of South Alabama, HEW, and the Justice Department. That Plan recognized that most of the schools in the western zone and some of the other more remote schools would be predominately black because of population factors.[65] The original projections prepared by the University of South Alabama in July, 1970 showed black enrollments of approximately 94% at Keith, 94% at Five Points, 93% at Salem, 83% at Martin Station, 92% at Hazen-Harrell, 95% at Shiloh, 86% at Tyler Union, 92% at E. M. Brown, and 93% at Hunter Mission.[66] Those projections were based upon the number of students actually residing in those zones. However, all parties (including HEW and the Three Judge Court) anticipated that a substantial number of white students might drop out of the school system and attend private schools. Accordingly, the Three

**58.** See the several semi-annual reports filed by the School Board in Civil Action No. 5945–70–H, styled *Anthony T. Lee, et al. v. Dallas County Board of Education,* showing school enrollments by race. Said case is hereinafter called the "Lee Case".

**59.** See Order of February 13, 1970 in Lee Case, at p. 1 of Record on Appeal.

**60.** See Report of the United States filed in the Lee Case in 1967, listing the ten (10) Alabama school systems which had filed voluntary desegregation plans in 1965. See, e.g., testimony of Mr. Frank Earnest, Jr., during the 1978 hearing in the Lee Case.

**61.** Id.

**62.** See Plan filed by school board in Lee Case on January 15, 1970, and the Order approving the plan (with minor modifications) entered February 13, 1970. See Record on appeal, p. 1, et seq. See Maps showing attendance zones admitted in Lee Case during January 26, 1978 hearing as Plaintiff-Intervenor Exhibits 1, 2, 3, and 4.

**63.** See n. 65, *infra.*

**64.** Numerous witnesses have testified as to the racial population of Dallas County. See, e.g., testimony of Samson Crum and J. C. Davis, Sr. See also the population "dot map" introduced by Plaintiff as Plaintiff Exhibits 8–A and 8–B, and also Plaintiff Exhibits 2 and 3. Also, see Maps and testimony admitted in evidence in Lee Case during 1978 hearing.

**65.** See original projections filed in the Lee Case July 31, 1970, at pp. 8–9, 12, of Record on Appeal, and also map of Dallas County attached to Order in Lee Case entered February 13, 1970, at p. 6 of Record on Appeal.

**66.** See Record on Appeal, pp. 8–9, 12.

Judge Court ordered that a report on actual enrollment and racial composition be filed and served on all parties by September 30, 1970. On July 31, 1970, the School Board filed the projected racial composition of the student body, faculty, and staff for the 1970–71 school year, as required by the Three Judge Panel.[67] After the beginning of school, on September 30, 1970, the School Board filed the actual enrollment which had resulted from the approved Plan.[68] Both the projection and the report of actual enrollment were filed by the School Board and served on all parties, and reflected the following:[69]

1970–71 PROJECTED RACIAL COMPOSITION

| SCHOOL | WHITE | BLACK | TOTAL |
|---|---|---|---|
| Keith | 54 | 797 | 851 |
| Five Points | 14 | 209 | 223 |
| Salem | 17 | 213 | 230 |
| Martin Station | 42 | 211 | 253 |
| Hazen Harrell | 26 | 301 | 327 |
| Southside | 917 | 916 | 1833 |
| Tipton | 246 | 588 | 834 |
| Shiloh | 19 | 418 | 437 |
| Tyler Union | 40 | 253 | 293 |
| E. M. Brown | 26 | 299 | 325 |
| Hunter Mission | 12 | 170 | 182 |
| Brantley | 150 | 342 | 492 |
| Plantersville | 453 | 367 | 820 |
| Potters Station | 114 | 131 | 245 |
| Valleygrande | 142 | 124 | 266 |

1970–71 ACTUAL ENROLLMENTS

| SCHOOL | WHITE | BLACK | TOTAL |
|---|---|---|---|
| Keith | 0 | 897 | 897 |
| Five Points | 4 | 220 | 224 |
| Salem | 0 | 233 | 233 |
| Martin Station | 0 | 187 | 187 |
| Hazen Harrell | 0 | 497 | 497 |
| Southside | 998 | 712 | 1710 |
| Tipton | 0 | 613 | 613 |
| Shiloh | 0 | 486 | 486 |
| Tyler Union | 0 | 304 | 304 |
| E. M. Brown | 0 | 250 | 250 |
| Hunter Mission | 0 | 175 | 175 |
| Brantley | 0 | 505 | 505 |
| Plantersville | 505 | 324 | 829 |
| Potters Station | 86 | 63 | 149 |
| Valleygrande | 156 | 55 | 211 |

These 1970 reports reflected a substantial loss in white students attending the public school system at the beginning of the 1970–71 school year. For example, the projection showed 2,272 white students, whereas the actual enrollment was 1,749. This showed a loss of approximately 523 white students from the school system during the first year of the operation of the Plan. Most of those students transferred to private schools in Selma or surrounding counties near their residence. The black enrollment that year was close to the projections, and in fact was slightly higher than the projection.

32. There was no appeal from the final Order of the Three Judge Court approving and implementing the Desegregation Plan for Dallas County, and there were no objections filed to the projected or actual enrollment figures filed with the Court in 1970.[70] However, on April 4, 1971, the United States filed a Motion for Supplemental Relief, alleging: that the School Board was operating its high school program in violation of the Desegregation Order; that the approved Desegregation Plan projected that white students would attend each school in the system; that the School Board's report dated September 17, 1970 indicated that only four schools in the Dallas County System had white students in attendance; that the Court should reassess the effectiveness of the Desegregation Plan in light of the actual results achieved under the Plan as implemented; that reasonable alternative methods were available to the School Board to provide all students with an opportunity to receive a substantial desegregated education and to alleviate overcrowded conditions; and that technical assistance was available to the Court and to the School Board from the Office of Education to aid in the development, adoption, and implementation of a new Desegregation Plan.[71] In that Motion, the United States specifically moved the Court to order the Board to prepare, in collaboration with the Office of Education of HEW, a new Desegregation Plan with respect to student

67. See Record on Appeal, pp. 8–9, 12.

68. See Record on Appeal, pp. 10–11, 13–14.

69. See Record on Appeal, pp. 8–14.

70. See *Lee v. Dallas County Board of Education,* 578 F.2d 1177 (5th C.C.A., 1978).

71. See Record on Appeal, pp. 15–21.

attendance for the Dallas County School System, to be implemented at the commencement of the 1971 school year. This 1971 proceeding, and all of the aforesaid issues, were finally adjudicated and resolved by an Agreement and Consent Order entered July 27, 1971, which reaffirmed the original Desegregation Plan, ordered the Board to comply with the approved Plan "in all respects . . . including the assignment of each student in the school system to the school facility designated in the Desegregation Plan to serve his or her attendance area and grade level on a non-segregated, non-discriminatory basis", afforded the United States the opportunity "at any time during the 1971–72 school year to evaluate the progress in desegregation of the Dallas County School System . . .", and obligated the Board to cooperate with the United States in providing the information necessary for such evaluation.[72] This subsequent evaluation was accomplished by the United States, and included a full review of school and attendance records, an examination of all reports submitted to HEW, and actual physical inspection of the Dallas County Schools during school attendance hours.[73] There were no further complaints by the United States following that evaluation and inspection, and all prior objections of the United States to the approved Plan were concluded and satisfactorily resolved by the 1971 Consent Order.

33. On September 21, 1972, the National Education Association, as Plaintiff-Intervenor in the *Lee* case, filed a motion for further relief and permanent injunction alleging that the School Board had discriminated on the basis of race in its employment practices in violation of the February 13, 1970 Order of the Court and contrary to the mandate of *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th C.C.A., 1969).[74] The NEA Motion was filed September 21, 1972, and on October 10, 1972

the Court entered an Order directing counsel for NEA to contact the other parties and arrange a conference for the purpose of discussing the issues in controversy and presenting a Consent Order resolving those issues if possible, with the proviso that any issues unresolved by such conference should be certified to the Court by the aggrieved party.[75] NEA failed to arrange such conference, and on March 14, 1975 the Court entered an Order reciting the failure of NEA to comply with the 1972 Order, and ordering that the proceedings " . . . will be dismissed for want of prosecution unless the parties show good cause why same should not be done within fifteen days of this Order".[76] On March 31, 1975 the United States filed its response to the Court's Order to show cause.[77] In this response, the United States alleged that the Court should allow a reasonable time for the United States "to complete an investigation to determine whether the alleged violations, and any other violations of applicable federal law, exist at this time". The United States represented to the Court: "We have initiated an investigation to determine whether Defendants have complied with the February 13, 1970, Order and applicable federal law". The United States requested that the Court allow forty-five days for the completion of the investigation, "in order to assure that constitutional violations do not exist, or . . . that those violations are properly remedied. . . .". In response to the Motion of the United States, the Court entered an Order on April 1, 1975, directing the parties to "conduct all such investigations and discoveries as they feel essential within the next forty-five (45) days from date of this Order and will confer among themselves as to the issues involved within sixty (60) days from the date of this Order and shall certify to this Court what areas of controversy, if any, still exist between

72. See Record on Appeal, pp. 22–33.

73. The 1971 proceedings were concluded by entry of the Consent Order at pp. 22–23 of Record of Appeal.

74. See Record on Appeal, pp. 34–40.

75. See Record on Appeal, p. 41.

76. See Record on Appeal, p. 64.

77. See Record on Appeal, pp. 65–69.

them, what areas of agreement or accord have been reached, and whether there is anything necessary for this Court to do by way of hearings or otherwise to resolve any conflicts".[78] The Certification of Parties in response to Order of April 1, 1975, was filed on June 4, 1975 certifying only four specified issues as then remaining and being contested. The remaining issues certified to the Court involved objective non-racial criteria to be utilized in personnel actions, and other issues involving employment or assignment of personnel by the Board. There were no remaining issues with respect to the constitutionality or the appropriateness of the approved Plan of Desegregation, and there were no issues certified requesting or relating to modification of the approved Plan.[79] On June 5, 1975, the Court set the remaining issues for hearing, and a full evidentiary hearing was conducted by the Court on July 8, 9, and 10, 1975. During the course of that hearing, evidence was introduced and considered by the Court relating to the racial composition of the faculty and student body at the various schools, as well as evidence concerning the circumstances under which the use of three school buildings was discontinued. On the third day of the hearing, the parties suggested to the Court their belief that a Consent Order might be entered, and the Court recessed the hearing to afford the parties such an opportunity. Thereafter, on October 22, 1975, the parties submitted a Consent Decree, which was entered by the Court disposing of all issues and concluding the proceedings.[80] This Consent Decree recited the prior stipulation and certification of the parties as to the resolution of all other matters and allegations raised by or contained in the NEA Motion, and specifically ordered that all such other matters and allegations, except for the four remaining certified and contested issues, "should be and are hereby resolved and adjudicated in and by this Consent Decree". That Consent Decree also required the School Board to make faculty assignments, utilizing race as a factor, until the black-white faculty ratio at each school was approximately the same as the black-white faculty ratio in the system as a whole; required the School Board to file annual reports with the Court giving detailed information on the faculty by race; required the School Board to adopt non-racial objective criteria to be used in the demotion and dismissal of teachers and other staff; and contained other provisions resolving the contested issues to the satisfaction of all parties. All parties agreed as to the form and entry of the Consent Decree "without admissions by the Defendants of violations of the Constitution or any Federal Statute, or Order of this Court...".

34. On November 15, 1976, the Clerk of this Court notified the parties that a status conference on fourteen of the *Lee v. Macon* school districts, including Dallas County, was scheduled for December 6, 1976. No motions were pending in the Dallas County case and no written or oral motions were made by any counsel at the status conference on Dallas County. At the hearing held on December 6, which was informal and not transcribed, the Court announced its intention to take appropriate steps to remove from the Court's docket all actions involving school districts which were then operating in compliance with the Fourteenth Amendment. Following that status conference, this Court entered an Order on February 10, 1977, which determined and found the Dallas County School System to be desegregated and unitary.[81] That Order made similar findings with respect to 10 other school districts then subject to the Court's jurisdiction. In that Order, this Court stated: "Because of a long and intimate relationship with each of these cases and after a further review of the proceedings in each to date, this Court is able to state with confidence that the above styled school systems are desegregated and are truly unitary in nature". The Court stated an intention to conclude the pending cases

---

78. See Record on Appeal, pp. 78–79.

79. See Record on Appeal, pp. 88–90.

80. See Record on Appeal, pp. 95–99.

81. See Record on Appeal, pp. 120–129.

and remove them from the Docket, but prescribed reporting requirements for all of the school systems and also established due process requirements whereby all parties were afforded an opportunity to file timely objections to that Order, and to obtain a hearing thereon. The Order specifically required, however, that "Any objection to this Order as it is formulated shall be filed within thirty days of the date of this Order". With respect to Dallas County, the Court specifically found "that the Dallas County School System has been desegregated, if not from the date of the Terminal Order then certainly since the Consent Order of October 22, 1975".[82] The United States filed neither objections nor an appeal to the Order of February 10, 1977 within the required thirty day limitation. Instead, on March 16, 1977 (thirty-four days after the February 10 Order) the United States filed its Response and Objection, objecting to the procedural and reporting requirements as well as the findings and determinations of the Court that Dallas County and other school systems had achieved a unitary status.[83] The United States did not support that pleading by Brief, as required by Local Rule of the Court. Consequently, on March 24, 1977, the Court entered the following Order: "Motion to Vacate Order of February 10, 1977 insofar as any school districts were found to be effectively desegregated and unitary contained in Response and Objections of the United States to the Order of February 10, 1977 filed on March 16, 1977 is Denied as untimely and without Brief contrary to local rule and without merit".[84] The United States did not appeal from either the February 10 Order or the March 24 Order, and both are final Orders. On July 26, 1977 the United States filed a Motion for Enforcement and Modification of Injunction, alleging violations of the Desegregation Plan, and also seeking modification of that Plan.[85] The Motion attacked the Desegregation Plan, asserting many of the same objections which had been considered and adjudicated by the Court in the Consent Orders entered in 1971 and 1975. However, there was no claim of any substantial change in the controlling facts and circumstances on which the 1970, 1971, and 1975 Orders approving the Plan were based. The United States filed interrogatories with its motion,[86] and the School Board filed objections on the ground that the interrogatories inquired into matters which had been finally determined by the February 10, 1977, and prior Orders.[87] The United States moved to compel discovery, and the case was set for Pre-Trial Conference on September 27, 1977, at which hearing the Court considered whether the United States was attempting, by means of a subterfuge motion, to go behind the prior Orders and re-litigate the same issues. On November 10, 1977, this Court entered an Order denying that part of the Government's motion which sought to modify the Desegregation Plan, but ordered that a hearing be held on the remaining allegations concerning alleged violations of the Desegregation Plan and prior Orders.[88] In that Order, this Court recited that it was "not willing to entertain Motions on matters such as the Desegregation Plan, an Order which has gone without appeal or objection for seven years...", and made the following specific findings and Order:

"On July 26, 1977 the United States as plaintiff-intervenor filed a motion for enforcement and modification of the desegregation order of February 13, 1970, the consent order of July 27, 1971, and the consent decree of October 22, 1975, requesting an alteration of the desegregation plan adopted by this Court for the Dallas County School System due to the improper racial composition of both faculty and student assignments within the system.

82. See Record on Appeal, p. 123.

83. See Record on Appeal, pp. 130–141.

84. See Record on Appeal, p. 142.

85. See Record on Appeal, pp. 163–178.

86. See Record on Appeal, pp. 151–162.

87. See Record on Appeal, pp. 229–234.

88. See Record on Appeal, pp. 241–243.

This Court ruled in February that the Dallas County School System "has been desegregated, if not from the date of the terminal order then certainly since the consent order of October 22, 1975". The United States did not choose to contest this final order by appeal, but rather filed untimely objections to the order and then filed this motion to reopen matters resolved against them in the order of February 10, 1977. The Court is of the opinion that having failed to contest the February 10 order either through objections or appeal the Government is now estopped to raise the desegregation issue through a motion to modify the desegregation plan implemented by this Court. The Court is not constrained to allow the Government to ignore the finding made by this Court in the February 10 order by means of a subterfuge motion; therefore, the Court is of the opinion that so much of the Government's July 26, 1977 motion as requests modification of the desegregation plan for the Dallas County School System is due to be and the same is hereby DENIED."

35. On November 25, 1977, the United States filed Notice of Appeal from the February 10, 1977 Order.[89] On August 28, 1978, the United States Court of Appeals for the Fifth Circuit affirmed that Order. *Lee v. Dallas County Bd. of Ed.,* 578 F.2d 1177 (5th C.C.A., 1978). During the pendency of that appeal, the Court proceeded with the hearing on the remaining aspects of the Government's motion, on January 26–27 and February 1–2, 1978. Following that hearing, the Court entered its Order of February 23, 1978, making detailed Findings of Fact and Conclusions of Law.[90] In that Order, the Court made the following Findings of Fact:

. a. Since the 1970 Desegregation Order, three schools have been closed, but the closing of those schools has not impaired the effectiveness of the Desegregation Plan, and there have been no other changes in the system since the 1970 Order.

b. There were violations of the 1970 Order in the nature of zone jumping, and the School Board knew or should have known that such violations existed. However, the School Board's involvement in those violations was in the nature of negligence, in the sense that the Board failed to take affirmative steps to preclude such violations, rather than intentional. The Board did not openly advocate, encourage, or aid the zone jumping, but merely failed to take adequate steps to prevent or stop it. Although the School Board was negligent in not strictly enforcing the zone lines, its conduct was not obdurately obstinate (as has been the case with other school boards within this Court's jurisdiction), nor did its conduct and that of its agents with respect to zone jumping constitute intentional racial discrimination.

c. On January 30, 1978 (during the pendency of the Trial) the School Board adopted and filed administrative procedures, which the Court believed would be effective in stopping the practice of zone jumping.

d. The School Board had failed to bring the system into compliance with *Singleton,* insofar as the assignment of faculty and staff were concerned.

e. The School Board had been remiss in its duties to adequately familiarize its staff and the general public with regard to the provisions of the Majority to Minority Transfer Program.

f. The Court found no disparity with respect to the funding or the facilities within the system. Although there was not a perfect equality of facilities, there was no showing by the Government that the School Board's decisions concerning funding, new construction, school closings, and acceptance of community contributions were based on anything other than sound education criteria. The facilities were not perfectly equal in 1970, when the original Desegregation Plan was adopted, but the Three Judge Court accepted the Plan and the facilities it

---

**89.** See Record on Appeal, p. 244.

**90.** Final Judgment in Lee Case entered February 23, 1978.

incorporated, and the School Board's decisions and actions since that time have not been contrary to the purpose, intent, or spirit of the 1970 Order.

g. The School Board's budget and allocations for janitorial supplies, fee replacement money, library, guidance, testing, and general maintenance were fairly and impartially adopted and administered, and there was no disparity nor discrimination with respect to those allocations.

h. Public schools in Alabama have traditionally had to depend upon community support for many of the necessities not provided by school boards, and the School Board's practice of permitting local parent-teacher organizations to provide assistance and benefits to the various schools within the system was not improper.

Based upon the foregoing Findings of Fact, the Court concluded that the School Board had breached its affirmative duty to enforce the 1970 Desegregation Plan by not strictly enforcing the geographical attendance zones, and that a judicial remedy was required to perpetuate the unitary status already achieved in the system. The Court entered its Judgement of February 23, 1978 enjoining the School Board: (a) from advocating, encouraging, or participating in violations of the geographical attendance zones set out by the 1970 Order, and from failing or refusing to fully investigate and certify the residential address of each and every student within the system; (b) from allowing or permitting its transportation facilities to be utilized by persons seeking to violate the geographical attendance zones set out in the 1970 Order; (c) from failing or refusing to comply with the requirements of *Singleton* and the 1970 Order with respect to faculty and staff assignment; and (d) from failing or refusing to publicize and advertise the provisions of the majority to minority transfer program set out in the desegregation plan to the end that the general public is familiar with such program and its benefits are equally accessible.[91]  In that Order, the Court also imposed reporting requirements on the School Board, to determine the effect and adequacy of the School Board's efforts to stop zone jumping and implement the *Singleton* requirements. The Court further ordered "... that so much of the motion for enforcement of injunction as relates to alleged disparity of facilities is due to be dismissed on the merits, the government having failed to carry its burden of proof with respect to the alleged racial motivation involved in creating such disparity."

36. On January 30, 1978, the School Board voluntarily adopted administrative procedures designed to correct the zone jumping and other problems which had then become evident.[92]  Those procedures have been implemented, and the Board has in good faith carried them out and successfully perpetuated the unitary system which was previously achieved.[93]  Pursuant to those procedures, the School Board has taken the following constructive and responsive actions: [94]

a. The School Board appointed a Black Director of Attendance whose primary function was to insure that the zone requirements were properly enforced.

b. The Director of Attendance audits the records of each school to verify that all students are in their proper attendance zone.

**91.** Id.

**92.** See Reports filed by School Board in Lee Case and served February 10, 1978 and March 31, 1978.

**93.** See Reports filed by School Board in Lee Case and served March 31, 1978 and September 12, 1978. See also the Memorandum Order of this Court entered February 2, 1979, which found: "The 1977 order concluded that this system had been desegregated and unitary since at least October 22, 1975, and semiannual reports were required to be filed... On the basis of the record and the evidence adduced during trial, the Court is satisfied that this system remains desegregated and unitary as noted in 1977." See also prior orders of this Court in the Lee Case entered February 10, 1977, March 24, 1977, November 10, 1977, and February 23, 1978 (at p. 19).

**94.** See the several Reports filed by School Board in Lee Case during 1978 and 1979.

c. The Director of Attendance verifies the actual residence of all new students enrolling in the System.

d. A new and better enrollment application form has been adopted, containing information as to the residence of each child and the actual geographical location of that residence, with a map on the reverse side on which the student must mark the location of his residence.

e. An improved record keeping system was set up.

f. Principals are required to report the names of students who fail to report back for enrollment the following year.

g. Rules were adopted for the transportation system, and a bi-racial committee examines the transportation system at least each semester to insure that it is in compliance with the Desegregation Plan and policies of the School Board.

h. The Superintendent or his designated staff person explains the provisions of the majority to minority transfer policy during the Annual Teacher Institute conducted before the beginning of each school year.

i. Before the end of each school year, letters advising students and parents of the provisions of the majority to minority transfer policy are sent home to all students within the System.

j. A procedure was adopted for handling requests for transfers under the majority to minority transfer policy, with final action being subject to Board approval to insure accountability.

k. An improved system was set up for supervising requests for enrollment from students residing outside the System.

37. During 1978, the School Board voluntarily adopted additional procedures dealing with inter-district transfers.[95] These procedures, as finally adopted and amended, insure that transfers into the Dallas County System will be permitted only on a non-discriminatory basis and only where the cumulative effect of such transfers will not reduce desegregation in either school system or reinforce the dual school system. After a thorough study of past and potential applications for transfer, the School Board decided that no application for inter-district transfer should be approved except in cases where the applicant would transfer from a school in which his or her race is in the majority into a school in the Dallas County School System where his or her race is in the minority, except in certain limited and defined exceptional circumstances.[96] The School Board voluntarily acted to adopt those procedures, and such action is further evidence of its good faith in enforcing and implementing the Desegregation Plan.

38. Having adopted new administrative procedures to stop the practice of zone jumping, the School Board took action in February, 1978, to require all students in the System to re-register, using the new registration form and procedures. The Board and its newly appointed Director of Attendance made a complete and thorough investigation into the actual residence of all students attending the Dallas County School System, and all students and their parents or guardians completed the new registration forms, which were reviewed and verified by principals or other designated staff persons at each school. That investigation by the School Board disclosed that there were 735 students attending schools in an improper zone, of whom 187 (25%) were white and 548 (75%) were black.[97] These figures were almost identical to the percentages of black—white enrollment within the System,[98] and this zone jumping did not involve any preferential or discriminatory treatment of either whites or blacks. Many parents—both white and black—preferred (and continue to prefer) that their children attend different schools from those

95. See the several reports filed by the School Board in the Lee Case and served September 5, 1978, August 25, 1978, and August 3, 1978.

96. Id.

97. See Report of School Board filed in Lee Case and served March 31, 1978.

98. See Report of Student Enrollment as of September 1, 1978, filed by School Board in Lee Case and served September 12, 1978.

prescribed by the Desegregation Plan. While this Court understands their feelings, nevertheless the approved Desegregation Plan will not work unless it is enforced. For that reason the School Board, with the support of the Court, transferred all students into their proper zones and resisted all efforts by those students and their parents to obtain exceptional or preferential treatment. The Court commends the School Board for its courage and its cooperative attitude in handling these massive transfers, which occurred in the middle of the school year and which, except for the School Board's cooperation and diligence, could have severely disrupted the School System.

39. The School Board also acted promptly to insure that the *Singleton* requirements were fully implemented, beginning with the academic year of 1978–79. In May, 1978, the School Board reported to this Court the following schedule reflecting proposed and projected teacher assignments, by race and school, for the 1978–79 school year.[99]

| School | No. of White Teachers | No. of Black Teachers | % of White Teachers | % of Black Teachers |
|---|---|---|---|---|
| Brantley Jr. High | 8½ | 13 | 39.53 | 60.47 |
| Dallas County High | 13 | 18 | 41.94 | 58.06 |
| Five Points Elem. | 3 | 5⅓ | 36.01 | 63.99 |
| Hazen Harrell | 9½ | 14 | 40.43 | 59.57 |
| Hunter Mission Elem. | 3 | 4½ | 40.00 | 60.00 |
| J. E. Terry Elem. | 4½ | 6½ | 40.91 | 59.09 |
| Keith High | 13 | 21 | 38.24 | 61.76 |
| Martin Station Elem. | 4 | 6⅓ | 38.72 | 61.28 |
| Salem Elem. | 3 | 4⅓ | 40.93 | 59.07 |
| Shiloh Jr. High | 10 | 16 | 38.46 | 61.54 |
| Southside Elem. | 11 | 16½ | 40.00 | 60.00 |
| Southside High | 18 | 27 | 40.00 | 60.00 |
| Tipton Jr. High | 11 | 17 | 39.29 | 60.71 |
| Valleygrande Elem. | 6½ | 9 | 41.94 | 58.06 |
| TOTALS | 118 | 178½ | 39.80 | 60.20 |

40. The School Board has filed extensive reports, reflecting the actual composition of the faculty and student enrollments, by race and school, during the periods from October 1, 1978 to April 1, 1979 (including the commencement of the 1978–79 school year) and from April 1, 1979 to October 1, 1979 (including the commencement of the 1979–80 school year). The number of students, by race, enrolled in the various schools within the Dallas County School System for those periods is set out as follows: [100]

| SCHOOLS | 10/1/78 to 4/1/79 | | 4/1/79 to 10/1/79 | |
|---|---|---|---|---|
| | BLACK | WHITE | BLACK | WHITE |
| Brantley Jr. High | 393 | 154 | 437 | 142 |
| Dallas County High | 267 | 348 | 289 | 342 |
| Five Points Elementary | 146 | 0 | 130 | 0 |
| Hazen Harrell Jr. High | 420 | 0 | 394 | 0 |
| Hunter Mission Elementary | 115 | 1 | 95 | 0 |
| J. E. Terry Elementary | 81 | 112 | 79 | 118 |
| Keith High | 596 | 2 | 568 | 2 |
| Martin Station Elementary | 201 | 0 | 205 | 0 |
| Salem Elementary | 113 | 0 | 91 | 0 |
| Shiloh Jr. High | 429 | 5 | 425 | 3 |

99. See Report filed by School Board in Lee Case.

100. See Reports filed by School Board in Lee Case for periods October 1, 1978 to April 1, 1979 and April 1, 1979 to October 1, 1979.

| SCHOOLS | 10/1/78 to 4/1/79 | | 4/1/79 to 10/1/79 | |
|---|---|---|---|---|
| | BLACK | WHITE | BLACK | WHITE |
| Southside Elementary | 314 | 285 | 324 | 283 |
| Southside High | 567 | 287 | 613 | 242 |
| Tipton Jr. High | 580 | 10 | 554 | 9 |
| Valleygrande Elementary | 86 | 258 | 85 | 234 |
| TOTALS | 4,308 | 1,462 | 4,289 | 1,375 |

41. The number of teachers, by race, in each school within the Dallas County School System for the aforesaid periods of October 1, 1978 to April 1, 1979 and April 1, 1979 to October 1, 1979 was as follows: [101]

| SCHOOL | 10/1/78 to 4/1/79 | | | | 4/1/79 to 10/1/79 | | | |
|---|---|---|---|---|---|---|---|---|
| | Black | % | White | % | Black | % | White | % |
| Brantley | 17 | 59.6 | 11.5 | 40.4 | 17 | 57.6 | 12.5 | 42.4 |
| Dallas Co. High | 18 | 58.1 | 13 | 41.9 | 17 | 56.7 | 13 | 43.3 |
| Five Points Elem. | 5.33 | 64.0 | 3 | 36.0 | 4.83 | 61.7 | 3 | 38.3 |
| Hazen Harrell Jr. | 14 | 59.6 | 9.5 | 40.4 | 14.5 | 63.0 | 8.50 | 37.0 |
| Hunter Mission Elem. | 4.5 | 60.00 | 3 | 40.00 | 3.5 | 58.3 | 2.50 | 41.7 |
| J. E. Terry Elem. | 7.5 | 62.5 | 4.5 | 37.5 | 7 | 60.9 | 4.5 | 39.1 |
| Keith High | 21 | 61.8 | 13 | 38.2 | 21 | 61.8 | 13 | 38.2 |
| Martin Station Elem. | 6.33 | 61.3 | 4 | 38.7 | 6.83 | 63.1 | 4 | 36.9 |
| Salem Elem. | 4.33 | 59.1 | 3 | 40.9 | 3.33 | 52.6 | 3 | 47.4 |
| Shiloh Jr. High | 16 | 61.5 | 10 | 38.5 | 16.5 | 61.1 | 10.5 | 38.9 |
| Southside Elem. | 18.5 | 60.7 | 12 | 39.3 | 18.5 | 60.7 | 12 | 39.3 |
| Southside High | 26 | 57.8 | 19 | 42.2 | 24 | 60.0 | 16 | 40.0 |
| Tipton Jr. High | 18.5 | 62.7 | 11 | 37.3 | 20 | 61.5 | 12.5 | 38.5 |
| Valleygrande Elem. | 10 | 60.6 | 6.5 | 39.4 | 10 | 55.6 | 8 | 44.4 |
| Area Voc. School | 4 | 26.7 | 11 | 73.3 | 6 | 42.9 | 8 | 57.1 |
| TOTALS | 191 | 58.8 | 134 | 41.2 | 189.5 | 59.1 | 131 | 40.9 |

42. These reports confirm, and the Court finds, that the School Board is in full compliance with the approved Desegregation Plan, as well as all prior Orders of this Court. On February 2, 1979, the Court entered a Memorandum Order, reviewing the status of the unitariness of the Dallas County School System.[102] At that time the Court reviewed the procedural history of the Dallas County School System, and found that "on the basis of the record and the evidence adduced during trial, the Court is satisfied that this System remains deseg-regated and unitary as noted in 1977.". In that Memorandum Order, the Court further found that the School Board, in response to the Court's opinion of February 23, 1978, had eliminated zone jumping, obtained proper assignments, and made the benefits of the majority to minority transfer program available to all students.[103]

43. The transportation system of the Dallas County School System is fully deseg-regated, and black and white students are transported daily on the same buses.[104] The

101. Id.

102. Order of this Court in Lee Case entered February 2, 1979.

103. Id.

104. This Court has thoroughly reviewed the transportation system in the Lee Case, and has considered extensive testimony, evidence, and reports during and following the 1977–1978 hearings. See, e.g., testimony of Aubrey C. Rush, Jr., and Frank Earnest, Jr., during 1978 hearings; Plaintiff-Intervenor Exhibit 7 admitted in the Lee Case during the January 26, 1978 hearing; and Answers of School Board served January 17, 1979 in Lee Case to Plaintiff's Interrogatories No. 30–37.

School Board has appointed a bi-racial committee on transportation, which has met during 1978 and 1979 and examined the transportation policies and practices of the School Board. This bi-racial committee has found those policies and practices to be operating on a non-discriminatory basis and within the provisions of the Orders of this Court,[105] and this Court concurs with and adopts their findings. The School Board has afforded priority to a good transportation system, and has routed its buses so as to accommodate all students, including those residing in remote areas of the County.[106] There has been no testimony offered by the Plaintiff to show that the School Board has not been fair, diligent, and responsive to all students in the routing and operation of its transportation system. To the contrary, the evidence in the *Lee* case affirmatively shows, and the Court therefore finds, that the School Board's operation of the transportation system has been fair, without discrimination, and responsive to the needs of all students, both black and white.

44. Not only are the schools and transportation system being operated on a desegregated and non-discriminatory basis, but all other facilities such as gymnasiums, auditoriums, and cafeterias are also being operated by the School Board on a unitary and desegregated basis, and without discrimination.[107] The School Board has made these gymnasiums, auditoriums, and cafeterias available to the local communities in which they are situated.[108] Many of these communities are predominately black, and the local schools and their gymnasiums, auditoriums, and cafeterias fill a need for community meetings, community recreation, and community service organizations. By this practice, the School Board has further evidenced its responsiveness to the black citizens of Dallas County.

45. A system-wide bi-racial Title I E.S.A. Advisory Committee has also functioned with respect to the entire Title I program for the Dallas County School System for a number of years.[109] This Title I Bi-Racial Committee functioned with respect to the entire Title I program, which affected all of the economically and culturally deprived students (80%) within the Dallas County School System.[110] In early 1977, the School Board established a bi-racial advisory committee to advise the School Board regarding any problem or interest affecting local community schools.[111] This bi-racial committee has met on a regular basis since its formation. This bi-racial committee was created by the School Board in response to the request and suggestion of Mr. J. L. Chestnut, Jr., a black attorney then representing a number of black citizens interested in Brantley School.[112] The School Board also appoints three (3) Trustees from each school, from a list of six persons nominated by the parents and guardians of children attending each

---

105. Id.

106. Id.

107. During and since the 1978 hearing in the Lee Case, this Court has considered extensive testimony, evidence, and reports concerning the adequacy and equality of the funding and facilities of the School Board. In the Final Judgment entered in the Lee Case on February 23, 1978, this Court dismissed on the merits all claims then made by Plaintiff against the School Board relative to alleged disparity of facilities. See, e.g., testimony of Dr. Herbert H. Sheathelm and Frank Earnest, Jr., during 1978 hearing in Lee Case; Answers of School Board served January 17, 1979 in Lee Case to the Plaintiff's Interrogatories No. 12, 13, 14, 15, 16, 17, 18, 21, and 48; and Plaintiff-Intervenor Exhibits No. 26 and 27 and School Board Exhibits 1–116, 119, 120–124, and 126–127 admitted in

evidence in the Lee Case during the 1978 hearing.

108. Id. See, e.g., testimony of Frank Earnest, Jr., in 1978 hearings in Lee Case. Also, see Section 16–10–11, 1975 Code of Ala.

109. See Answers of School Board served January 17, 1979 in Lee Case to Plaintiff's Interrogatories No. 7–12; testimony of Frank Earnest, Jr., during 1978 hearing in Lee Case; testimony of J. L. Chestnutt, Jr., at pp. 1152–1153 of Transcript.

110. Id.

111. Id.

112. Id.

school.[113] These School Trustees provide another valuable source of lay imput to the School Board, through the principals of the individual schools. The School Board has also obtained citizen imput, from the black community as well as the white community, through the local parent-teacher organizations in the various schools.[114] The principals maintain close liaison with their respective parent-teacher organizations, as well as the local communities in which the schools are located, and through them the School Board receives valuable imput from the black community as well as the white community. These various sources for citizen imput, including the bi-racial committees and parent-teacher organizations, provide further evidence of the School Board's desire to ascertain the needs of the black community and their responsiveness to those needs.

46. Approximately eighty percent (80%) of the total enrollment within the Dallas County School System is comprised of economically and culturally deprived students who are eligible for the Title I program.[115] The Court finds that the School Board has effectively utilized the Title I program to benefit these economically and culturally deprived students within the System, approximately 80% of whom are black.[116] This further evidences the responsiveness of the School Board to the particularized needs and interests of blacks. The Court has been favorably impressed with the School Board's record of achievement in the Title I program. The scope and extent of this participation is reflected by the following figures: [117]

| | 70–71 | 71–72 | 72–73 | 73–74 | 74–75 | 75–76 | 76–77 | 77–78 | 78–79 |
|---|---|---|---|---|---|---|---|---|---|
| INSTRUCTIONAL ACTIVITIES: | | | | | | | | | |
| Business Ed. | 350 | | | | | | | | |
| Reading | 4300 | 3275 | 2701 | 2047 | 2043 | 1530 | 1552 | 1620 | 1713 |
| Industrial Arts | 225 | | | | | | | | |
| Math | 2240 | 1653 | 1718 | 1247 | 1850 | 1280 | 1299 | 1270 | 1179 |
| Natural Science | 2400 | 1500 | 1382 | 940 | | | | | |
| Social Science | 2500 | 1500 | 1467 | 924 | | | | | |
| Home Ec. | 540 | | | | | | | | |
| Handicapped | 600 | | | | | | | | |
| Pre-School | 350 | | | | | | | | |
| Cultural Enrichment | 4865 | 1460 | | | | | | | |
| SUPPORTIVE SERVICES: | | | | | | | | | |
| Guidance & Testing | 5060 | 3850 | 4285 | 3427 | 2495 | 1945 | 2012 | 2009 | 2031 |
| Health Services | 3975 | 3850 | 3050 | 2140 | 1550 | 1322 | 1270 | 1130 | 1050 |
| Attendance | 5060 | 3850 | 2350 | 2400 | 1950 | 1518 | 1460 | 1280 | 1300 |
| Services for Handicapped | 600 | | | | | | | | |

113. Id. Also, see Section 16–10–11, 1975 Code of Ala.

114. Id.

115. See Plaintiff's Exhibit 31; School Board Exhibits Q and R; School Board Exhibits 125 and 128 in 1978 hearing in Lee Case; testimony of Frank Earnest, Jr. in 1978 hearing in Lee Case; and Answers of School Board served January 17, 1978 to Plaintiff's Interrogatory No. 19 in Lee Case.

116. Id.

117. Id.

| SUPPORTIVE SERVICES: | 70–71 | 71–72 | 72–73 | 73–74 | 74–75 | 75–76 | 76–77 | 77–78 | 78–79 |
|---|---|---|---|---|---|---|---|---|---|
| Speech Therapy | | 209 | 212 | 170 | 205 | 210 | 211 | 240 | 239 |
| EXTRA–CURRICULAR PROGRAMS: | | | | | | | | | |
| Field Trip Experiences | 3964 | 2200 | 2700 | | . | | | | |
| TOTAL NO. OF PARTICIPANTS: | 5475 | 4602 | 4285 | 3427 | 2495 | 1945 | 2012 | 2009 | 2031 |
| % OF WHITE PARTICIPANTS: | | | 19.0 | 19.0 | 24.0 | 27.5 | 27.3 | 18.9 | 19.15 |
| % OF BLACK PARTICIPANTS: | | | 81.0 | 81.0 | 76.0 | 72.5 | 72.7 | 81.1 | 80.85 |

47. The School Board obtains the major portion of its funding from state and local sources, with Title I funding providing a significant amount of assistance.[118] The Court finds that the School Board has been diligent in obtaining federal assistance under all federal programs designed to strengthen the educational opportunities afforded Dallas County students, both black and white, especially those who are economically and culturally deprived.[119] The School Board has received very little financial assistance from local county government, but it has been successful in obtaining passage of constitutional amendments providing for ad valorem taxes for the operation of the County schools. The sources and amounts of funding for the School Board since 1975 are as follows: [120]

| SOURCE OF FUNDING | 1975–76 | 1976–77 | 1977–78 | 1978–79 |
|---|---|---|---|---|
| State of Ala. | 3,807,487.54 | 3,795,177.48 | 4,297,032.82 | 4,882,078.94 |
| FEDERAL: | | | | |
| General | 189,175.61 | 156,904.70 | 69,785.65 | 156,432.98 |
| P.L. 89–10 Title I | 762,311.00 | 781,016.00 | 888,478.00 | 1,080,664.00 |
| P.L. 89–10 Tit. II & IV | 10,504.54 | | | |
| P.L. 89–10 Tit. III | 48,000.00 | 48,000.00 | | |
| P.L. 89–10 Tit. IV | | 40,862.18 | | |
| P.L. 89–10 Tit. IV–B | | | 24,236.00 | 28,280.00 |
| P.L. 89–10 Tit. IV–C | | | 39,000.00 | 38,955.00 |
| P.L. 89–10 Tit. VI | 16,430.00 | 35,000.00 | 28,560.00 | 49,173.00 |
| P.L. 89–313 | | 552.00 | | |
| County Ad Valorem | 379,820.04 | 389,876.69 | 384,886.00 | 427,392.16 |
| Other Revenues | 16,014.60 | 10,466.42 | 6,494.40 | 10,258.95 |
| Non-Revenue | 23,664.36 | 27,975.50 | | 47,651.12 |

118. Id.

119. Id.

120. Id.

48. Because of the large number (approximately 80%) of its students who are economically and culturally deprived, the School Board has made a special effort to provide additional pre-school training for those students.[121] The School Board has adopted a system of pre-school centers, in cooperation with the Dallas County Economic Opportunity Board and the State Department of Education.[122] The School Board has attempted to locate as many units as possible in each of the school zones. During 1977–78 there were six such units in the system, four of which were Head Start units funded by EOB, and two of which were kindergarten units allocated by the State Department of Education.[123] Participants in the Head Start program funded by EOB are selected based upon the poverty level of the family, while participants in the kindergarten units are selected through an impartial lottery system.[124] All units have enrollments of 20 pupils per unit. During 1977–78 there were two Head Start units at Keith High School, serving children in the western zone; a kindergarten unit at Valleygrande Elementary School and a Head Start unit at Brantley, serving units in the northern zone; and a Head Start unit at Tipton and a kindergarten unit at Southside Elementary, serving students in the southern zone.[125] The pre-school students in the western zone were transported by EOB facilities, while those in the southern and northern zones were transported by regular school buses.[126] The School Board has further evidenced its responsiveness to the particularized need by black students for pre-school centers by developing and supporting the Head Start and kindergarten programs for children in predominately black rural areas.

49. The School Board has received very little financial support from local county government.[127] For that reason, it has been faced with a shortage of funds for janitorial supplies, fee replacement money, library, guidance, and testing funds, and general maintenance.[128] The available funds have been fairly and impartially administered by the School Board to the various schools within the System, without favoritism or discrimination. There has been no disparity with respect to the allocations of those funds by the School Board, and the allocations have generally been handled according to student population, teacher units, or other objective standards.[129] Because the public funds have generally been insufficient, the School Board, as well as other public schools throughout Alabama, has traditionally had to depend upon community support for many of the necessities not provided by the School Board. Local parent-teacher organizations have provided assistance and benefits to the various schools within the System, and the Court finds that such practice is neither improper nor discriminatory, but in furtherance of the educational interests of the children within the School System.[130]

---

121. See Testimony of Frank Earnest, Jr. in 1978 hearing in Lee Case; and School Board Exhibit 131 in 1978 hearing in Lee Case. See also School Board Exhibit V.

122. Id.

123. Id.

124. Id.

125. Id.

126. Id.

127. See Plaintiff Exhibit 31; School Board Exhibits B, E, F, G, H, and K; testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; School Board Exhibits 120, 121, 122, 123, 124, and 125 of 1978 hearing in Lee Case; and Answers of School Board in Lee Case served January 17, 1978 to Plaintiff's Interrogatories No. 19, 21, and 29. See also Findings of Fact and Conclusions of Law made and entered in Lee Case on February 23, 1978 following extensive evidentiary hearings.

128. Id.

129. Id.

130. Id.

50. During the 1976–77 school term, the School Board funded and adopted a pilot testing program for grades 1–6.[131] In early September, 1976, students in grades 1–6 were pre-tested in reading and math, using the California Achievement Test. In mid-May, 1977, those students were given a post-test, to determine their progress during that school year. There was significant progress made in both reading and mathematics during that school year.[132] The program was continued during the 1977–78 school term, and included standardized achievement tests in reading and math for all students in grades 1–6, 8, and 10; algebra prognosis for grades 7–8; and interest inventory for grade 9; and teacher made test items for grades 1–12.[133] The test results have been utilized by the teachers in the System as a teaching aid for the identification of weaknesses and strengths of individual students. The 1976–77 test results, with the progress made during that year, are set out in summary form below.[134] The School Board's interest in raising the educational level of its students, and its willingness to utilize the latest available educational tools, is further evidence of the School Board's interest in and responsiveness to the educational needs and requirements of all of its students, especially its black and economically and culturally deprived students.

| GRADE | READING TEST RESULTS | | | | MATHEMATIC TEST RESULTS | | | |
|---|---|---|---|---|---|---|---|---|
| | Number Tested | Pre-Result | Post-Result | Gain | Number Tested | Pre-Result | Post-Result | Gain |
| 1 | 522 | | 1.6 | | 436 | | 1.6 | |
| 2 | 442 | 0.7 | 2.3 | 1.6 | 458 | 0.7 | 2.5 | 1.8 |
| 3 | 504 | 1.8 | 3.1 | 1.3 | 439 | 2.2 | 3.5 | 1.3 |
| 4 | 528 | 2.6 | 4.2 | 1.6 | 527 | 2.8 | 4.3 | 1.5 |
| 5 | 553 | 3.1 | 4.2 | 1.1 | 447 | 3.6 | 4.7 | 1.1 |
| 6 | 446 | 3.8 | 4.8 | 1.0 | 484 | 4.4 | 5.7 | 1.3 |

51. Counsel for Plaintiff has suggested that the School Board's disciplinary procedures have worked more harshly against blacks than whites. However, the evidence does not substantiate that contention. During the 1972–73 school year 153 students received corporal punishment as a formal disciplinary measure, of whom 111 (72.5%) were black and 42 (27.5%) were white.[135] During the 1975–76 school year 1,096 students were administered corporal punishment, of whom 467 (42.6%) were white and 629 (57.4%) were black.[136] During the 1977–78 school year 481 students were administered corporal punishment, of whom 365 (75.9%) were black and 116 (24.1%) were white.[137] During the 1975–76 school year, a total of 264 students were expelled or suspended, of whom 155 (58.7%) were white and 109 (41.3%) were black.[138] During the 1977–78 school year 187 students were expelled or suspended, of whom 144 (77%) were black and 43 (23%) were white.[139] Since blacks comprise approximately 75% of the student enrollment, these figures show that the relative numbers and percentages of white and black students who were disci-

131. See School Board Exhibit 130 of 1978 hearing in Lee Case; and testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case.

132. Id.

133. Id.

134. Id.

135. See Plaintiff Exhibit 31.

136. Id.

137. Id.

138. Id.

139. Id.

plined has substantially conformed to the relative numbers and percentages of white and black students enrolled in the School System. If anything, these figures suggest that the School's Boards disciplinary procedures have perhaps worked more harshly against whites than blacks. The Court therefore finds that the School Board's disciplinary procedures have been applied fairly and without discrimination, and that Plaintiff's evidence concerning those procedures has failed to show any lack of responsiveness by the School Board.

52. The School Board has also evidenced its awareness of the specialized needs of its black students, and its responsiveness to those needs, by offering an extensive vocational education program to high school students.[140] Because many of the Dallas County students are economically and culturally deprived, and do not plan to attend college, the School Board has recognized the importance of providing a solid vocational education program. In 1971, the School Board planned and constructed an area vocational school, primarily with state funding then available.[141] With resources provided at that school, supplemented by the staff and resources of the three high schools, the School Board has provided vocational education programs in agri-business, auto-mechanics, auto-body, business education, handicapped, home economics, masonry, industrial arts, and distributive education.[142] During the 1977–78 school year, there were a total of 1,072 high school students enrolled in vocational education programs, of whom 768 (71.6%) were black and 304 (28.4%) were white.[143] These figures reflect that of the total high school enrollment that year of 2,047 students,[144] approximately 52.4% elected to take vocational education courses. The School Board's awareness of the special needs of its black students for vocational education programs, and its response to those needs by constructing a vocational education school and by providing vocational courses, further evidence the responsiveness of the School Board to the black community of Dallas County.

53. The School Board has also provided special education classes to meet the special needs of students requiring those courses. During the 1977–78 school year there were 393 students enrolled in special education courses, of whom 331 (84.2%) were black and 62 (15.8%) were white.[145] During the 1979–80 school year there were a total of 524 students enrolled in special education classes, of whom 442 (84.4%) were black and 82 (15.6%) were white.[146] These special education classes meet a special need of Dallas County students, most of whom are black, and further evidence the School Board's responsiveness to the particularized needs of its black students.

54. There has been a historical low tax base for support of the Dallas County School System. Under a long-standing policy, all playground equipment at the various schools has been provided by either PTO organizations, local projects, or other interested lay organizations.[147] In 1977 the Dallas County Commission, with aid provided through federal funding, set up a County wide educational program under which recreational sites were built and equipped at

140. See testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; School Board Exhibit 126 of 1978 hearing in Lee Case; and Answers of School Board served January 17, 1978 to Plaintiff's Interrogatories No. 37 and 38 in Lee Case.

141. Id. See also Plaintiff's Exhibits 31 and 32.

142. Id.

143. Id.

144. Id.

145. See Plaintiff's Exhibit 31; testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; and School Board Exhibit 129 of 1978 hearing in Lee Case.

146. Id.

147. See testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; deposition of Frank Earnest, Jr. taken November 2, 1979 and admitted in evidence (Transcript, pp. 1508–09); and testimony of Andrew Calhoun (Transcript, pp. 2279–2281).

various locations throughout the County.[148] Because of the location of these sites, they have been used primarily by members of the black community.[149] The School Board assisted and cooperated with the County Commission in this project by making several of its school sites available for the county recreation program.[150] This action by the School Board constitutes further evidence of its awareness of the particularized recreational needs of the black community and its responsiveness to those needs.

55. The School Board has participated in a number of child nutrition programs, including the National School Lunch Program, the Special Milk Program, and the Non-Food Assistance Program.[151] These programs have provided substantial benefits to children who are economically and culturally deprived, most of whom are black. On or about October 1, 1978, 4,360 students received free lunches and 269 students received reduced price lunches.[152] Thus, 4,629 students received free or reduced price lunches, representing 80.6% of the total enrollment of 5,743 students on October 1, 1978. These figures confirm that the School Board has actively participated in the child nutrition program, and has insured that the benefits of that program are made available to all eligible students, most of whom are black. This action by the School Board further evidences its awareness of the special nutritional needs of its black students, and its responsiveness to those needs.

56. The United States Department of Agriculture also has a free breakfast program.[153] The School Board does not now participate in that program, although it has participated in prior years through two pilot programs.[154] Eligibility for the school breakfast program is determined by schools, based on the number of students in depressed economic circumstances. Approximately 9 schools within the Dallas County System are eligible to participate in that program.[155] Before deciding whether to participate in this breakfast program, the School Board not only ran two pilot programs but also instructed the local principals to determine the extent of community interest and support for the program.[156] Because of bus and class schedules, a school's participation in the program would require that all children transported to that school arrive earlier and leave later, including those who might not participate in the breakfast program as well as those who did.[157] The principals of the eligible schools (most of whom were black) reported to the School Board that there did not appear to be sufficient community interest and support to justify the program, and the program was not adopted by the School Board.[158] The Court finds no fault with that decision, nor the procedures followed to arrive at that decision. The School Board had to weigh the need for the program against the lack of community support, the hardships that would have been imposed on non-participating students, and the resulting disruptions in class and transportation scheduling. The School Board's decision was not arbitrary, but was reached only after careful investigation of the program through two pilot programs and studies and recommendations made by principals of the eligible schools.[159] This decision appears to be fair and reasonable and based on solid educational criteria and procedures,

148. Id.

149. Id.

150. Id.

151. See Plaintiff Exhibit 31; deposition of Frank Earnest, Jr. taken November 2, 1979 and admitted in evidence (Transcript, pp. 1508–09); testimony of Frank Earnest, Jr. at pp. 1511–1529 of Transcript.

152. Id.

153. Id.

154. Id.

155. Id.

156. Id.

157. Id.

158. Id.

159. Id.

and it therefore does not show any lack of responsiveness by the School Board to the nutritional needs of its black students. In view of the School Board's active participation in the free lunch program and the Special Milk Program, the Court attaches no significance and affords no weight to the fact that the School Board, after investigation and trial, decided not to participate in the free breakfast program.

57. Plaintiff's evidence reflecting the employment practices of the School Board has failed to establish any discrimination against blacks or lack of responsiveness to the employment needs of blacks. During 1977–78 school year, blacks comprised approximately 60% of the teaching and administrative staff, approximately 58% of the non-certified staff, and approximately 65% of the school bus drivers.[160] The salary schedules of the School Board have been reviewed in the *Lee* case and are fair and non-discriminatory.[161] These figures reflect, and the Court therefore finds, that the employment practices of the School Board have been fair, non-discriminatory, and responsive to the particularized employment needs and concerns of blacks.

58. Through testimony in the *Lee* case, this Court knows that the School Board has for many years operated an adult education program, with night classes offered in the local communities.[162] This adult education program meets an important educational need of the adult black citizens of Dallas County, and further evidences the School Board's awareness of and responsiveness to those particularized black needs and interests.

59. The School Board requested and obtained the assistance of the Needs Assessment Team of the State Department of Education during the 1976–77 school year.[163] That professional team made certain specific recommendations, which were implemented by the School Board. Pursuant to those recommendations, the School Board has adopted a plan for professional development and has taken steps to implement that plan.[164] By its efforts to further the professional development of its professional staff, the School Board has evidenced an awareness of the professional needs of its professional staff (approximately 60% of whom are black) and the educational needs of its students (approximately 75% of whom are black), and a responsiveness to those needs.

60. For many years, the State Department of Education has maintained a survey staff that has provided assistance to city and county superintendents and their boards of education in the analysis and solution of various types of educational problems. The School Board has utilized the services of this state survey staff, going back to 1947.[165] The original survey of the Dallas County School System was made in 1947,[166] and later surveys were made in

**160.** See Plaintiff's Exhibit 31; testimony of Frank Earnest, Jr. in 1978 hearings in Lee Case; Plaintiff-Intervenor Exhibits No. 8, 9, 10, 11, 12, 13, 14, 15, 16, and 24 of 1978 hearing in Lee Case; School Board Exhibit 127 of 1978 hearing in Lee Case; School Board Exhibits I and J; Answers of School Board in Lee Case served January 19, 1978 to Plaintiff's Interrogatories No. 27 and 28; and Answers of Frank Earnest, Jr. served May 14, 1975 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 1–16. Also, see the several Reports of School Board filed in Lee Case since 1975.

**161.** Id. See also Findings of Fact and Conclusions of Law made and entered in Lee Case on February 23, 1978.

**162.** See testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; Plaintiff's Exhibit

131; and School Board Exhibit 127 of 1978 hearing in Lee Case.

**163.** See Testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; and School Board Exhibit BB.

**164.** Id. See also School Board Exhibit HH.

**165.** See testimony of Frank Earnest, Jr. at pp. 1532–33 of Transcript; deposition of Frank Earnest, Jr. taken November 2, 1979 and admitted in evidence (at pp. 1508–09 of Transcript); and Plaintiff's Exhibits 33, 34, 35, 36, 37, and 38.

**166.** Plaintiff's Exhibit 33.

1951,[167] 1958,[168] 1964,[169] 1968,[170] and 1979.[171] Plaintiff has offered in evidence the official reports of those surveys, and the Court has carefully considered them on the issue of responsiveness. These reports, together with other evidence previously received and considered by the Court in the *Lee* case, demonstrate that the School Board has improved and upgraded its System, thereby achieving a quality educational program for all of its students—and especially the 75% who are black. Prior to 1954, the Dallas County School System was operated on a completely racially segregated basis pursuant to the laws of the State of Alabama. Under this system of *de jure* segregation, the School Board operated separate school systems for its black and white students. The 1947 survey report [172] painted a dreary and almost hopeless picture of the Dallas County School System. There were then a total of 195 separate school centers, 26 of which were white and 169 of which were black.[173] Most of these schools had inadequate buildings, inadequate staff, and inadequate programs.[174] Neither state nor federal governments then provided the type financial assistance that is now available, and in 1947 the School Board received a total of only $433,954.00, of which $322,-087.00 (74.2%) was state funds, $108,858.00 (25.1%) was local funds, and only $3,534.00 (0.8%) was federal funds.[175] By all recognized criteria and indicators, the Dallas County School System was then doing a deplorable job—especially for its black students. For example, the 1947 school census of children ages 6 to 20 reflected 9,095 blacks and 1,504 whites residing in the School District. However, only 858 whites and 6,959 blacks were enrolled, and their average daily attendance was only 767 whites and 5,835 blacks.[176] Even more significantly, the holding power of the System was deplorable, especially as to the black students. Holding power is one of the primary methods to test the effectiveness of a school system.[177] The holding power is determined by comparing the number of students enrolled in the 12th grade with the number of students enrolling in the 1st grade twelve years previously.[178] This 1947 survey showed that out of 128 white students enrolling in the 1st grade in 1934, only 37 were still enrolled twelve years later in the 12th grade, with a white holding power of 28.9%.[179] However, of the 3,353 black students enrolled in the 1st grade in 1934, only 17 were still enrolled in the 12th grade twelve years later, with an unbelievably low holding power of 0.5%.[180] Most of the school centers were inadequate, both as to facilities and staff. The report found an immediate need for $1,707,000.00 in new construction, but recognized that there were available building funds of only $140,613.00.[181] The report opined that the System could possibly issue warrants up to $300,000.00, but even by borrowing up to its maximum indebtedness the System would still be without necessary funds to meet its immediate building needs.[182] In short, the picture presented by the 1947 report was bleak, if not hopeless. The progress and achievements which have been recorded by the School Board since 1947 have been remarkable, and are best illustrated by reference to those same criteria which painted such a hopeless picture in 1947.

167. Plaintiff's Exhibit 35.

168. Plaintiff's Exhibit 36.

169. Plaintiff's Exhibit 37.

170. Plaintiff's Exhibit 38.

171. Plaintiff's Exhibit 34.

172. Plaintiff's Exhibit 33.

173. Id.

174. *Id.*

175. Id.

176. Id.

177. Id.

178. Id.

179. Id.

180. Id.

181. Id.

182. Id.

61. An analysis of the school census, the actual enrollment, and the average daily attendance figures since 1936 show remarkable improvement. These figures are as follows: [183]

| YEAR | BLACKS | | | WHITES | | |
|------|--------|--------|--------|--------|--------|--------|
| | Census Ages 6–20 | Actual Enrollment | Avg. Daily Attendance | Census Ages 6–20 | Actual Enrollment | Avg. Daily Attendance |
| 1936 | 12,789 | 7,752 | 6,760 | 1,898 | 1,130 | 950 |
| 1938 | 12,547 | 7,028 | 6,052 | 1,863 | 996 | 848 |
| 1940 | 12,669 | 7,732 | 6,831 | 1,580 | 962 | 836 |
| 1942 | 10,749 | 7,228 | 6,450 | 1,759 | 984 | 867 |
| 1946 | 9,095 | 6,959 | 5,835 | 1,504 | 858 | 767 |
| 1950 | 8,213 | 6,684 | 5,740 | 2,150 | 1,076 | 976 |
| 1954 | 7,642 | 6,559 | 5,381 | 2,619 | 1,620 | 1,370 |
| 1958 | 7,506 | 6,449 | 5,646 | 2,055 | 1,429 | 1,272 |
| 1962 | 7,300 | 6,472 | 5,670 | 2,374 | 1,628 | 1,463 |
| 1966 | 6,352 | 6,323 | N/A | 2,942 | 1,766 | N/A |
| 1970 | 6,210 | 5,792 | N/A | 2,970 | 2,486 | N/A |
| 1974 | 6,123 | 5,242 | N/A | 2,797 | 2,054 | N/A |

62. The above figures clearly and dramatically show steady increases in both the percentage of school age children actually enrolled in school as well as the percentage of enrolled students attending classes. For example, the figures for 1936 reflect that 60.6% of eligible blacks were enrolled, and 59.5% of eligible whites. However, the percentages based on average daily attendance are 50.1% white and 52.9% black. In 1946 (the year of the original survey) 57% of the eligible whites were enrolled and 76.5% of the eligible blacks. Using average daily attendance figures, the 1946 percentages were 51% white and 64.2% black. The steady increase in pupil enrollment and attendance continued, as reflected above. By 1974, 85% of eligible blacks were enrolled in school, and 73.4% of eligible whites. These figures show that the School Board has done a good job in attracting and keeping eligible students, especially blacks. Average daily attendance figures were available only through 1962, but for that year the black attendance average was 87.6%, while the white attendance average was 89.9%. These figures clearly show that the School Board has made progress, over the years, in attracting eligible school age children.

63. The figures showing the steady increases in holding power are equally impressive and dramatic, and are even more significant from an educational viewpoint. The figures reflecting holding power are as follows: [184]

| YEAR | WHITE STUDENTS | | | | BLACK STUDENTS | | | |
|------|--------|--------|--------|--------|--------|--------|--------|--------|
| | No. in Grade 1 12 Yrs. Ago | No. in 12th Grade | % of Holding Power | Loss of Students In 12 Yr. Period | No. in Grade 1 12 Yrs. Ago | No. in 12th Grade | % of Holding Power | Loss of Students In 12 Yr. Period |
| 46–47 | 128 | 37 | 28.9% | −26.5% | 3,353 | 17 | 0.5% | −3.7% |
| 50–51 | 108 | 45 | 41.7% | +13.0% | 3,045 | 53 | 1.7% | −13.2% |
| 57–58 | N/A | N/A | N/A | N/A | 1,948 | 158 | 8.1% | −4.9% |
| 63–64 | 146 | 67 | 45.9% | +42.3% | 1,494 | 269 | 18.0% | −1.2% |
| 67–68 | 152 | 101 | 66.4% | +53.2% | 1,140 | 292 | 25.6% | −7.2% |
| 78–79 | 231 | 117 | 50.6% | −28.2% | 735 | 332 | 45.2% | −26.5% |

**183.** See Plaintiff's Exhibits 33, 34, 35, 36, 37, and 38.

**184.** Id.

64. The above figures show a dramatic increase in holding power in all students, but especially among black students. Thus the percentage of holding power for black students increased steadily from 0.5% in 1946, 1.7% in 1950, 8.1% in 1957, 18.0% in 1963, 25.6% in 1967, and 45.2% in 1978. During those same periods, there were substantial losses in black student enrollments, which makes the holding power figures even more impressive. For example, in 1978 there was a 45.2% holding power, even though there was a 26.5% decline in black enrollment. The figures for white students are also impressive, although population increases during many of these periods account for some white increases in holding power. Nevertheless, during 1978, there was a 50.6% white holding power even with a 28.2% decline in white enrollment. These holding power figures are especially significant in view of the fact that approximately 80% of all students enrolled come from culturally and economically deprived families, and therefore are more prone to drop out of school and go to work before graduation. Although the holding power figures are slightly better for white students, the Court is impressed that the School Board's efforts have achieved dramatic results among black students. Furthermore, the Court's analysis of available figures indicates that, in future years, the holding power of the Dallas County schools will continue to improve. For example, the holding power of black pupils enrolled in the 11th grade in 1977–78, when compared to the number enrolled in the 1st grade eleven years previously, reflects a holding power of 57.1%, during a period when the black student enrollment decreased by 26.2%.

65. The Dallas County School System started a program of school consolidation and new construction following the 1946 survey, designed to implement the state recommendations and improve the school facilities.[185] This Court is well aware of the multitude of problems associated with closings and consolidations of schools, especially in rural areas. Nevertheless, the School Board achieved remarkable results, and implemented the recommendations of the state survey teams. In 1946 there were 195 school centers, of which 26 were white and 169 were black.[186] By 1950, there were 109 schools, of which 8 were white and 101 were black.[187] By 1957, following an intensive period of consolidation, there were 33 schools, of which 8 were white and 25 were black.[188] By 1963, the number had been reduced to 25, of which 7 were white and 18 were black.[189] In 1965 the School Board adopted its voluntary plan of desegregation, and in 1970 the Court approved plan of desegregation was implemented. However, the consolidation program started in 1946 was substantially completed by 1967, at which time there were only 16 schools.[190] There are now 15 schools, including the Area Vocational School.[191] The School Board has progressed from the *de jure* system of segregation required before 1954, to the voluntary desegregation plan adopted by the School Board in 1965, to its present unitary and desegregated status achieved under the 1970 approved Desegregation Plan.[192] The program of closings and consolidations implemented by the School Board before 1970 has substantially improved the educational opportunities of black students, and further evidences the School Board's interest and awareness in the particularized needs of blacks for quali-

185. Id. See also Plaintiff's Exhibit 32; testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; Plaintiff-Intervenor's Exhibits 21 and 22 of 1978 hearing in Lee Case; and School Board's Answers served January 19, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 17 and 18.

186. See Plaintiff's Exhibit 33.

187. See Plaintiff's Exhibit 35.

188. See Plaintiff's Exhibit 36.

189. See Plaintiff's Exhibit 37.

190. See Plaintiff's Exhibits 38 and 34.

191. See Plaintiff's Exhibits 31, 32, and 34.

192. See prior Orders of this Court entered in Lee Case on February 10, 1977; March 24, 1977; November 10, 1977; February 23, 1978; and February 2, 1979.

ty education, as well as its responsiveness to those needs.

66. During the period from 1946 to 1970 the School Board reduced the total number of its schools from 195 to 16.[193] In order to achieve these closings and consolidations, it was necessary for the School Board to undertake a substantial new construction program. All of its present schools, except the original buildings at Dallas County High, were built in 1946 or later, at a total cost of more than $3,300,000.00.[194] The school buildings which were constructed contained a total of 489,790 feet.[195] Of that total square footage, 10,004 square feet (2.0%) was constructed prior to 1920; 50,912 square feet (10.4%) from 1941 to 1950; 147,752 square feet (30.2%) from 1951 to 1960; 221,921 square feet (45.3%) from 1961 to 1970; and 59,201 square feet (12.1%) since 1971.[196] These figures do not include either the Area Vocational School or the Learning Resource Center, since those facilities were not reflected in the Plans and Surveys School Index for Dallas County introduced by Plaintiff (presumably because these are special purpose facilities rather than approved school sites).[197] However, the Court is aware (through the *Lee* case) that the Area Vocational School was built with state funds in 1971 at a cost of $321,692.00, and that the Learning Resource Center was built primarily with federal funds in 1966 at a cost of approximately $225,000.00.[198] The following is a summary of Plaintiff's evidence describing the school facilities of the Dallas County School System, showing when originally built, the total number of buildings (original plus additions), the size of the school sites, the total costs, and the amounts provided by federal and local sources:[199]

### SCHEDULE OF SCHOOL BUILDINGS

| SCHOOL | Original Year Built | Total No. of Bldgs. | Size of Site (Acres) | Federal Funds In Cost | Total Costs | Local Funds In Cost |
|---|---|---|---|---|---|---|
| Brantley | 1956 | 5 + 3 = 8 | 12 | 49,600.00 | 244,460.00 | 48,000.00 |
| Dallas Co. Hi. | 1908 | 8 + 6 = 14 | 21 | –0– | 260,360.00 | 63,000.00 |
| Five Points El. | 1962 | 1 + 0 = 1 | 7 | –0– | 69,000.00 | –0– |
| Hazen Harrell Jr. | 1962 | 5 + 0 = 5 | 15 | 49,600.00 | 215,100.00 | 11,500.00 |
| Hunter Mission El. | 1955 | 1 + 0 = 1 | 12 | N/A | N/A | N/A |
| J. E. Terry El. | 1957 | 1 + 3 = 4 | 6 | –0– | 216,877.00 | 15,000.00 |
| Keith High | 1949 | 6 + 2 = 8 | 52 | –0– | 315,800.00 | 73,000.00 |
| Martin Station El. | 1958 | 1 + 2 = 3 | 8 | –0– | 51,700.00 | 51,700.00 |
| Salem El. | 1952 | 1 + 1 = 2 | 7 | –0– | 46,800.00 | 46,800.00 |
| Shiloh Jr. High | 1949 | 7 + 2 = 9 | 13 | 49,600.00 | 231,006.00 | 32,000.00 |
| Southside El. | 1968 | 3 + 0 = 3 | 13 | 110,000.00 | 318,500.00 | 208,500.00 |
| Southside High | 1946 | 5 + 9 = 14 | 58 | –0– | 587,726.00 | 241,400.00 |
| Tipton Jr. High | 1953 | 7 + 5 = 12 | 15 | 80,000.00 | 295,540.00 | 74,750.00 |
| Tyler Union | 1953 | 6 + 0 = 6 | 15 | 49,600.00 | 84,100.00 | 34,500.00 |

193. See Plaintiff's Exhibits 33, 34, 35, 36, 37, and 38.

194. See Plaintiff's Exhibit 32.

195. Id.

196. Id.

197. Id.

198. See Plaintiff-Intervenor's Exhibits 21 and 22 of 1978 hearing in Lee Case, and testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case.

199. See Plaintiff's Exhibit 32.

### SCHEDULE OF SCHOOL BUILDINGS

| SCHOOL | Original Year Built | Total No. of Bldgs. | Size of Site (Acres) | Federal Funds In Cost | Total Costs | Local Funds In Cost |
|---|---|---|---|---|---|---|
| Valleygrande El. | 1969 | 4 + 0 = 4 | 26 | 37,200.00 | 311,200.00 | 274,000.00 |
| Westlawn El. | 1962 | 1 + 0 = 1 | 10 | –0– | 69,000.00 | –0– |
| TOTALS | | 62 + 33 = 95 | | 426,400.00 (12.9%) | 3,317,169.00 | 1,174,150.00 (35.4%) |

As can be seen, the School Board provided approximately 35.4% of the total cost of the above facilities from local funds, while the federal government contributed only 12.9% and assisted in construction of only 7 of the 16 schools. These figures show a substantial amount of "self-help" by the School Board, from local funds, in implementing the consolidation program and new construction necessary to achieve a quality education system. The achievements of the School Board in implementing its planned program of closing and consolidating the multitude of small and inadequate schools, and replacing them with modern adequate consolidated schools, further evidences the School Board's awareness of the needs of its students for a quality educational program, and its responsiveness to those needs by providing adequate school facilities. It is especially significant that most of this progress was achieved by the Board before 1970, with very little (only 12.9%) federal assistance and a substantial amount (35.4%) of local funds to supplement the available state funds (approximately 51.7%).

67. The School Board has substantially implemented and complied with the recommendations of the State Department of Education relative to school centers, sites, and buildings.[200] As noted in the 1968 survey report, "the Dallas County School System was probably the first county system in the state to completely comply with recommendations of the State Department of Education relative to school centers, sites, and buildings".[201] This action reflects favorably upon the School Board and its responsiveness to the educational needs of its students, both black and white.

68. The school facilities of the School Board have substantially increased in value since they were originally constructed. The School Board's judgment as to current value is reflected in the insured value of its educational facilities. In January, 1978, the insured values for the Dallas County educational facilities were as follows: [202]

| NAME OF EDUCATION FACILITY | INSURED VALUES |
|---|---|
| Brantley Jr. High School | 490,800.00 |
| Dallas County High School | 1,224,333.00 |
| Five Points Elementary | 145,000.00 |
| Hazen-Harrell Jr. High | 445,700.00 |
| Hunter Mission Elementary | 110,000.00 |
| J. E. Terry Elementary | 305,000.00 |
| Keith High School | 1,241,134.00 |
| Martin Station Elementary | 130,000.00 |
| Salem Elementary | 130,000.00 |
| Shiloh Jr. High | 450,300.00 |
| Southside High | 1,119,433.00 |
| Southside Elementary | 935,400.00 |
| Tipton Jr. High | 877,500.00 |
| Tyler Union | 358,500.00 |
| Valleygrande Elementary | 464,000.00 |
| Westlawn Elementary | 120,000.00 |
| Area Vocational School | 515,000.00 |
| Resource Center | 750,000.00 |

69. Since 1970 the School Board has disposed of three parcels of surplus real estate. One of these parcels was exchanged with Joseph I. McHugh in January, 1974, in exchange for other real estate then needed by the Board.[203] In January, 1974, the School

200. See Plaintiff's Exhibits 32, 33, 34, 35, 36, 37, and 38; testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; and Answers of School Board served January 17, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 14, 15, 16, 17, and 18.

201. Plaintiff's Exhibit 38.

202. See Plaintiff-Intervenor's Exhibit 20 of 1978 hearing in Lee Case, and also School Board's Answers served on January 17, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 14 and 15.

203. See Testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; and Answers of School Board served January 17, 1978 in Lee

Board conveyed the old Orrville school site to the town of Orrville, for use as a rest home or nursing home.[204] On May 19, 1977, the Board conveyed to E. M. Brown Community Center, a non-profit corporation, the land previously used as the E. M. Brown school.[205] Both of these latter conveyances were made as public benefit conveyances, without consideration, for public usage by the residents of those communities, most of whom were black.[206] The deeds contained express conditions that the property could not be used as private or public schools, or for other than public usage.[207] These public benefit conveyances reflected an awareness of the needs of the black residents of those local communities, and a responsiveness by the Board to those needs. Furthermore, by inserting the restrictive covenants, the School Board was following the spirit and intent of the approved Desegregation Plan and further evidenced its good faith compliance with that Plan.

70. Before 1970 none of the present Dallas County Schools were accredited by the Southern Association of Colleges and Secondary Schools, and only three schools (Keith High, Shiloh Jr. High, and Dallas County High) were accredited by the State of Alabama.[208] Accreditation by the State of Alabama indicates that a school so accredited meets certain basic criteria indicative of quality education, including such areas as facilities, teacher qualifications, teacher—student ratios, available libraries, counseling services, and other program services.[209] The Southern Association of Colleges and Secondary Schools is a regional accrediting agency which evaluates schools and determines whether those schools meet those basic criteria indicative of a quality educational program. The Southern Association criteria are similar to those of the State of Alabama.[210] By 1975, the School Board had achieved state accreditation for every school within the System, and had achieved Southern Association accreditation for its three high schools.[211] The following table indicates the status of each Dallas County School, indicating whether and when it was accredited by the State of Alabama and by the Southern Association of Colleges and Secondary Schools: [212]

| SCHOOL | STATE ACCREDITMENT | SOUTHERN ASSOCIATION ACCREDITMENT |
|---|---|---|
| Brantley High School | 1974 | |
| Dallas County High | 1958 | 1974–75 school year |
| Five Points Elementary | 1975 | |
| Hazen-Harrell Jr. High | 1973 | |
| Hunter Mission Elementary | 1975 | |
| J. E. Terry Elementary | 1974 | |
| Keith High School | 1953 | 1974–75 school year |
| Martin Station Elementary | 1975 | |
| Salem Elementary | 1975 | |
| Shiloh Jr. High | 1953 | |

Case to Plaintiff-Intervenor's Interrogatories No. 51.

204. Id.

205. Id.

206. Id.

207. Id.

208. See Testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; School Board's Exhibits 117, 118, and 127 of 1978 hearing in Lee

Case; and Answers of School Board served January 17, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 29. See also School Board Exhibit DD.

209. Id.

210. Id.

211. Id.

212. Id.

| SCHOOL | STATE ACCREDITMENT | SOUTHERN ASSOCIATION ACCREDITMENT |
|---|---|---|
| Southside High | 1970 | 1974–75 school year |
| Southside Elementary | 1975 | |
| Tipton Jr. High | 1973 | |
| Valleygrande Elementary | 1974 | |

Accreditation procedures review whether the school facilities are adequate, both as to the real estate (including size of site) and buildings and equipment.[213] Consideration is given to teacher—student ratios, adequacy of libraries, total number of students taught by each teacher, whether teachers hold appropriate certificates for their teaching positions, whether guidance services are available, whether principals are bonded and handle local finances, whether Alabama courses of study are followed, whether credit is granted for transfers from other state accredited schools, the existence and adequacy of cumulative student records, the existence and adequacy of approved accounting systems, whether essential equipment is adequate for laboratory courses in science, music, art, home economics, and shop, whether job descriptions are written for each employee, whether an effective personnel evaluation system is in effect, and other inquiries to determine whether the school offers a quality educational program.[214] Southern Association accreditation is especially significant for those students who plan to attend college.[215] Furthermore, the accreditation review process is another method whereby the School Board reviews and upgrades its educational programs. Accreditation is a stamp of approval, confirming that the accredited schools have established quality educational programs.[216] The success of the School Board in achieving state accreditation for all of its schools and Southern Association accreditation for its high schools is especially significant when consideration is given to the deplorable conditions which existed within the System prior to 1951.[217]

71. As part of the School Board's program to gain accreditation for all schools, the School Board established libraries in each school and provided at least the minimum required library books.[218] During the 1977–78 school year, the Dallas County schools had the following number of books in their libraries: Brantley 7,075; Dallas County High 8,218; Five Points 1,768; Hazen-Harrell 5,296; Hunter Mission 6,659; J. E. Terry 4,180; Keith High 9,552; Martin Station 3,070; Salem 2,430; Shiloh 6,294; Southside High 13,275; Southside Elementary 5,022; Tipton 6,709; and Valleygrande 4,399.[219]

72. As part of its program to achieve accreditation, the School Board substantially reduced and finally eliminated its prior practices of using non-professionally certified teachers. Thus, for example, there were 45 such teachers employed during 1969–70; 58 during 1970–71; 31 during 1972–73; 13 during 1973–74; and 3 during 1974–75.[220] Accreditation was achieved in 1975, and since that time the School Board

213. Id.

214. Id.

215. See, e.g., Testimony of J. C. Davis, Sr., at pp. 839–840 of Transcript; and testimony of Edwin L. Moss at pp. 735–736 of Transcript.

216. See n. 208, *supra*.

217. See Plaintiff's Exhibits 33 and 35.

218. See Testimony of Frank Earnest, Jr. during 1978 hearing in Lee Case; Answers of School Board served January 17, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 12 and 21; School Board Exhibits 117, 118, and 127 of 1978 hearing in Lee Case; and Plaintiff-Intervenor's Exhibit 21 of 1978 hearing in Lee Case.

219. Id.

220. See Answers of Frank Earnest, Jr. served May 14, 1975 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 4.

has used only professionally certified teachers, further evidencing its commitment to a quality educational program.[221]

73. The School Board has established a well-rounded and non-discriminatory program of extra-curricular activities in all schools. For example, during the 1977–78 school year there were numerous extra-curricular activities at the three senior high schools.[222] At Keith there were Band, Cheerleader Club, Future Nurses, Future Teachers, Science Club, FHA, FFA, 4–H, English and Journalism, Football, Basketball, Baseball, Track, Esquire Club, Mademoiselles Club, Jr. Honor Society, Sr. Honor Society, and Annual Staff. At Southside there were Football, Basketball, Baseball, Track, Volleyball, 4–H, Student Council, Jr. Honor Society, Sr. Honor Society, Annual Staff, Foreign Language Club, Band, FCA, FBLA, FFA, FHA, VIC, Science Club, and School Newspaper. At Dallas County High there were Band, Football, Baseball, Basketball, Track 4–H, Student Council, Sr. Honor Society, Jr. Honor Society, Annual Staff, Foreign Language Club, FHA, FFA, and Science Club. Plaintiff has offered no evidence to show that the School Board has been other than responsive to the particularized needs of blacks with respect to social and extra-curricular activities, including athletics. However, in the *Lee* case this Court has found that those programs are operated by the School Board in a fair and non-discriminatory fashion, and therefore finds that they are responsive to the needs and concerns of blacks.[223]

74. Superintendent Frank Earnest, Jr. was originally employed by the Dallas County School System in 1952, as Assistant Superintendent, and was assigned the primary responsibility for implementing the 1951 state recommendations for consolidations, closings, and construction of schools.[224] Mr. Earnest was named Superintendent in 1963, and has served since that time.[225] The School Board, under the guidance of Superintendent Earnest, has achieved remarkable and dramatic results in its efforts to improve the educational opportunities afforded by the Dallas County School System. This Court is aware of the conditions which existed in the System before 1951,[226] as well as the substantial improvements which have been made since that time. The program results are best reflected and confirmed by the criteria and factors which the Court has considered and discussed, including accreditation, adequacy of facilities, and holding power. The Court is familiar with the Dallas County Board of Education,[227] having supervised it since 1970.[228] The Court knows that the School Board has made a good faith effort not only to implement the approved Desegregation Plan, but also to preserve and strengthen the public school system while doing so. The test of the School Board's responsiveness to the needs of black (and white) citizens of Dallas County is whether the School Board has achieved a quality educational program as well as a unitary and desegregated system.[229] These School Board Defendants have done both, and in the process of doing so have maintained public support and public confidence in both the white and

221. See n. 208, *supra.*

222. See Answer of School Board served January 17, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 13.

223. See prior Orders of this Court in Lee Case made and entered on February 10, 1977; March 24, 1977; November 10, 1977; February 23, 1978; and February 2, 1979.

224. See Testimony of Frank Earnest, Jr. during 1978 hearings in Lee Case; and deposition of Frank Earnest, Jr. taken November 2, 1979 and admitted in evidence (at pp. 1508–09 of Transcript).

225. Id.

226. See Plaintiff's Exhibits 32 and 35.

227. See Finding of Fact No. 30, *supra,* and Order entered in Lee Case.

228. This Court has supervised the School Board in the Lee Case since 1970. Both informally and during trial proceedings, the Court has observed the policies, staff, programs, and community support of the School Board.

229. Id.

black communities.[230] Even as early as 1965, the School Board attempted to approach the transitional problems involved in converting to a unitary school system with a spirit of conciliation, compromise, and goodwill.[231] The School Board's success in establishing both a unitary system and a quality educational program has been accomplished during a time when student enrollments, both black and white, have been steadily decreasing because of sociological and economic factors unrelated to the operation of the School System, resulting in a decrease in available funds and a curtailment of teaching positions.[232] These achievements by the School Board not only deserve commendation by this Court, but also further evidence the School Board's responsiveness to the educational needs of black and white students and citizens in Dallas County.

75. The testimony of many of Plaintiff's witnesses showed acts by the School Board responsive to the requests or needs of blacks. For example, Mr. Samson Crum testified that he requested and was granted permission by the School Board to transport senior high school students to be registered as voters.[233] Mr. Edwin Moss testified as to the progress made by the School Board in achieving accreditation and in operating Title I programs.[234] Mr. J. C. Davis, Sr., has six children, four of whom graduated from Southside High School and two of whom are still in the Dallas County System.[235] He testified that four of his children went to college, and were benefited by the fact that Southside High School was accredited by the State of Alabama and the Southern Association of Secondary Schools.[236] This witness also testified concerning a disciplinary incident involving his son, J. C. Davis, Jr., who was expelled from Southside High but later reinstated at his father's request.[237] Mr. Cleophus Hobbs gave similar testimony concerning a disciplinary problem involving his son which was handled in a satisfactory manner by the black assistant principal at Southside High School.[238]

76. Most of the state survey reports contained general language to the effect that where the number of students who graduate are less than the number entering the 1st grade twelve years earlier, a major cause arises in not offering school programs which appeal to the interest or meet the needs of the pupils.[239] The Court has previously commented with respect to the dramatic increases in holding power accomplished by the School Board,[240] and the fact that the school programs have been accredited by the State of Alabama and also (with respect to the high school programs) by the Southern Association of Colleges and Secondary Schools.[241] Plaintiff has failed to offer any credible evidence showing that the School Board's programs have been other than adequate.[242] In that regard, the Court has considered the testimony of Mr. J. L. Chestnut, Jr., who was permitted to express his opinion that the School Board has not been as responsive as it could or should have been, because of the content of what is taught in the System.[243] Mr. Chestnut is an attorney and journalist known to the Court, but has no particular knowledge

230. Id.

231. See Findings of Fact No. 30 and 31, *supra*.

232. See Plaintiff's Exhibits 31, 33, 34, 35, 36, 37, and 38; and also the several Reports filed by the School Board in the Lee Case since 1975.

233. Transcript, pp. 468–680.

234. Transcript, pp. 735–736.

235. Transcript, pp. 839–840.

236. Id.

237. Transcript, pp. 835–840.

238. Transcript, pp. 906–909.

239. See, e.g., p. 4 of Plaintiff's Exhibit 34; p. 3 of Plaintiff's Exhibit 38; and p. 4 of Plaintiff's Exhibit 37.

240. See Findings of Fact No. 63 and 64, *supra*.

241. See Findings of Fact No. 70, 71, 72, and 73, *infra*.

242. See Findings of Fact No. 42, 43, 44, 45, 46, 49, 50, 51, 52, 53, 55, and 58, *supra*.

243. Transcript, p. 1080.

or qualifications as to educational standards and criteria. In any event, on cross-examination this witness made it clear that his criticism was not directed at the Dallas County System, but rather related generally to the perceived inadequacies of the curriculum prescribed by the State of Alabama.[244] Since the State Board of Education prescribed that curriculum, rather than the School Board Defendants, the Court has afforded no weight to those opinions expressed by this witness. Mr. Chestnut also opined, in general terms, that the quality of the black teachers within the Dallas County System was not equal to the quality of the white teachers within the System.[245] However, by way of contradiction, Mr. Chestnut acknowledged that he had previously attempted to get the School Board to assign an all black teaching staff at Brantley School, contrary to the *Singleton* mandate.[246] The Court finds no lack of responsiveness by the School Board in complying with the *Singleton* mandate in the assignment of teachers. During the course of his testimony, Mr. Chestnut also testified that the School Board acted in response to his request and suggestion in creating the Bi-Racial Advisory Committee, and that this was a responsive action by the School Board.[247] On balance, the testimony of Mr. Chestnut did not aid Plaintiff's case, but to the contrary tended to confirm the responsiveness of the School Board in creating a Bi-Racial Lay Advisory Committee.

77. The School Board has for a number of years offered courses in black culture as electives at Keith High School and South-side High School.[248] This evidences an awareness of the particularized interests and concerns of its black students in black history, and a responsiveness by the School Board to those particularized interests and concerns.

78. The School Board maintains attendance officers, whose duty it is to insure that the compulsory child attendance laws are obeyed.[249] The success of the School Board's efforts is best measured by the figures previously recited, showing the progressive increase in the percentages of eligible students who are enrolled in class, and the corresponding increases in average daily attendance figures.[250] The School Board's enforcement of the compulsory attendance laws is especially beneficial to those black students who might otherwise drop out of school at an early age. The School Board's compulsory attendance program is further evidence of its awareness of the particularized needs of blacks and its responsiveness to those needs.

79. The Court has reviewed the curriculum in the Dallas County Schools.[251] The State Board of Education prescribes the basic courses, but the School Board offers many electives (including courses in black culture).[252] The School Board's educational programs include basic skills programs (reading, writing, and arithmetic), college preparatory programs, vocational programs, Title I programs, special education programs, and adult education programs.[253] The Court finds that the School Board's education programs and courses are bal-

---

**244.** See Transcript, pp. 1148–1149.

**245.** See Transcript, p. 1150.

**246.** See Transcript, pp. 1150–1153.

**247.** Transcript, pp. 1151–1153.

**248.** See School Board Exhibit 127 of 1978 hearing in Lee Case; and Answer of School Board served January 17, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 12.

**249.** See testimony of Frank Earnest, Jr., in 1978 hearings in Lee Case; Plaintiff's Exhibit 31; and the several reports filed by School Board in Lee Case.

**250.** See Findings of Fact No. 61, 62, 63, and 64, *supra.*

**251.** This was one of the issues litigated in the 1978 hearings in the Lee Case. See testimony of Frank Earnest, Jr., during 1978 hearings in Lee Case; School Board Exhibit 127 of 1978 hearing in Lee Case; and Answer of School Board served January 17, 1978 in Lee Case to Plaintiff-Intervenor's Interrogatories No. 12. Also, see Findings of Fact No. 46, 48, 50, 52, 53, 58, 59, 70, 72, 74, and 77, *supra.*

**252.** Id.

**253.** Id.

anced, and that they reflect an awareness of the particularized needs and interests of black students and black citizens in Dallas County and a responsiveness to those needs.

80. Plaintiff offered no evidence to show that the School Board was not responsive in areas of community service such as youth programs, parent-teacher organization functions, community recreational programs, community meeting facilities, book mobile services, voter registration, health and sanitation services, and programs sponsored by the local community action agency and charitable organizations. The only evidence offered by Plaintiff relating to those community service areas has shown the School Board to be fully responsive to the needs and interest of blacks. Those community services in which the School Board has previously been found to be responsive include its participation in the county recreation program,[254] its effective utilization of parent-teacher organizations as a means of lay input,[255] its policy of utilizing local schools for community meetings,[256] its cooperation with the Community Action Agency in the operation of Head Start programs and bus transportation for Head Start Centers,[257] and its affirmative response to Mr. Crum in his voter registration efforts.[258] The Court therefore finds that there has been no lack of responsiveness by the School Board to the community service needs and interests of black students and black citizens in Dallas County.

81. In recent years the School Board has adopted policies designed to strengthen its basic skills programs, emphasize personal learning achievements, and eliminate the practice of "social promotions" previously followed in this (and most other) school systems.[259] These policies evidence an awareness of and responsiveness to the particularized needs of black students for basic learning skills.

82. The established policies of the School Board provide for lay input.[260] This lay input is not only provided by the School Trustees,[261] Title I Lay Advisory Committee,[262] parent-teacher organizations,[263] and the special Bi-Racial Advisory Committee,[264] but also by the "open-door" policy followed by the Superintendent, principals, and teaching staff.[265] Parents, students, and other interested citizens are encouraged, as a matter of School Board policy, to meet with the appropriate school officials and discuss any and all problems relating to the operation of the School System.[266] As previously noted, the creation of the special Bi-Racial Advisory Committee was one result of this open-door policy.[267] The Court therefore finds that the policies and procedures followed by the School Board in obtaining lay input from black parents, students, and other interested citizens further evidences their awareness of the special needs of the black community for lay input, and their responsiveness to those needs.

83. The Court has previously noted the program results of the educational policies

254. See Findings of Fact No. 54, *supra*.

255. See Findings of Fact No. 45, 74, and 82, *supra*.

256. See Findings of Fact No. 44, 58, and 80, *supra*. Also, see Section 16–10–11, 1975 Code of Ala.

257. See Findings of Fact No. 48 and 80, *supra*.

258. See Findings of Fact No. 75, *supra*, and n. 233, *supra*.

259. See Findings of Fact No. 79, *supra*, and n. 251, *supra*.

260. See Findings of Fact No. 45, *supra*, and n. 109, n. 110, n. 111, n. 112, n. 113, and n. 114, *supra*.

261. *Id.* See also Section 16–10–1 *et seq.*, 1975 Code of Ala.

262. *Id.*

263. *Id.*

264. *Id.*

265. *Id.* Also, see Findings of Fact No. 45, 74, 75, and 76, *supra*, and n. 111, n. 112, n. 228, n. 233, and n. 237, *supra*.

266. *Id.*

267. See Findings of Fact No. 45 and 76, *supra*, and n. 112 and n. 247, *supra*.

implemented by the School Board, including such things as accreditation,[268] holding power,[269] kindergarten and Head Start programs,[270] vocational education,[271] Title I programs,[272] testing procedures,[273] basic skills programs,[274] college preparatory programs,[275] and the community acceptance.[276] All of these factors result from a sound educational program,[277] and further evidence the School Board's recognition of and responsiveness to the special needs of black students and black citizens of Dallas County for a sound educational program.

84. The Court has previously discussed and made findings with respect to the sources of funding and revenues for the School Board, with particular emphasis on local efforts.[278] Although not reflected by the evidence, this Court is fully aware of the impact of recent state reappraisal programs on the Dallas County School System as well as other school systems throughout Alabama.[279] The School Board has supported and obtained ad valorem tax increases by county-wide vote, and has also sought and obtained ad valorem tax increases from the Dallas County Commission.[280] The School Board has effectively utilized a number of available federal programs,[281] and has effectively sought and obtained available state funds, especially for capital improvements.[282] There was evidence that the School Board had not applied for funds to promote desegregation which possibly were available under the Emergency School Aid Act.[283] However, the evidence clearly establishes that the School Board has achieved a unitary and fully desegregated system without the necessity for those funds, even if they were otherwise available.[284] In view of that fact, and in view of the School Board's effective utilization of many other federal sources of funding to improve its facilities and its educational program,[285] the Court affords neither significance nor weight on the issue of responsiveness to the mere fact that the School Board did not apply for that particular federal program which Plaintiff's counsel asserted to have been available.

85. The Plaintiff offered the entire record in the Lee case, together with a number of HEW reports, state surveys and statistical reports, and other documentary evidence, in an effort to show a lack of responsiveness by the School Board to the particularized needs of blacks. There was some testimony on this issue, although the primary thrust of Plaintiff's testimony was directed against the County Commission rather than the School Board. After careful consideration and review, the Court finds that Plaintiff's evidence not only fails to establish unresponsiveness to blacks by the School Board Defendants, but instead affirmatively shows by a preponderance of the evidence that the School Board Defendants have been responsive to the particular-

268. See Findings of Fact No. 70, 71, and 72, supra.

269. See Findings of Fact No. 63 and 64, supra.

270. See Findings of Fact No. 48, supra.

271. See Findings of Fact No. 52, supra.

272. See Findings of Fact No. 46 and 47, supra.

273. See Findings of Fact No. 50, supra.

274. See Findings of Fact No. 79 and 81, supra.

275. See Findings of Fact No. 79 and 81, supra.

276. See Findings of Fact No. 74, supra, and n. 228, supra.

277. See Findings of Fact No. 74, 79, and 81, supra.

278. See Findings of Fact No. 47 and 84, supra.

279. Much of the ad valorem tax base of the School Board is on agricultural land, and the impact of the "current use" assessments will further erode this tax base.

280. See Findings of Fact No. 47, supra.

281. See Findings of Fact 46, 47, and 66, supra.

282. See Findings of Fact 47 and 66, supra.

283. See testimony of Frank Earnest Jr. (Transcript, pp. 1510–12).

284. See Findings of Fact 34 and 42, supra.

285. See Findings of Fact 46, 47, and 66, supra.

ized needs and interest of black students and black citizens of Dallas County. In reaching this factual finding, the Court has weighed and considered all of the evidence and testimony which shows the School Board's responsiveness to black needs in all vital areas, including the following: transportation;[286] curriculum;[287] facilities;[288] vocational education;[289] special education;[290] Title I programs;[291] child nutrition programs;[292] adult education programs;[293] Head Start programs and pre-school centers;[294] citizens input, including bi-racial advisory committees;[295] state accreditation for all schools;[296] accreditation by the Southern Association of Colleges and Secondary Schools for all high schools;[297] achievement of a fully desegregated and unitary school system;[298] student assignments;[299] faculty assignments;[300] funding and revenue sources;[301] budgetary allocations for janitorial supplies, fee replacement money, library, guidance, testing, and general maintenance;[302] community support, including parent-teacher organizations, school trustees, and bi-racial advisory committees;[303] implementation and enforcement of approved Desegregation Plan;[304] adoption of policies and procedures governing inter-district transfers;[305] adoption of policies and procedures to stop zone jumping by students;[306] adoption of testing programs to assist teachers in raising the educational level of students;[307] adoption and maintenance of promotional standards which eliminated prior policy of social promotions;[308] voluntary adoption of HEW approved Desegregation Plan in 1965;[309] employment practices;[310] voter registration;[311] consolidations and closings of schools;[312] new construction;[313] professional development and in-service education programs;[314] and program results,[315] including accreditation,[316] holding power,[317]

**286.** See Findings of Fact 43, *supra,* and n. 104, *supra.*

**287.** See Findings of Fact 46, 52, 53, 79, and 81, *supra,* and n. 251, *supra.*

**288.** See Findings of Fact 44, 66, 67, and 68, *supra,* and n. 107, *supra.*

**289.** See Findings of Fact 52, *supra.*

**290.** See Findings of Fact 53, *supra.*

**291.** See Findings of Fact 46, *supra.*

**292.** See Findings of Fact 55, *supra.*

**293.** See Findings of Fact 58, *supra.*

**294.** See Findings of Fact 48, *supra.*

**295.** See Findings of Fact 45 and 82, *supra.*

**296.** See Findings of Fact 70, 71, and 72, *supra.*

**297.** Id.

**298.** See Findings of Fact 34 and 42, and n. 104 and n. 107, *supra.*

**299.** See Findings of Fact 34, 35, 36, 37, 38, 40, and 42, *supra.*

**300.** See Findings of Fact 33, 34, 35, 39, 41, and 42, *supra.*

**301.** See Findings of Fact 47, 66, and 84, *supra.*

**302.** See Findings of Fact 49, *supra.*

**303.** See Findings of Fact 45, 74, 80, and 82, *supra.*

**304.** See Findings of Fact 30–42 and 74, *supra,* and n. 104, n. 107, and n. 251, *supra.*

**305.** See Findings of Fact 36 and 37, *supra.*

**306.** See Findings of Fact 35, 36, 37, 38, 40, and 42, *supra.*

**307.** See Findings of Fact 50, *supra.*

**308.** See Findings of Fact 81, *supra.*

**309.** See Findings of Fact 30 and 31, *supra,* and n. 60, *supra.*

**310.** See Findings of Fact 57, *supra.*

**311.** See Findings of Fact 75 and 80, *supra,* and n. 233 and n. 258, *supra.*

**312.** See Findings of Fact 60, 65, 66, and 67, *supra.*

**313.** See Findings of Fact 66, 67, and 68, *supra,* and n. 107, *supra.*

**314.** See Findings of Fact 59, *supra.*

**315.** See Findings of Fact 74 and 83, *supra.*

**316.** See Findings of Fact 70, 71, and 72, *supra.*

**317.** See Findings of Fact 63 and 64, *supra.*

and the community acceptance.[318]  After careful consideration of the Plaintiff's evidence, the Court finds that Plaintiff has failed to establish by any credible evidence that the School Board has been unresponsive to the needs of either black students within the Dallas County School System or black citizens of Dallas County.  To the contrary, the evidence clearly shows, and this Court finds, that the School Board Defendants have been responsive to the particularized needs of black students within the School System and other black citizens of Dallas County.

86.  The Court has considered and weighed the substantial evidence offered by Plaintiff relating to the *Zimmer* issues of whether blacks lack access to the process of slating candidate, and whether the existence of past discrimination against blacks in general precludes their effective participation in the election system.  Because much of the evidence is overlapping, the Court will discuss all such evidence and findings together, but will make separate factual findings as to each of the separate *Zimmer* criteria.  In the process of doing so, the Court will of necessity also discuss and make findings as to a number of the criteria previously identified as "the eleven crucial Kirksey elements".  See *McIntosh Cty. NAACP v. City of Darien,* 605 F.2d 753, 761 (5th C.C.A., 1979).

87.  Dallas County, Alabama, is located in central Alabama.  It is bordered by Wilcox County to the south, Marengo County to the west, Perry County to the north and west, Autauga County to the north and east, and Lowndes County to the east.  Much of its population resides in Selma, which is the County seat and major municipality.  Its population has remained fairly stable.  For example, in 1970 there were 55,296 residents, of whom 26,330 (47.6%)

were white and 28,892 (52.3%) were black.[319]  On July 1, 1976, there were 56,200 residents, of whom 28,448 (50.62%) were white and 27,752 (49.38%) were black.[320]  Although the population remains substantially the same, there was a proportional increase in the white population by approximately 3%, with a corresponding proportionate decline in the black population.[321]  Furthermore, the white voting age population is proportionately higher than the total white population.[322]  For example, in 1970 whites comprised 53% of the voting age population and only 47.6% of the total population, while blacks comprised 47% of the voting age population and 52.3% of the total population.[323]  Although there have been no exact figures offered for voting age populations in 1976, the 1970 census figures [324] and other evidence all indicate that in July, 1976 whites comprised approximately 56% of the voting age population and 50.6% of the total population, while blacks comprised approximately 44% of the voting age population and approximately 49.4% of the total population.  These figures are significant, when considered along with the figures showing voter registration by races.  The following is a summary, by years, of the number and percentages of black and white registered voters in Dallas County: [325]

SUMMARY OF REGISTERED VOTERS

| YEAR | WHITE VOTERS | | BLACK VOTERS | | TOTALS |
|------|------|------|------|------|------|
| | No. | % | No. | % | |
| 1961 | 9,195 | 98.3% | 156 | 1.7% | 9,351 |
| 1962 | 8,597 | 97.3% | 242 | 2.7% | 8,839 |
| 1963 | 9,162 | 96.8% | 298 | 3.2% | 9,460 |
| 1964 | 9,542 | 96.6% | 335 | 3.4% | 9,877 |
| 1966 | 12,319 | 53.9% | 10,557 | 46.1% | 22,876 |
| 1968 | 13,301 | 55.4% | 10,717 | 44.6% | 24,018 |
| 1969 | 13,582 | 56.2% | 10,576 | 43.8% | 24,158 |
| 1970 | 15,017 | 56.7% | 11,480 | 43.3% | 26,497 |
| 1972 | 16,134 | 57.3% | 12,020 | 42.7% | 28,154 |
| 1974 | 16,158 | 55.9% | 12,761 | 44.1% | 28,919 |
| 1976 | 16,683 | 56.2% | 13,009 | 43.8% | 29,692 |
| 1977 | 16,774 | 56.2% | 13,059 | 43.8% | 29,833 |
| 1978 | 17,525 | 55.7% | 13,937 | 44.3% | 31,462 |

318.  See Findings of Fact 74 and 83, *supra,* and n. 228, *supra.*

319.  See Paragraph 4(a)22, Pretrial Order.

320.  See Paragraph 4(a)24, Pretrial Order.

321.  See n. 319 and n. 320, *supra.*

322.  See Paragraph 4(a)23, Pretrial Order.

323.  See Paragraphs 4(a)22 and 4(a)23, Pretrial Order.

324.  See Plaintiff's Exhibit 3 and Paragraphs 4(a)22 and 4(a)23, Pretrial Order.

325.  See Plaintiff's Exhibit 2.

As can be seen from the above figures, both in 1970 and in 1976 the percentages of white and black registered voters were substantially the same as the percentages of white and black citizens of voting age. Thus in 1976 whites comprised approximately 56% of persons of voting age and 56.2% of registered voters, while blacks comprised approximately 44% of persons of voting age and 43.8% of registered voters. In 1970 whites comprised approximately 53% of the voting age population and 56.7% of the registered voters, while blacks comprised 47% of the voting age population and 43.3% of the registered voters. These figures are significant in determining whether there is now any lingering effect of past discrimination against blacks. Certainly, at least with respect to voter registration, there is no such present effect. The Court finds that the percentages of blacks and whites of voting age who have registered to vote is now substantially equal, and that past discrimination has no present effect on black voter registration.

88. The early history of Alabama, and Dallas County in particular, has demonstrated racial discrimination against blacks in all fields. This discrimination has been intentional, subtle, and pervasive, and has been achieved through legal as well as economic means.[326] The practical effect of the 1901 Constitution was to put a legal gloss on the disenfranchisement of black voters. The 1901 Constitutional Convention was called for that purpose, among others.[327] Having been effectively disenfranchised prior to 1901, blacks were unable to participate in political affairs in Alabama until passage of the 1965 Voting Rights Act.[328] Before then, many legal devices were employed to prevent or hinder blacks from voting, including such requirements for registration as a literacy test, a poll tax, and a voucher of good character from a registered voter.[329] At least until 1954, there was

what is now called a *de jure* segregation in Alabama, with dual school systems required by law. Before 1965 there were few gains made by blacks—and those few were achieved primarily through litigation in the Federal courts. Literacy tests, which had served as a tool to discriminate against black voting applicants, were invalidated in 1949. *Davis v. Schnell,* 81 F.Supp. 872 (S.D. Ala., 1949). Racial gerrymandering of districts for elections was then outlawed on two separate occasions. *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Sims v. Baggett,* 247 F.Supp. 96 (M.D.Ala., 1965). There have been many other cases, unrelated to voting rights, in which Alabama blacks have sought recourse in the Federal courts to protect their constitutional rights in areas such as employment, housing discrimination, and criminal proceedings. See *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Wilkins v. United States,* 376 F.2d 552 (5th C.C.A., 1967); *Thomas v. United States,* 376 F.2d 564 (5th C.C.A., 1967); *Sims v. Amos,* 336 F.Supp. 924 (M.D.Ala., 1972); *Harper v. Vance,* 342 F.Supp. 136 (N.D.Ala., 1972); *Strain v. Philpott,* 331 F.Supp. 836 (M.D. Ala., 1971); *United States v. Alabama,* 252 F.Supp. 95 (M.D.Ala., 1966); *Williams v. Wallace,* 240 F.Supp. 100 (M.D.Ala., 1965); and *United States v. Alabama,* 192 F.Supp. 677 (M.D.Ala., 1961). There were also a number of cases involving Dallas County, in which blacks were required to seek recourse in federal courts to protect their voting rights and other constitutional rights. See *U. S. v. Atkins,* 323 F.2d 733 (5th C.C.A., 1963); *U. S. v. Clark,* 249 F.Supp. 720 (S.D. Ala., 1965); *Clark v. Boynton,* 362 F.2d 992 (5th C.C.A., 1966); *U. S. v. Executive Comm. of Dem. Party of Dallas Co., Ala.,* 254 F.Supp. 537 (S.D.Ala., 1966); *U. S. v. McLeod,* 385 F.2d 734 (5th C.C.A., 1967). The impact of these state laws and discriminatory state practices is best evidenced by

---

**326.** See Plaintiff's Exhibits 11, 12, 23, 24, 25, 26, 27, 28, 29, 33, 44, 45, and 50. Also see this Court's opinion in *Clark v. Marengo County,* 469 F.Supp. 1150, at 1172–1173 (D.C., S.D.Ala., 1979).

**327.** Id.

**328.** Id.

**329.** Id. Also, see Paragraph 4(a)(19), Pretrial Order.

the above voter registration statistics, which reflect that in 1964 there were only 335 black registered voters in Dallas County, representing only 3.4% of the total registered voters at that time.[330] However, it is significant to note that the Dallas County School System had, as early as 1951, embarked on a systematic program of improving the educational opportunities offered to its black students.[331] As previously noted, the holding power of black students in the Dallas County School System was 0.5% in 1947, 1.7% in 1951, 8.1% in 1958, 18.0% in 1964, 25.6% in 1968, and 45.2% in 1979—all during periods of substantial losses in black enrollment.[332] The planned programs of school closings, consolidations, and new construction were also begun long before 1965.[333] As previously noted, there were 195 school centers in 1946; 109 in 1950; 33 in 1957; 25 in 1963; and 16 in 1967.[334] Following passage of the Voting Rights Act of 1965, the Dallas County School System was among the first in the state to adopt a voluntary HEW approved plan of desegregation.[335] This Court has previously noted the achievements and responsiveness of the School Board both before and after 1965.[336] However, it is significant to emphasize that during a period while many other state and local officials were literally being dragged into compliance with constitutional mandates, the Dallas County Board of Education was quietly but effectively achieving progress in its planned program to improve the educational opportunities of its black students and eliminate the lingering effect of historical discrimination and *de jure* segregation practices.[337]

89. Since 1965, there have been substantial changes in Dallas County as well as throughout the state of Alabama. The Voting Rights Act of 1965 brought sweeping changes, and removed many of the legal impediments which had previously prevented or hindered blacks from exercising their voting rights.[338] In 1966 the prior state requirements of a literacy test, a poll tax, and a voucher of good character from a registered voter were all eliminated as a condition to registration.[339] Federal voting registrars were appointed and used in many Alabama counties, including Dallas County, and these federal registrars registered substantial numbers of black voters.[340] For example, a 1969 report by the Justice Department reflected that in Alabama federal registrars had registered a total of 66,539 voters, of whom 61,239 (92%) were black and 5,300 (8%) were white.[341] Of this statewide total, 9,068 (13.6%) were registered in Dallas County alone, of whom 8,993 (99.2%) were black and only 75 (0.8%) were white.[342] In Dallas County most of these newly enfranchised black citizens were registered before 1966, with the result that by 1966 the number of registered black voters in Dallas County had increased to 10,557 (from only 335 in 1964), comprising at that time approximately 46.1% of the total number of registered voters in Dallas County.[343]

90. Plaintiff offered a substantial amount of evidence relating to the activities of the Dallas County Board of Registrars. The thrust of Plaintiff's evidence was that the Board of Registrars meets

**330.** See Plaintiff's Exhibit 2.

**331.** See Findings of Fact 60, 61, 62, 63, 64, 65, 66, 67, 68, and 74, *supra.*

**332.** See Findings of Fact 63 and 64, *supra.*

**333.** See Findings of Fact 65 and 66, *supra.*

**334.** Id.

**335.** See Findings of Fact 30, 31, and 85, *supra,* and n. 60 and n. 309, *supra.*

**336.** See Findings of Fact 42, 43–59, 60–68, 69, 70–72, 73, 74, 77–82, 83, 84, and 85, *supra,* and n. 93, n. 104, n. 107, n. 228, and n. 251, *supra.*

**337.** Id.

**338.** See, e.g., Plaintiff's Exhibits 12 and 45.

**339.** Id.

**340.** See Plaintiff's Exhibits 11, 12, and 45.

**341.** See Plaintiff's Exhibit 45.

**342.** Id.

**343.** See Plaintiff's Exhibit 2.

only at times inconvenient to black and white citizens who wish to register, and that some blacks have been discouraged from registration because the Board meets at the Dallas County Court House.[344] Plaintiff also challenged the recent decision of the Board of Registrars not to appoint deputy registrars to assist in registering voters.[345] Since 1978 the Board of Registrars has been empowered to appoint deputy registrars, but has not done so. See Section 17–4–158, 1975 Code of Alabama. Since the School Board Defendants are neither involved in nor connected with the voter registration process, this evidence was offered by Plaintiff in support of its contention that blacks lack equal access to the election system in Dallas County. Plaintiff's evidence relating to the Board of Registrars clearly fails to establish any lack of access by blacks to the registration and election process, and the evidence preponderates against Plaintiff on that issue. The Court House is the seat of county government, and is therefore a proper and appropriate place for the Board of Registrars to conduct its activities. The evidence clearly shows that the Board has met frequently, and has been accessible to all citizens (both black and white) who desired to register.[346] On the basis of the evidence offered, this Court is unable to find any fault with the Board's decision as to appropriate office hours. The Board will never be able to please all citizens with its office hours, but the Court finds that there has been no evidence of discrimination or discriminatory purpose in setting office hours. The office hours certainly have not been unreasonable, and any resulting inconvenience has affected black and white citizens in equal measure. Furthermore, prior to April 27, 1978, the Board was required by State law to visit each precinct at least once (and more

often if necessary) between October 1 and December 31 every other year; to remain in each such precinct at least a half day; and to give at least twenty days notice of the time and place, in each precinct, where voter registration could be accomplished. Section 17–4–1, 1975 Code of Alabama. That law was repealed effective April 27, 1978, and was superseded by another law permitting the Board to meet a maximum of 120 session days each year, with the actual number to be determined by a quorum of the Board according to the needs of the County. Section 17–4–156, 1975 Code of Alabama. That 1978 law specifically required at least one member of the Board to be in attendance at the Dallas County Court House on any day on which the full Board does not meet and the Court House is open for business, excepting Saturday, to receive applications, administer oaths, and perform clerical duties of the Board. Section 17–4–156(a). The Board was further authorized to use as many as 25 session days for special registration sessions away from the Court House and out in the several precincts of the County, with provisions for proper notice. Section 17–4–156(f). There has been no evidence that the Board has failed to follow any of these statutory requirements and procedures, either before or after 1978.[347] Instead, Plaintiff's evidence showed only that the Board has been authorized since April 27, 1978, to appoint deputy registrars (Section 17–4–158), and that it has not done so despite the requests and wishes of a number of black leaders. The appointment of deputy registrars is clearly discretionary with the Board of Registrars, and Plaintiff offered no evidence as to the Board's reasons for declining to do so. Neither was there any evidence showing an actual need for deputy registrars, although certainly there is a perceived need for such

344. See, e.g., testimony of Rev. F. D. Reese (Transcript, pp. 119–290); testimony of Edwin L. Moss (Transcript, pp. 681–758); testimony of J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181); Mrs. Marie Foster (Transcript, pp. 290–430); Mrs. Ethelena Dixon (Transcript, pp. 911–930); and Mr. Samson Crum (Transcript, pp 468–680).

345. Id.

346. See, e.g., testimony of Mrs. Marie Foster, (Transcript, pp. 290–430) Edwin L. Moss (Transcript, pp. 681–758) and Rev. F. D. Reese, (Transcript, pp. 119–290).

347. See n. 344, supra.

appointments by leaders of the black community. Notwithstanding such perceived need, the Court finds that the Board of Registrars has provided all black citizens with equal access to voter registration procedures;[348] that there is no disparity between whites and blacks with respect to access to the registration process;[349] that the percentage of black voters is substantially the same as the percentage of black citizens of voting age;[350] and that registration procedures have been applied by the Board fairly, equally, and without discrimination or discriminatory purpose against blacks.[351] The Court therefore finds and concludes that the voter registration procedures followed in Dallas County do not discriminate against blacks nor constitute a denial to blacks of equal access to the voting rolls or the election system in Dallas County.*

91. Plaintiff's evidence tended to show that prior to 1965 black citizens of Dallas County (and elsewhere in Alabama) were often oppressed or intimidated by operation of some laws and acts of some people and thereby discouraged from participating in the election process.[352] Since few blacks were then registered,[353] it is apparent that the purpose of that intimidation was to discourage registration rather than voting. In any event, those evils have been largely eliminated since passage of the Voting Rights Act of 1965.[354] At the present time black citizens of Dallas County register and vote freely, without any more intimidation or harassment than that to which any other voter is subject, and without *de jure* or *de facto* barriers to their participation in the election system.[355]

92. Since 1966 blacks have achieved substantial progress in Dallas County, and most—if not all—of the vestiges and lingering effects of past official discrimination have been eradicated. The Court has discussed at length the progress and improvements made in the Dallas County School System.[356] Blacks have also achieved substantial equality with whites in voter registration,[357] as well as the opportunity to participate fully in the election processes in Dallas County.[358] The Court is of the opinion and finds that official discrimination in Dallas County has now been eliminated, not only within the Dallas County School System but also within all other areas of government. The Court further finds that the vestiges and lingering effects of past discrimination in Dallas County has also been eliminated, and that any such past discrimination no longer precludes the present effective participation by blacks in the political affairs of Dallas County.

93. Since passage of the Voting Rights Act of 1965, black citizens of Dallas County

348. Id.

349. Id.

350. See Plaintiff's Exhibits 2 and 3, and Paragraphs 4(a)22, 4(a)23, and 4(a)24 of Pretrial Order.

351. See n. 344, *supra.*

* The Court notes that Mr. Edwin Moss, a black, has recently been appointed as a member of the Board of Registrars. This does not appear of record and has not been considered by the Court.

352. See, e.g., testimony of Mrs. Marie Foster (Transcript, pp. 290–430), Mr. Samson Crum (Transcript, pp 468–680), Rev. Seaborn Powell (Transcript, pp. 990–1046); Mr. Joseph Pettway (Transcript, pp. 1310–1402); and Rev. F. D. Reese (Transcript, pp. 119–290).

353. See Plaintiff's Exhibit 2.

354. See Findings of Fact 89, *supra.* Also see, e.g., testimony of Rev. F. D. Reese (Transcript, pp. 119–290), Mr. Edwin L. Moss (Transcript, pp. 681–758), Mrs. Marie Foster (Transcript, pp. 290–430), and Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

355. Id.

356. See Findings of Fact 40–42, 43–59, 60–68, 70–72, 73, and 74, *supra.*

357. See Plaintiff's Exhibit 2, and Findings of Fact 87, *supra.*

358. See Findings of Fact 87, 89, and 90, *supra.* Also see, e.g., testimony of Rev. F. D. Reese (Transcript, pp. 119–290), Mr. Edwin L. Moss (Transcript, pp. 681–758), Mrs. Marie Foster (Transcript, pp. 290–430), and Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

have achieved full access to the process of slating candidates. All of the previous barriers to black participation in the political process have been eliminated in Dallas County. Thus blacks now freely and openly register, vote, run for office, serve as election officials * and participate in political campaigns without any legal or other barriers.[359] Much of the success achieved by blacks in eliminating the previous barriers to their full participation in the political process can be attributed to the high quality of black leadership in Dallas County.[360] Even before 1965, many of the black leaders were openly encouraging black citizens to register and vote.[361] Since then black citizens have become effectively organized in Dallas County, and have achieved remarkable success in their voter registration efforts.[362] For example, an analysis of the 1970 census figures prepared by the United States Commission on Civil Rights in January, 1975, showed that in 1970 in the state of Alabama as a whole, black citizens lagged behind whites in the percentages of voting age citizens who had actually registered. For the entire state of Alabama, the voting age population was 2,205,760, of whom 1,697,434 (77%) were white and 508,326 (23%) were black. However, of the 1,659,599 registered voters, 1,369,542 (82.5%) were white and only 290,057 (17.5%) were black.[363] In Dallas County, however, in 1970 blacks comprised approximately 47% of the voting age population and 43.3% of the registered voters.[364] These figures indicate that by 1970 blacks in Dallas County had not only achieved substantial equality with whites in voting registration,[365] but that in doing so they had surpassed the efforts of black leaders in other Alabama counties. By 1976, further gains had been made, and by then blacks comprised approximately 44% of the voting age population and 43.8% of the registered voters.[366]

94. The Court has reviewed and considered the mass of evidence with respect to previous elections in Dallas County, including the statistical analysis and expert opinions offered by Plaintiff.[367] This evidence shows that—at least in recent history—blacks have not been elected to any county office in Dallas County.[368] Before 1965, there were very few black candidates.[369] Since 1965 there have been a large number of black candidates for county offices, although none has been elected.[370] Nevertheless, in all of these elections since 1965, blacks were able to register, to vote, to run for office, to campaign, to serve as election officials, and to participate fully in the election process—all without any barriers or

---

359. Id.

360. See, e.g., testimony of Rev. F. D. Reese (Transcript, pp. 119–290), Mr. Edwin L. Moss (Transcript, pp. 681–758), Mr. Samson Crum (Transcript, pp. 468–680), Mrs. Marie Foster (Transcript, pp. 290–430), and Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

361. Id.

362. Id. Also, see Plaintiff's Exhibit 2 and Findings of Fact 87, 90, and 92, *supra*.

363. See Plaintiff's Exhibit 45.

364. See Plaintiff's Exhibit 2.

365. See Findings of Fact 87, *supra*.

366. See Plaintiff's Exhibit 2; Paragraph 4(a)24, Pretrial Order; and Findings of Fact 87, *supra*.

367. See, e.g., Paragraphs 4(a)20 and 4(a)25 of Pretrial Order; Plaintiff's Exhibits 1, 2, 3, 4, 47, 11, 12, and 45; and testimony of Dr. Charles Cottrell (Transcript, pp. 1557–1710), Mr. Joseph Sappey (Transcript, pp. 1411–1497), Rev. F. D. Reese (Transcript, pp. 119–290), Mr. Edwin L. Moss (Transcript, pp. 681–758), Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181); Mr. Samson Crum (Transcript, pp. 468–680); Mrs. Ethelena Dixon (Transcript, pp. 911–930); Mrs. Marie Foster (Transcript, pp. 290–430); Rev. Seaborn Powell (Transcript, pp. 990–1046); and Mr. Joseph Pettway (Transcript, pp. 1310–1402).

368. Id.

369. Id.

370. See Plaintiff's Exhibit 1.

obstacles based on race.[371] The following is a complete list of all candidates for County offices since 1966, with the race of each candidate shown.[372]

### MAY 3, 1966 – PRIMARY ELECTION

Tax Collector

Davis R. (Dave) Gamble (W)
Lawrence Williams (B)

Sheriff

Wilson Baker (W)
Virgil Bates (W)
James G. (Jim) Clark, Jr. (W)
Murphy F. Suther (W)

Coroner

Fairro Brown (B)
L. H. Hudson (W)

Court of County Revenue – South District

James Boley (W)
Andrew P. Calhoun, Jr. (W)
Robert Culpepper (W)
William J. (Billy) Neighbors (W)
Robert E. H. J. Perry (B)

Court of County Revenue – Fork District

Tom Martin (W)
Johnny Radford (W)

Court of County Revenue – City of Selma

J. D. Hunter (B)
Seawell Jones (W)

### MAY 31, 1966 – PRIMARY RUNOFF ELECTION

William J. (Billy) Neighbors (W)
Robert E. H. J. Perry (B)

### NOVEMBER 8, 1966 – GENERAL ELECTION

Sheriff

Wilson Baker (W)

Tax Assessor

Mrs. Abbie Lily (B)
Claude A. Sherrer (W)

Tax Collector

Horace D. Griffin, Sr. (B)
Davis R. (Dave) Gamble (W)

Coroner

N. F. Payne (B)
L. H. Hudson (W)

Court of County Revenue – Fork District

A. D. Bush (B)
Johnny Radford (W)
R. D. (Bob) Wilkinson (W)

Court of County Revenue – City of Selma

Mrs. Agatha Harville (B)
Seawell Jones (W)
Ira O. Sullivan (W)

Court of County Revenue – West District

Roosevelt McElroy (B)
R. Furniss Ellis (W)

Court of County Revenue – South District

Wilmer Walker (B)
William J. (Billy) Neighbors (W)

Board of Education, Place No. 3

George Sallie (B)
Fred L. England, Jr. (W)

### NOVEMBER 5, 1968 – GENERAL ELECTION

County Board of Education, Place No. 1

John J. (Joe) Grimes, Sr. (W)
Sullivan Jackson (B)

County Board of Education, Place No. 2

Paul Mayo (W)
Mrs. Marie P. Foster (B)

### MAY 5, 1970 – PRIMARY ELECTION

Judge of Probate

Bernard A. Reynolds (W)
W. B. (Willie) Whitehead (W)

Sheriff

Wilson Baker (W)
C. E. "Buck" Chavers (W)
Mack Roberts (W)

Clerk of Circuit Court

Marguerite H. Houston (W)
Peggy Knight (W)
William A. "Bill" Kynard (W)

Coroner

E. E. Hancock (W)
L. H. Hudson (W)

Court of County Revenue – City of Selma

O. L. (Ed) Edwards (W)
Gordon A. "Jerry" Giraud (W)
Seawell Jones (W)

Court of County Revenue – West District

R. Furniss Ellis (W)
Paul L. Kilgore (W)

### JUNE 2, 1970 – PRIMARY RUNOFF ELECTION

Clerk of Circuit Court

Marguerite H. Houston (W)
William A. "Bill" Kynard (W)

---

**371.** See Findings of Fact 87, 89, 90, 92, and 93, *supra;* and n. 358, *supra.*

**372.** See Plaintiff's Exhibit 1 and Paragraph 4(a)20 of Pretrial Order.

NOVEMBER 3, 1970 – GENERAL ELECTION

Sheriff

Wilson Baker (W)

Judge of Probate

Bernard A. Reynolds (W)
Amelia Boynton (B)

Coroner

L. H. Hudson (W)
N. F. Payne (B)

Clerk of Circuit Court

William A. "Bill" Kynard (W)

Judge of Dallas County Court

B. M. Miller Childers (W)

County Commissioner – City of Selma

Seawell Jones (W)

County Commissioner – Fork District

Johnny Radford (W)
A. D. Bush (B)

County Commissioner – West District

R. Furniss Ellis (W)
Roosevelt McElroy (B)

County Commissioner – South District

William J. (Billy) Neighbors (W)
George Sallie (B)

Board of Education, Place No. 4

Joe K. Rives (W)

Board of Education, Place No. 5

William R. "Bob" Martin (W)

MAY 1972 – PRIMARY ELECTION

Tax Assessor

Lorenzo (Brother) Johnson, Jr. (W)
Claude A. Sherrer (W)

NOVEMBER 7, 1972 – GENERAL ELECTION

County Board of Education, Place No. 3

Fred L. England, Jr. (W)

MAY 7, 1974 – PRIMARY ELECTION

Sheriff

Wilson Baker (W)
H. Leo Nichols (W)
Mack Roberts (W)

Coroner

Marius J. "Ace" Anderson (B)
L. H. Hudson (W)
Kenneth R. Lawrence (W)
James C. Rutledge (W)

County Commissioner – City of Selma

Gordon "Jerry" Giraud (W)
Seawell Jones (W)
Willard T. Jones (W)

County Commissioner – South District

Fairro Brown (B)
William J. (Billy) Neighbors (W)
E. Morris Williams (W)

County Commissioner – West District

R. Furniss Ellis (W)
M. M. Etheridge (W)

County Commissioner – Fork District

Fred Baldwin (W)
D. J. Barnes (W)
George M. Cook, Sr. (W)
Lee A. Henderson (W)
Johnny Radford (W)
James Vines (W)
L. A. (Bill) Wimberly (W)

County Board of Education, Place No. 2

Martin Chance (W)
Paul D. Mayo (W)

JUNE 4, 1974 – PRIMARY RUNOFF ELECTION

Coroner

Marius J. "Ace" Anderson (B)
L. H. Hudson (W)

County Commissioner – Fork District

Fred Baldwin (W)
Johnny Radford (W)

NOVEMBER 5, 1974 – GENERAL ELECTION

Sheriff

Wilson Baker (W)

Coroner

Calvin Strickland (W)
L. H. Hudson (W)

County Commissioner – City of Selma

Seawell Jones (W)

County Commissioner – South District

William J. (Billy) Neighbors (W)

County Commissioner – West District

R. Furniss Ellis (W)

County Commissioner – Fork District

Bob Slone (W)
Fred Baldwin (W)
Johnny Radford (W)

County Board of Education, Place No. 1

J. J. (Joe) Grimes, Sr. (W)

County Board of Education, Place No. 2

Martin Chance (W)
Gloria Meadows (B)

MAY 4, 1976 – PRIMARY ELECTION

Judge of Probate

Samson Crum, Sr. (B)
John W. (Johnny) Jones, Jr. (W)
Joe Knight (W)
Johnny Radford (W)

County Board of Education, Place No. 4

William Dillard (B)
Joe Rives (W)

County Board of Education, Place No. 5

W. R. (Bob) Martin (W)
Louis Padgett, Jr. (B)

NOVEMBER 2, 1976 – GENERAL ELECTION

Judge of Probate

Joe Grimes (W)
John W. (Johnny) Jones, Jr. (W)

County Board of Education, Place No. 4

Joe Rives (W)

County Board of Education, Place No. 5

W. R. (Bob) Martin (W)

SEPTEMBER 5, 1978 – PRIMARY ELECTION

Sheriff

W. D. "Cotton" Nichols (W)
C. T. "Sgt." Stewart (W)
Charles Allen (Leo) Walker (B)

Coroner

Willie Frank King (B)
Kenneth Lawrence (W)

Tax Assessor

Lee Calame (W)
Dale R. Curry (W)
Jean Edwards (W)
A. L. ("Al") Turner (W)

County Democratic Executive Committee, Place No. 1

Samson Crum, Sr. (B)
J. W. (Sgt.) Pearson (W)

County Commissioner – City of Selma

Seawell Jones (W)
Willard T. Jones (W)

County Commissioner – South District

Andrew Calhoun, Jr. (W)
Bobby "Gene" Norris (W)
Robert E. H. J. Perry (B)

County Commissioner – West District

R. Furniss Ellis (W)
W. H. (Bill) Kendricks (W)
Joseph Pettway (B)

County Commissioner – Fork District

C. Stanley (Stan) Baldwin (W)
George Cook (W)
James R. Friday (W)
Lee A. Henderson (W)
Walter C. Massey (W)
Ed Rush (W)

County Board of Education, Place No. 2

Gerald O. (Gerry) Harvin (B)
James Priestley (W)

SEPTEMBER 26, 1978 – PRIMARY
RUNOFF ELECTION

Tax Assessor

Lee Calame (W)
Dale R. Curry (W)

County Commissioner – South District

Andrew Calhoun, Jr. (W)
Bobby E. "Gene" Norris (W)

County Commissioner – West District

W. H. (Bill) Kendricks (W)
Joseph Pettway (B)

County Commissioner – Fork District

C. Stanley (Stan) Baldwin (W)
James R. Friday (W)

NOVEMBER 7, 1978 – GENERAL ELECTION

Coroner

Kenneth Lawrence (W)

Tax Assessor

Dale R. Curry (W)

Tax Collector

Davis R. (Dave) Gamble (W)

County Commissioner – City of Selma

Seawell Jones (W)

County Commissioner – South District

Bobby E. "Gene" Norris (W)

County Commissioner – West District

W. H. "Bill" Kendricks (W)

County Commissioner – Fork District

C. Stanley (Stan) Baldwin (W)

County Board of Education, Place No. 2

James N. Priestley (W)

As shown above, many blacks have been candidates for county offices in Dallas County since 1966, but none have been elected. The mere fact that there have been a large number of black candidates is "suggestive of the fact that there is minori-

ty access to the nomination process." *Hendrix v. Joseph,* 559 F.2d 1265, 1268 (5th C.C.A., 1977). However, on the question of whether blacks have been denied equal access to the political process, the fact that many blacks have run for office is no more determinative than the fact that their efforts were unsuccessful. The Court has therefore examined other factors to determine whether blacks have been effectively denied equal access to the political process in Dallas County.[373]

95. There appear to be no white organizations in Dallas County which actively slate or endorse candidates for local offices.[374] However, there are a number of black organizations, political groups, and leadership coalitions within the black community in Dallas County which have—at least since 1966—traditionally and regularly endorsed and supported candidates for local office.[375] For example, state and national groups such as the NAACP, the Alabama Democratic Conference, and the Southern Christian Leadership Conference have been active for many years. County-wide groups have included the Dallas County Voters League, the Dallas County Improvement Association, and the Selma-Dallas County Black Leadership Council. Other organizations have represented different areas within the County, or within the black community, such as the Selmont Improvement Association, the Black Caucus, and the Black Focus. Black churches have long provided a focal point for political action, as have black financial institutions (including credit unions), business groups, social clubs, civic groups, and fraternal organizations (such as the Elks Club). At the present time the Selma-Dallas County Black Leadership Council acts as an umbrella group, which has brought together black leaders from all segments, groups, and political factions within Dallas County. The Black Leadership Council is comprised of representative black leaders selected by business, church, civic, social, fraternal, and political organizations and groups within the county. The Black Leadership Council actively promotes voter registration and political activities within the black community, and it screens, endorses, and supports candidates for local office—both black and white. As will be more fully shown elsewhere in these Findings, no candidate for local office in Dallas County may now reasonably expect to win election without substantial support from the black community.[376] Indeed, the lack of such black support has proved fatal in the past to a number of office-holders, including former Sheriff James G. Clark, Jr., School Board Chairman Paul D. Mayo, Circuit Clerk Margurite H. Houston, and County Commissioners Andrew Calhoun, Jr., R. Furniss Ellis, Johnny Radford, and Tom Martin.[377]

96. Black political leaders have been exceptionally able and active in Dallas County. Consequently, the support of various black leaders and black political groups has been openly sought and obtained by various candidates—both black and white.[378] The Court has reviewed the election returns since 1966, and certain voting patterns are clearly evident. At times there has been a

---

373. See Findings of Fact 86, *supra,* and Findings of Fact 95–113 *infra.* The Court has followed the precepts pronounced in *Rogers v. Lodge, supra; Lodge v. Buxton, supra; Nevett v. Sides, supra;* and all authorities therein discussed.

374. See, e.g., testimony of Rev. F. D. Reese (Transcript, pp. 119–290), Mr. Edwin L. Moss (Transcript, pp. 681–758), Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181), Mr. Samson Crum (Transcript, pp. 468–680); Mr. Joseph Pettway (Transcript, pp. 1310–1402); Rev. Fairro Brown (Transcript, pp. 431–467); Mrs. Marie Foster (Transcript, pp. 290–430); and Mr. J. C. Davis, Sr. (Transcript, pp. 794–843).

375. Id.

376. See Findings of Fact 96, 97, 104, and 105, *infra.*

377. Id. Also see, e.g., Findings of Fact 94, and testimony of Rev. F. D. Reese (Transcript, pp. 119–290), Mr. Edwin L. Moss (Transcript, pp. 681–756), and Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

378. Id.

high degree of unanimity within the black community, resulting in substantial black votes for the favored candidates. However, at other times there have been deep divisions within the black community, accompanied by political strife and resulting in fragmented black support. These divisions have occurred not only in races where whites were opposing whites, but also in races where blacks were opposing whites. For example, Probate Judge John W. Jones, Jr. was originally elected in the May 4, 1976 Democratic Primary, winning without a runoff against two white and one black opponents. In that race it is evident that Judge Jones received a substantial number of black votes, even though he was then opposed by Mr. Samson Crum, Sr., a major political leader within the black community. In 1978, blacks overwhelmingly supported Sheriff W. D. Nichols over a black candidate (who was not regarded as qualified or viable) who received very little black support. In the 1966 general election many of the black candidates were nominees of the Black Panther Party, while in the 1968 and 1970 general elections many of the black candidates were nominees of the National Democratic Party of Alabama. Both of these parties were predominately black, and were supported primarily by black voters. However, the returns indicate that many black voters elected not to support the black nominees of those political organizations, but instead voted for their white opponents. In both the 1976 and 1980 elections for Mayor of Selma, the black leadership was divided between Mayor Joe T. Smitherman and his white opponents. However, Mayor Smitherman easily won both elections without a run-off, carrying approximately 80% of the black vote in 1976 and 75% in 1980. Black voters have demonstrated a tendency to support incumbent white office-holders. This tendency is most prevalent where the white incumbents are opposed by other whites, although it is evident that white incumbents have also received black support even against black opponents. Black support has usually been necessary to win local elections, and there have been many races where black voters have determined the outcome. This has been true in several instances where white incumbents were defeated by white opponents who received substantial black support. Thus, for example, County Commissioner Andrew Calhoun, Jr. was defeated by Gene Norris in 1978; County Commissioner R. Furniss Ellis was defeated by W. H. Kendricks in 1978; County Commissioner Johnny Radford was defeated by Fred Baldwin in 1974; School Board Chairman Paul D. Mayo was defeated by Martin Chance in 1974; County Commissioner Tom Martin was defeated by Johnny Radford in 1966; Circuit Clerk Margurite H. Houston was defeated by W. A. Kynard in 1970; and Sheriff James G. Clark, Jr. was defeated by Wilson Baker in 1966.[379] Similarly, a number of local officials have been elected with substantial black support, including Tax Assessor Dale R. Curry (1978); Sheriff W. D. Nichols (1978); Mayor Joe T. Smitherman (1976 and 1980); Probate Judge John W. Jones, Jr. (1976); Sheriff Wilson Baker (1974 and 1970); Probate Judge B. A. Reynolds (1970); County Commissioner C. Stanley Baldwin (1978); County Commissioner Seawell Jones (1978, 1974, and 1970); and County Commissioner R. Furniss Ellis (1974).[380] In Dallas County white candidates have actively and publicly sought the support of black voters;[381] however, the converse is not true, and black candidates have seldom (if ever) actively and publicly sought the support of white voters.[382] There has been no white "backlash" among white voters, as there has been in many other Alabama counties. In Dallas County black support has generally been openly sought, and regarded as essential to victory, and there has thus been no "backlash" of white opposition to those white candidates

---

379. See Plaintiff's Exhibit 1 and Paragraph 4(a)20 of Pretrial Order.

380. Id.

381. See Findings of Fact 95, *supra,* and n. 377, *supra.*

382. Id.

who have been fortunate enough to obtain public black support.[383]

97. Incumbent local office-holders have generally recognized the necessity for obtaining and retaining black support in order to remain in office. Consequently, incumbent local office-holders (both at Selma City Hall and Dallas County Court House) must acknowledge and respond to black needs and interests, and must remain accessible to black citizens and black leaders. It is significant that at this time the Probate Judge, the Sheriff, the Mayor of Selma, the Tax Assessor, the Circuit Clerk, and most (3 of 4) of the County Commissioners were all elected with substantial black support.[384] It is equally significant that many of Plaintiff's witnesses were black leaders who have attained substantial influence in local government. For example, Reverend F. D. Reese is an incumbent City Councilman, and Mr. Edwin L. Moss is Chairman of Craig Field Airport and Industrial Authority, a major public body in Dallas County.[384a] These witnesses—by their very presence—afford evidence of black access to the political process and influence within that process.

98. Another issue raised by the evidence is whether there is racial polarization in white and black voting. Racial polarization has been defined as "White voting for white and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs.", accompanied by a white backlash "which usually results in the defeat of the black candidate or the white candidate identified with the black". *Bolden v. City of Mobile,* 423 F.Supp. 384, 388

(S.D.Ala., 1976), aff'd 571 F.2d 238 (5th C.C.A., 1978), rev. 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). As previously discussed, black support has generally been actively and publicly sought by all white candidates, and there has therefore been no white backlash and no substantial polarized voting in races involving only white candidates.[385] However, in those races in which whites have opposed blacks, there has been evidence of polarization in the voting of both white and black voters.[386] In such races white voters have generally supported white candidates and black voters have generally supported black candidates. However, there have been a number of exceptions to this practice; the most notable being the 1976 election in which Probate Judge Jones defeated Mr. Samson Crum, Sr., and the 1978 election in which Sheriff W. D. Nichols defeated Mr. Charles Allen Walker. In those races where whites have generally supported whites and blacks have generally supported blacks, there were other independent variables—other than race—which might contribute to and partly account for this result. For example, in those races involving NDPA and Black Panther candidates, polarization among white voters was predictable because of traditional Democratic Party loyalties among whites, as well as the perception among whites that they were unwelcome in those predominantly black parties.[387] These results—at least within the white community—were also influenced by traditional patterns of white support for incumbent office-holders,[388] as well as the fact that black candidates usually did not campaign in the white community[389] and did not utilize media advertising.[390] Incumbents usually enjoy a high

383. Id.

384. Id.

384a. As previously noted, Mr. Moss was recently appointed as a member of the Dallas County Board of Registrars.

385. See Findings of Fact 96 and 97, *supra.*

386. Id.

387. See, e.g., testimony of Dr. Charles Cottrell (Transcript, pp. 1557–1710), Rev. F. D. Reese (Transcript, pp. 119–290), Mr. Edwin L. Moss (Transcript, pp. 681–758), Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

388. Id.

389. Id.

390. Id.

success rate, not only because of the traditional support given incumbent office-holders, but also because of certain other advantages of incumbency, such as name identification, an existing organizational structure, and access to patronage in the form of projects that affect voters.[391] Thus it is probably inaccurate to conclude that white voters who have voted for white incumbents against black opponents have been influenced solely or even primarily by race, since obviously there are other factors which could account for that same result. On the other hand, black voters who have supported black candidates over white incumbents probably were motivated more by racial than other factors. In any event the evidence does indicate that—for whatever reasons—there has been voting along racial lines among both black and white voters in most of those races in which white candidates were opposed by black candidates.

99. The racial polarization previously discussed did not constitute the only reason for the failure of blacks to win elections. In many elections black candidates ran as nominees of the NDPA and Black Panther Party, and thus lacked the traditional support given Democrats.[392] Blacks usually ran against incumbents who benefitted from the advantages of incumbency.[393] Blacks also have seldom actively sought white votes [394] or utilized media advertising to the same extent as their white opponents.[395] However, there is an even more compelling reason why black candidates have not been successful. Since 1966 blacks have comprised approximately 44% of the total voters.[396] In most elections the voter turnout has been pitifully small, and the outcome has been determined more by voter apathy than by racial polarization.[397] A rare exception occurred in 1966, when Sheriff Jim Clark was defeated by Wilson Baker

by a heavy black turnout. Voter apathy has not been confined to the black community, but is apparent among white voters as well. If blacks could have overcome voter apathy and turned out a high percentage of their votes, they could easily have elected black candidates despite polarization. The Court finds that in Dallas County the racial polarization which exists has not produced a white backlash, does not generally affect white voters in races involving only whites, and is evident only in some (but not all) races in which blacks have opposed whites, and even then in varying degrees. The polarized voting which has been found can, in part, be explained by other factors, but race has obviously played some role. Although the polarization in black and white voting is an obstacle to black success at the polls, voter apathy among blacks constitutes a far greater barrier. The Court therefore finds that the polarization which exists among white and black voters in Dallas County has little bearing on the equal access of blacks to the Dallas County political system, or the system of slating and electing candidates.

100. As previously noted, Dallas County has a history of discriminatory practices against its black citizens, going back from 1965 to slavery times.[398] However, since passage of the 1965 Voting Rights Act those previous discriminatory practices have been eliminated, and no longer pose barriers to black access to the Dallas County political system.[399] That such past discrimination has existed is without dispute. However, it is equally clear that such past discrimination no longer precludes the present effective participation by blacks in the election system in Dallas County. As previously noted, blacks are now able to register,

---

391. Id.

392. Id.

393. Id.

394. Id.

395. Id.

396. See Plaintiff's Exhibit 2.

397. See Findings of Fact 94 and 99, *supra.*

398. See Findings of Fact 88 and 91, *supra.*

399. See Findings of Fact 89, 90, 92, 93, 94, 96, and 97, *supra,* and 110, *supra.*

vote, run for office, serve as election officials, campaign, and otherwise participate fully in the election process. The black community has developed knowledgeable, influential, and sophisticated political leaders who have achieved significant influence and power in Dallas County politics. Among citizens of voting age, blacks have registered to vote in substantially the same percentages as whites. However, in most elections the voter turnout of all races has been extremely low, with the turnout somewhat lower among blacks than the whites. This evidences a general voter apathy among both whites and blacks, so that the outcome of most elections has been determined more by the number of voters who stayed home than by the votes of those who participated. This voter apathy does not demonstrate a lack of access to the election system by whites or blacks, but does reflect a lack of interest in utilizing such access by exercising the right to vote. The failure of blacks to win elections is clearly more attributable to voter apathy than to racially polarized voting. The Court has considered whether voter apathy among black voters is the result of prior discrimination, and concludes that it is not. Admittedly there is a disparity in socio-economic levels among whites and blacks. The 1970 census figures showed such disparity in educational levels as well as income levels.[400] Although current figures for Dallas County are not available, the Court is convinced that blacks still generally occupy lower socio-economic levels than whites, although the gap probably is not as wide as previously. On balance, the Court concludes that voter apathy among blacks is not the result of prior discrimination, but is probably caused by the same factors which have resulted in voter apathy among whites.

101. Plaintiff has failed to establish that black citizens are geographically concentrated in Dallas County in ghettoes or barrios.[401] Instead, the evidence has shown that black citizens are generally dispersed throughout Selma and Dallas County, and that blacks and whites generally reside in the same localities throughout the county.[402]

102. There is no residency requirement for members of the School Board, other than residency within Dallas County. There is a residency requirement for members of the Dallas County Commission, although their election is at-large.

103. The only slating groups within Dallas County have been predominately black, and black voters have had full access to those slating groups.

104. The evidence reflects that in many elections there have been effective coalitions between blacks and whites. Most of the present major office-holders in Dallas County have been elected as the result of such coalitions, including Probate Judge John W. Jones, Jr., Sheriff W. D. Nichols, Mayor Joe T. Smitherman, Tax Assessor Dale Curry, Circuit Clerk W. A. Kynard, and County Commissioners Seawell Jones, Gene Norris, and Stanley Baldwin.

105. Since 1966 there have been no racial campaigns or racial tactics which have resulted in large turnouts among either white or black voters. In 1966, there was a heated campaign between Sheriff James G. Clark, Jr. and Wilson Baker, and there was a heavy turnout among both white and black voters. The black voters supported Baker, who won primarily because of his black support and the heavy black turnout.[403]

106. There are no segregated public facilities in Dallas County. All public facilities are desegregated, including schools,

**400.** The Court has taken judicial notice of the 1970 census information. Also see testimony of Dr. Charles Cottrell (Transcript, pp. 1557–1710).

**401.** Plaintiff neither asserted nor attempted to prove any such claim.

**402.** See Paragraphs 4(a)13 and 4(a)14 of Pretrial Order, and Section 16–8–1, et seq., 1975 Code of Ala.

**403.** Id. Also see, e.g., testimony of Rev. F. D. Reese (Transcript, pp. 119–290) and Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

parks, stadiums, public buildings, and all other public facilities.[404]

107. Plaintiff has offered no evidence of any present discrimination against blacks in Dallas County in the areas of housing, employment, public facilities, or health care.

108. Plaintiff has offered no evidence that the election procedures for the School Board were adopted for discriminatory purposes. To the contrary, counsel for Plaintiff has admitted and represented to the Court that such procedures are constitutional, and that Plaintiff does not challenge their application or effect in any of the other 34 counties to which they apply.

109. Plaintiff has failed to offer any evidence showing that Section 16–8–1, and the at-large system therein prescribed, has been maintained for discriminatory purposes in any of the 34 counties to which it applies other than Dallas County. With respect to Dallas County, Plaintiff has failed to offer any evidence as to the purpose or intent of any state legislator in maintaining that system, or in failing to take any action to adopt local legislation which might have the effect of removing Dallas County from that system. Plaintiff has conceded the constitutionality of that statute, and the at-large system thereby prescribed. Plaintiff has further conceded that the impact or effect of that statute is constitutional and has produced no discriminatory effect in any of these other 34 counties. The Court has found no application of that statute in Dallas County different from that in these other 34 counties. Plaintiff has therefore failed to establish by a preponderance of the evidence that Section 16–8–1 or the at-large electoral system thereby prescribed were either established or maintained in Dallas County for discriminatory purposes.

110. On consideration of all of the evidence, the Court concludes and finds that past discrimination in general no longer precludes effective participation by blacks in the election system, and that blacks no longer lack access to the process of slating candidates. Except for the disparity between whites and blacks in socio-economic levels, all other barriers to full political participation by blacks have been removed or eliminated. The reasons for the disparity in socio-economic levels are complex, and Plaintiff has failed to establish by a preponderance of the evidence that such disparity results from the historical discrimination practiced against blacks prior to 1965. On balance, the Court is convinced and finds that the evidence preponderates against the Plaintiff and in favor of the School Board on the issue of whether blacks lack access to the process of slating candidates, as well as the issue of whether the existence of past discrimination in general precludes effective participation by blacks in the election system.

111. The Court has previously addressed each of the *Zimmer* criteria, as well as the "eleven crucial *Kirksey* elements", and has made specific findings as to whether the evidence under each criterion weighs in favor of or against a finding of dilution. Following that procedure, the Court has reached the following conclusions and therefore makes the following specific factual findings, applying the standards prescribed in *Nevett, supra, Lodge, supra,* and *Rogers, supra:*

a. Blacks do not lack access to the process of slating and electing candidates in Dallas County. This weighs against a finding of dilution.

b. The School Board Defendants have been fully responsive to the particularized interests and needs of blacks. This weighs against and precludes a finding of dilution.

c. There is a firm, long-standing state policy favoring the at-large election of the School Board under and pursuant to Section 16–8–1, 1975 Code of Alabama. This weighs against a finding of dilution.

d. There has been discrimination in the past, but the existence of such past discrimination no longer precludes the effective participation of blacks in the election system in Dallas County. This weighs against a finding of dilution.

---

**404.** The Plaintiff neither asserted nor offered proof to support any such claim.

e. The School Board is elected at-large in Dallas County, and there are no large districts involved.[405] When compared to that of other Alabama counties, neither the size nor population of Dallas County is unusually large.[406] The media is concentrated in Selma, so the cost of a media campaign would be no more in an at-large race than in a race for smaller districts. The Court therefore concludes that this criterion is neutral.

f. There is no majority vote requirement in any general election held in the State of Alabama, but the laws governing primary elections require a majority vote for nomination.[407] The Democratic Party is the primary but not exclusive pathway to election, and one member of the School Board is a Republican.[408] Political parties also have the opportunity to nominate candidates by caucus and convention, and this has been done by the NDPA, the Black Panther Party, and other political parties.[409] Nevertheless, the evidence weighs in favor of a finding of dilution on this criterion.

g. There are no anti-single shot voting provisions in the general election laws governing the election of members of the School Board and other elective offices in Alabama.[410] Candidates for nomination and election to the School Board run for a designated single position, pursuant to the established laws and firm, long-standing policies of the state of Alabama.[411] This criterion is neutral.

h. There are no provisions for at-large candidates running from particular geographical sub-districts. This criterion is neutral.

i. In modern times, no blacks have been elected to a county office. This weighs in favor of a finding of dilution.

j. Until 1966 the poll tax, a literacy test, and a voucher of good character from a registered voter were all prerequisites to registration in Alabama.[412] This weighs in favor of a finding of dilution.

k. There are no property requirements for candidates for the School Board or other county offices in Dallas County.[413] This weighs against a finding of dilution.

l. Dallas County has previously been designated for the use of federal voting registrars.[414] This weighs in favor of a finding of dilution.

m. There has been no evidence as to the disqualification of any black candidate by county election officials. Instead, the evidence reflects a laxity by election officials suggestive of partiality to blacks, since at least one black candidate (a convicted felon) was permitted to seek election with known disqualifications.[415] This weighs against a finding of dilution.

n. Although there is some disparity in the socio-economic levels between whites and blacks, the lower socio-economic level of blacks does not have the effect of precluding the ability of blacks to participate

405. See Paragraphs 4(a)6, 4(a)13, 4(a)14, and 4(a)24 of Pretrial Order; Plaintiff's Exhibits 2, 3, 4, 8, 9, and 52–A; and Findings of Fact 11, 12, 20, and 31, *supra.*

406. See, e.g., Paragraph 4(a)25 of Pretrial Order, and Findings of Fact 20, *supra.*

407. See Findings of Fact 13, *infra,* and Paragraph 4(a)15 of Pretrial Order.

408. Mr. John J. Grimes, Sr. See Plaintiff's Exhibit 1.

409. See Findings of Fact 14, *infra;* Paragraph 4(a)16, Pretrial Order; and testimony of Dr. Charles Cottrell (Transcript, pp. 1557–1710).

410. See Findings of Fact 15, *supra,* and Paragraph 4(a)18 of Pretrial Order.

411. See Findings of Fact 6, 11, 12, 15, 16, and 22, *infra;* and Paragraphs 4(a)6, 4(a)13, 4(a)14, 4(a)17, and 4(a)18 of Pretrial Order.

412. See Findings of Fact 17, *infra;* and Paragraph 4(a)19 of Pretrial Order.

413. See Findings of Fact 6, 11, 22, 23, and 29, *infra;* n. 22 and n. 51, *infra;* and Section 16–8–1 et seq., 1975 Code of Ala.

414. See Findings of Fact 89, *supra;* n. 340 and n. 341, *supra;* and Plaintiff's Exhibit 11.

415. See Plaintiff's Exhibit 2, and testimony of Rev. F. D. Reese (Transcript, pp. 119–290) and J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

in the political process. The preponderance of the evidence clearly shows that blacks not only have full access to the political process in Dallas County, but that black leaders effectively participate in and utilize those political processes. Nevertheless, the lower socio-economic level of blacks weighs in favor of a finding of dilution.

o. There are no known electoral mechanisms which discriminate against blacks.[416] This weighs against a finding of dilution.

112. The Court has viewed the above findings under the above *Nevett, Zimmer* and *Kirksey* criteria, in the aggregate, and as a whole, and has given due regard to the significance and strength of the findings under each of those criteria, all as required by *Nevett, Lodge,* and *Rogers.* Having done so, and having viewed those findings in the aggregate, the Court now finds that the ultimate inference of dilution is not possible under those criteria and findings, but that to the contrary, the evidence and findings under those criteria preponderates against any finding of dilution.

113. The Court has not confined its consideration of the evidence solely to the *Zimmer* and *Kirksey* criteria, but has also considered all other evidence and factors deemed relevant to the ultimate issue of dilution as required by *Nevett, supra, Lodge, supra,* and *Rogers, supra.* In doing so, the Court has also considered and given due regard to the contested issues of fact stipulated and set forth in the Pre-Trial Order. The Court has reached the following additional Conclusions, and makes the following further and additional factual findings as to the factual issues framed by the Pre-Trial Order:

a. As a result of the at-large electoral system used to elect the members of the School Board, black citizens of Dallas County do not have less opportunities than white citizens to participate in the political process and to elect members of their choice to the School Board.

b. The at-large electoral system does not dilute the voting strength of black voters in Dallas County.

c. Black voters are not largely concentrated in certain geographical areas of the county, but instead are widely dispersed throughout Dallas County and the City of Selma. There are, of course, areas with larger black populations (such as the rural areas of west and south Dallas County), but black and white citizens reside in all geographical areas of the county.

d. The Court has made detailed and specific findings on whether, and if so when, voting for state, district, county, and local offices in Dallas County has followed racial lines. Those findings are complex, and will not be repeated here, but they do not support a finding that blacks lack access to the process of slating candidates nor do they support a finding that the existence of past discrimination in general precludes the effective participation of blacks in the election system.

e. At least in modern times, no black has been elected or nominated as candidate of the Democratic or Republican party for a position on the School Board or the Dallas County Commission. Blacks have been the nominees of the Black Panther Party and the National Democratic Party of Alabama, both of which were predominately black organizations.

f. There has not been a lack of responsiveness by the School Board to the needs of the black citizens and voters of Dallas County.

g. In the past, the State of Alabama and Dallas County have unlawfully discriminated against black residents of Dallas County by disenfranchising black voters through the use of discriminatory devises such as literacy tests and poll taxes, and by applying more stringent registration requirements to black prospective voters. Those

**416.** See Findings of Fact 6, 11, 12, 13, 14, 15, 16, 22, 23, 29, 89, 90, 92, 93, 96, 102, 108, 109, and 110; Paragraphs 4(a)6, 4(a)13, 4(a)14, 4(a)15, 4(a)16, 4(a)17, and 4(a)18 of Pretrial Order; and Section 16–8–1 et seq., 1975 Code

of Ala. Also see, e.g., testimony of Mr. Edwin L. Moss (Transcript, pp. 681–758), Rev. F. D. Reese (Transcript, pp. 119–290), and Mr. J. L. Chestnutt, Jr. (Transcript, pp. 1046–1181).

practices have not been followed since at least 1966, and neither the State nor Dallas County now unlawfully discriminates against black residents of Dallas County by such means.

h. Black voters of Dallas County have been the subject of unlawful discrimination in education, employment, housing, public accommodations, and public facilities, all prior to 1966. Since 1966, there has been no such unlawful discrimination against black voters of Dallas County.

i. The past history of racial discrimination in Dallas County by state, local, and party officials, particularly with respect to public education and minority participation in the electoral process, does not now adversely affect minority participation in the political process. There is no present effect of such past discrimination.

j. There is a firm, long-standing state policy favoring the at-large election of members of the School Board, and also favoring the at-large election of members of county Boards of Education in 34 other Alabama counties subject to the provisions of Section 16–8–1 of the 1975 Code of Alabama.

k. The at-large electoral method does not adversely affect black or minority participation in the electoral process in Dallas County.

l. The majority vote requirement in primary elections, and the use of numbered places and staggered terms for members of the School Board, do not dilute or minimize minority voting strength in the context of the at-large electoral system, either in Dallas County or the other 34 Alabama counties having these same requirements and procedures.

m. Black citizens of Dallas County have full and complete access to the process of slating and electing candidates for nomination and election to the School Board, the Dallas County Commission, and other elective offices of Dallas County.

n. The School Board Defendants have been responsive to the particularized needs of black students within the Dallas County School System as well as black citizens of Dallas County.

o. The firm, long-standing policy, as well as the general laws of the State of Alabama, all favor and prescribe at-large elections for members of the School Board as well as members of 34 other county Boards of Education in the state of Alabama.

p. There has been no past discrimination against black citizens of Dallas County which now preclude the effective participation of black citizens in the election system.

q. There has been no racially motivated discrimination or action by any of the School Board Defendants that infringes on the constitutional rights of black citizens of Dallas County.

r. There is not now and has not been any invidious racial motivation or at-large scheme to deny black citizens effective participation in the election of members of the Dallas County Board of Education.

s. Intentional and invidious racial discrimination was not a motivating factor in the enactment of the laws and procedures of the State of Alabama prescribing and governing the election of members of the School Board.

t. Intentional and invidious racial discrimination has not been a motivating factor in the maintenance of the laws and procedures of the state of Alabama prescribing and governing the election of members of the School Board.

114. Plaintiff has offered no evidence as to the unconstitutionality of Section 16–8–1, 1975 Code of Alabama, but has instead admitted and represented that such statute is constitutional. Plaintiff has further admitted and represented that it does not challenge either the constitutionality of that statute or its effect or impact in any of the other 34 counties within Alabama whose School Boards are elected under that same statute. Plaintiff has sought to prove its case against the School Board Defendants by attempting to show that Section 16–8–1 has been unconstitutionally applied in Dallas County in a method or manner

different from that by which it has been applied in the other 34 Alabama counties whose School Boards are governed by the same statute. The Court has found that the evidence preponderates against Plaintiff on that factual issue. By tortuous reasoning, Plaintiff also sought to establish that the at-large electoral system prescribed by Section 16–8–1 is unconstitutional in Dallas County because of its impact or effect upon black voters, even though that statute is admittedly constitutional and admittedly achieves a constitutional result in all of the other 34 counties subject to its terms. The Court has carefully examined all of the evidence, to determine whether the evidence will support a finding that the at-large system prescribed by Section 16–8–1, as applied in Dallas County, has been adopted or maintained for discriminatory purposes. The Court has considered all evidence and testimony which might support or give rise to such an inference, including any such evidence relating to the *Zimmer* criteria, the *Kirksey* criteria, or other criteria relevant to that issue. The Court finds that the evidence preponderates against the Plaintiff, and preponderates in favor of the School Board Defendants, on the issue of whether Section 16–8–1, as applied to Dallas County, has been adopted or maintained for discriminatory purposes. In reaching that conclusion, the Court does not base its findings merely upon the admissions by Plaintiff that the statute is constitutional, but rather upon the fact that Plaintiff has utterly failed to establish by a preponderance of the evidence that the at-large electoral system prescribed for the election of the School Board Defendants in Dallas County has been adopted or maintained for discriminatory purposes. In short, the Plaintiff has failed to establish, by a preponderance of the evidence, that the at-large method of election for the School Board Defendants has been adopted or maintained for discriminatory purposes. To the contrary, the preponderance of the evidence clearly shows that (as conceded by Plaintiff) Section 16–8–1 is constitutional; that it has been applied in Dallas County in substantially the same way as it has been applied in all of the other 34 counties of Alabama subject to its provisions; that it was neither created nor maintained for discriminatory purposes; and that the at-large electoral system therein prescribed for Dallas County has been neither created nor maintained for discriminatory purposes.

115. Plaintiff has alleged a violation of 42 U.S.C., Section 1971, but has failed to offer any evidence establishing any such violation by either the School Board Defendants or any other public officials in Dallas County. Blacks now register, vote, run for office, serve as election officials, and otherwise participate fully in the election process in Dallas County, without discrimination and without distinction of race, color, or previous condition of servitude. The election laws, standards, practices, and procedures followed and applied in Dallas County do not differ from those followed and applied elsewhere in the State of Alabama, including specifically the other 34 Alabama counties having the same at-large electoral system, and they have been applied in Dallas County fairly, equally, and without discrimination in determining voter qualifications. In Alabama and Dallas County no literacy test is employed as a qualification for voting in any election. Further, Plaintiff has failed to establish any actual or attempted threats, intimidations, or coercion of any black or white citizen of Dallas County for the purpose of interfering with the right of such citizen to vote or to vote as he might choose. The Court therefore finds and concludes that Plaintiff has failed to establish any violation of 42 U.S.C., Section 1971, by either the School Board Defendants, other public officials of Alabama or Dallas County, or any other private citizen. See *Kirksey v. City of Jackson, Miss.,* 663 F.2d 659 (5th C.C.A., 1981), reh. den. 669 F.2d 316 (1982).

## CONCLUSIONS OF LAW

1. After Plaintiff completed the presentation of its evidence and rested, the School Board Defendants filed their Motion for Involuntary Dismissal under Rule 41(b), F.R.C.P., seeking a dismissal of the Com-

plaint and the action on the ground that upon the facts and the law the Plaintiff has shown no right to relief. The School Board's Motion was made orally, but with the permission of the Court a formal written Motion was later filed. Where—as here—the Defendants have made a Rule 41(b) Motion, the Trial Court has the option of weighing the evidence and rendering judgment against the Plaintiff, or declining to render judgment until the close of all the evidence. *Weissinger v. United States,* 423 F.2d 795 (5th C.C.A., en banc, 1970); *Smith Petroleum Service, Inc., v. Monsanto Chemical Co.,* 420 F.2d 1103 (5th C.C.A., 1970); *Benton v. Blair,* 228 F.2d 55 (5th C.C.A., 1955); *Emerson Electric Co., v. Farmer,* 427 F.2d 1082 (5th C.C.A., 1970); *Branizza v. Greyhound Corp.,* 394 F.2d 33 (5th C.C.A., 1968); *Wealden Corp. v. Schwey,* 482 F.2d 550 (5th C.C.A., 1973); and *Trask v. Susskind,* 376 F.2d 17 (5th C.C.A., 1967). In weighing the evidence, the Court must determine whether, from the record as it stands at the conclusion of Plaintiff's case, the Court is convinced that the evidence preponderates against the Plaintiff. *Weissinger v. United States, supra; Ellis v. Carter,* 328 F.2d 573 (9th C.C.A., 1964); *Motorola, Inc. v. Fairchild Camera & Instrument Corp.,* 366 F.Supp. 1173 (D.C., Ariz., 1973); *SEC v. Murphy,* 626 F.2d 633 (9th C.C.A., 1980); *Southern Arizona York Refrigeration Co. v. Bush Mfg. Co.,* 331 F.2d 1 (9th Cir. 1964); *Island Service Co. v. Perez,* 309 F.2d 799 (9th C.C.A., 1962); *Huber v. American President Lines,* 240 F.2d 778 (2d C.C.A., 1957); *Emerson Electric Co. v. Farmer, supra;* and *Benton v. Blair, supra.* In ruling on the Motion the Court must consider and weigh the evidence, but need not evaluate the evidence in a light more favorable to the Plaintiff. *Ellis v. Carter, supra; Bertolino v. Italian Line,* 414 F.Supp. 279 (D.C., N.Y., 1976); *White v. Jaegerman,* 391 F.Supp. 438 (D.C.N.Y., 1975); *Blount v. Xerox Corp.,* 405 F.Supp. 849 (D.C.Cal., 1975); and *Emerson Electric Co. v. Farmer, supra.* After weighing the evidence, the Court may grant the motion "... even if the evidence, viewed in a light most favorable to the plaintiff, made a pri-

ma facie case". *Ellis v. Carter, supra.* If the Motion is granted, the Court must then make Findings of Fact and Conclusions of Law pursuant to and as required by Rule 52(a), F.R.C.P. In the leading case of *Weissinger v. United States, supra,* Judge Godbold pronounced the correct rule with respect to Rule 41(b) motions:

"Rule 41(b) provides... After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.... The Court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.... If the court renders judgment on the merits against the Plaintiff, the court shall make findings as provided in Rule 52(a).

\*       \*       \*       \*       \*       \*

When the defendant makes a Rule 41(b) motion to dismiss for insufficiency of the plaintiff's evidence it becomes the duty of the court to weigh and evaluate the evidence. 2B *Barron & Holtzoff, supra,* Sec. 919 at 149–150. If the defendant's Rule 41(b) motion is granted on the merits, the court must make findings as required by Rule 52(a)...

The findings of fact thus required, and made in this case, are like any other findings of fact—they are not to be set aside on appeal unless clearly erroneous.... They cannot be supported by evidence not admitted at the time defendant's motion was sustained."

In *Emerson Electric Co. v. Farmer,* the Court said:

"... The Judge should now ordinarily evaluate the evidence without making special inferences in the Plaintiff's favor. The Court should go ahead and resolve the case on the basis of preponderance of the evidence.... This Court subscribed to this view as early as *Benton v. Blair,* 5

Cir., 1955, 228 F.2d 55, and for the full Court Judge Godbold stated recently, 'When the defendant makes a Rule 41(b) motion to dismiss for insufficiency of the plaintiff's evidence it becomes the duty of the court to weigh and evaluate the evidence' (emphasis added). *Weissinger v. United States...*"

The Court has considered and weighed all of the evidence presented by the Plaintiff, and from the record standing at the conclusion of Plaintiff's case the Court is convinced that the evidence preponderates against the Plaintiff. The School Board's Motion for Involuntary Dismissal should therefore be granted.

2. This action was filed by Plaintiff on October 19, 1978, alleging that the School Board Defendants are elected under an at-large electoral system which unlawfully dilutes the voting strength of the black electorate of Dallas County in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 1973, 42 U.S.C. Section 1971, and the 14th and 15th Amendments to the Constitution of the United States. At the time Plaintiff filed its Complaint, the trial of dilution cases in the Fifth Circuit was governed by the pronouncements of the Court of Appeals in the leading cases of *Zimmer v. McKeithen,* 485 F.2d 1297 (5th C.C.A., en banc, 1973), aff'd (on other grounds) 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), and *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th C.C.A., en banc, 1977), cert. den. 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977), aided by the more recent pronouncements of the Supreme Court in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). During the pendency of this action, the Supreme Court issued its decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The *Bolden* case has been followed by several Fifth Circuit cases, including *Lodge v. Buxton,* 639 F.2d 1358 (5th C.C.A., 1981); *Cross v. Baxter,* 639 F.2d 1383 (5th C.C.A., 1981); *Corder v. Kirksey,* 639 F.2d 1191 (5th C.C.A., 1981);

*Kirksey v. City of Jackson, Miss.,* 663 F.2d 659 (5th C.C.A., 1981), reh. den. 669 F.2d 316 (5th Cir. 1982); *Thomasville Branch of NAACP v. Thomas Cty., Ga.,* 639 F.2d 1384 (5th C.C.A., 1981); *Jones v. City of Lubbock,* 682 F.2d 504 (5th C.C.A., 1981); *McMillan v. Escambia Cty., Fla.,* 638 F.2d 1239 (5th C.C.A., 1981); and *Jenkins v. City of Pensacola,* 638 F.2d 1249 (5th C.C.A., 1981). On July 1, 1982, the Supreme Court decided *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), affirming *Lodge v. Buxton, supra.* In both the trial and decision of this action, this Court has tiptoed through the maze of developing law surrounding dilution actions, and has attempted to give effect to all of the controlling pronouncements of the appellate courts. In doing so, this Court has also attempted to follow the pronouncements of *Nevett v. Sides, supra, Cross v. Baxter,* 604 F.2d 875 (5th C.C.A., 1979) and *McIntosh Cty. NAACP v. City of Darien,* 605 F.2d 753 (5th C.C.A., 1979), which require the trial court in dilution cases to make findings of fact and conclusions of law in sufficient detail, showing that it has considered all relevant evidence, so that an appellate court can fully understand the factual and legal basis for the trial court's ultimate conclusions. These latter requirements have, of necessity, resulted in an extensive discussion of the facts and the law by this Court.

3. In *Zimmer v. McKeithen, supra,* the Court of Appeals (en banc) held that dilution could be established upon proof of the existence of an aggregate of four primary factors and four enhancing factors, which were defined as follows:

" ... where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particular interests, a tenuous state policy underlying the preference or multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of

large districts, majority vote requirements, anti-single shot voting provisions and the lack of provisions for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors..."

4. Later Fifth Circuit cases indicated that a plaintiff was not limited to evidence that fit within the *Zimmer* framework, but might offer other relevant evidence on the issue of intent. See *McIntosh Cty. NAACP v. City of Darien, supra; U. S. v. Board of Supervisors,* 571 F.2d 951 (5th C.C.A., 1978); *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th C.C.A., en banc, 1977), cert. den. 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). See also *Nevett v. Sides, supra; Lodge v. Buxton, supra;* and *Rogers v. Lodge, supra.* In *Board of Supervisors* the Court identified the following eleven crucial *Kirksey* "elements":

1. No black had been elected to a county office.

2. Retention of the poll tax as a requisite to voting until 1966.

3. Retention of a literacy test until 1966.

4. Conditioning of primary participation upon a pledge of party loyalty.

5. Property requirements for candidates for supervisors.

6. Designation of the County for the use of federal voting registrars.

7. Disqualification of certain black candidates by the county election commission.

8. Effect of a lower socio-economic level upon the blacks' ability to participate.

9. A high rate of bloc voting.

10. Various electoral mechanisms.

11. Lack of responsiveness to the needs of black residents.

5. In *City of Mobile v. Bolden,* the Supreme Court applied to voter dilution cases the same strict standards it had previously applied to all other equal protection claims in *Washington v. Davis, supra,* and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp., supra.* However the Court in that case spoke by a four justice plurali-

ty, with two special concurring opinions and three dissenting opinions. The opinion of the four justice plurality held:

1. Section Two of the Voting Rights Act of 1965 has no effect different from that of the Fifteenth Amendment (100 S.Ct. 1496–1497).

2. Racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation (100 S.Ct. 1497).

3. The Fifteenth Amendment does not entail the right to have black candidates elected, but prohibits only purposeful discriminatory denial or abridgement by government of the freedom to vote "on account of race, color, or previous condition of servitude" (100 S.Ct. 1498–1499).

4. All equal protection claims under the Fourteenth Amendment, including all vote dilution claims challenging at-large electoral systems, require proof of purposeful discrimination. It is not sufficient to show that blacks have not elected representatives in proportion to their numbers, but plaintiffs must prove that the challenged electoral plan was conceived or operated as a purposeful device to further racial discrimination. (100 S.Ct. 1499). In that regard, the Court merely applied to voter dilution cases the strict standards it had previously applied to all other Equal Protection claims in *Washington v. Davis, supra,* and *Arlington Heights, supra.*

5. Plaintiffs may not establish an Equal Protection violation merely by proof of disproportionate effects or impact of the challenged official action, but must instead prove an invidious discriminatory purpose or intent. (100 S.Ct. 1499–1504).

6. The standard of proof adopted by the Fifth Circuit in *Zimmer v. McKeithen, supra,* was expressly rejected, and the *Zimmer* criteria were expressly held to be insufficient to establish the required discriminatory purpose. (100 S.Ct. 1502–1503).

7. An unconstitutional "discriminatory purpose" requires proof that "the decision maker ... selected or reaffirmed a particular course of action at least in part

because of, not merely in spite of, its adverse effects upon an identifiable group" (100 S.Ct. 1502–1503), N. 17, citing *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870). "Discriminatory purpose" implies more than intent as volition or intent as awareness of consequences", so that the "foreseeability test" is no longer valid in voter dilution cases. (100 S.Ct. 1502–1503).

8. Where the evidence shows that blacks register and vote without hindrance, and that there are no official obstacles preventing blacks from becoming candidates for election, mere proof that black candidates have been defeated does not alone establish any Constitutional deprivation (100 S.Ct. 1503).

9. In providing the required invidious discriminatory intent or purpose of the "decision maker", it is necessary to look to the legislative body enacting the challenged legislation, and actions by unrelated government officials would be "of questionable relevance" (100 S.Ct. 1503).

10. The Equal Protection Clause does not require proportional representation, and no "political group" has a constitutional right to elect candidates in proportion to its numbers (100 S.Ct. 1504).

There were two special concurring opinions and three dissenting opinions. However, a careful examination of those separate opinions discloses that each of the above principles of law, as pronounced by the plurality, appeared to be supported by at least a majority of the Justices. For example, Justice Marshall agreed with the plurality that Section Two of the Voting Rights Act of 1965 contains the same standard as the Fifteenth Amendment, although he differed with the plurality's interpretation of that standard (100 S.Ct. 1520, N.2).

Justice Stevens agreed that a Constitutional violation required proof of discriminatory purpose or intent, and agreed ". . . that the *Zimmer* analysis should be rejected . . ." (100 S.Ct. 1512). However, he suggested that ". . . a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decision maker" (100 S.Ct. 1512). He favored a test that is probably more strict than that adopted by the plurality, in that he would require proof: (1) that the challenged action was "uncouth", as manifestly not the product of a routine or traditional political decision; (2) that it had a significant adverse impact on a minority group; and (3) that it was unsupported by any neutral justification and thus was either totally irrational or entirely motivated by a desire to curtail the political strength of the minority (100 S.Ct. 1512). Justice Stevens argued that a political decision may be valid even though irrational or invidious factors "played some part in its enactment or retention", and even though "some participants in the decision making process were motivated by a purpose to disadvantage a minority group" (100 S.Ct. 1513). In *Bolden*, Justice Stevens urged a standard of proof even more stringent and strict than that adopted by the plurality. See, also, his dissent in *Rogers v. Lodge*, —— U.S. at ——, 102 S.Ct. at 3282–84.

Justice Blackmun concurred in the reversal, primarily because he felt the Trial Court had adopted a remedy which constituted an abuse of judicial discretion. However, he assumed that proof of intent is a prerequisite to a finding of unconstitutional vote dilution, but agreed with the dissent by Justice White that the findings of the Trial Court supported an inference of purposeful discrimination (100 S.Ct. 1507). Justice Blackmun stressed that ". . . even a temporary alteration of a long-established form of municipal government is a drastic measure for a Court to take."

In his dissenting opinion, Justice White set forth the factual findings of the Trial Court at length, and reasoned that those findings could be affirmed. However, in his dissent he recognized ". . . that the Equal Protection Clause forbids only purposeful discrimination", although reasoning that ". . . an invidious discriminatory purpose can be inferred from objective factors of the kind relied on in *White v. Regester*,

412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and that the trial courts are in a special position to make such intensely local appraisals" (100 S.Ct. 1514). Justice White expressly accepted the prior holdings in *Washington v. Davis, supra,* and *Village of Arlington Heights, supra,* that proof of an invidious discriminatory purpose is necessary to establish an Equal Protection violation. However, he dissented from the opinions expressed by the majority of the Court that the *Zimmer* analysis should be rejected, and also dissented from what he perceived to be the plurality's rejection of the "totality of the circumstances" approach endorsed in *White v. Regester* (100 S.Ct. 1519). His dissent in *Bolden* should be considered along with his majority opinion in *Rogers v. Lodge, supra.*

Justice Brennan also dissented from the majority of the Court, agreeing with Justice Marshall that proof of discriminatory impact is sufficient in dilution cases. He agreed with Justice Marshall and Justice White that the plaintiffs had met their burden of proof, "... even accepting the plurality's premise that discriminatory purpose must be shown...".

In his dissent, Justice Marshall acknowledged that the standards were identical under the Fifteenth Amendment and Section 2 of the Voting Rights Act of 1965 (100 S.Ct. 1520, n.2). However, he disagreed with the majority of the Court on most of the other issues, and also disagreed with the standard of proof previously adopted by the Supreme Court in *Personnel Adm'r of Mass. v. Feeney, supra.*

6. Following *Bolden,* the Court of Appeals has decided a number of dilution cases. In the leading case of *Lodge v. Buxton,* 639 F.2d 1358 (5th C.C.A., 1981), the Court gave a definitive analysis of the law before *Bolden* and the *Bolden* decision, and attempted to reconcile *Bolden* with prior Fifth Circuit cases. The Court concluded that *Bolden* required proof of a discriminatory purpose in the creation or maintenance of the challenged at-large system in vote dilution actions arising under both the 14th and 15th Amendments; rejected the exclu-

sive use of the *Zimmer* criteria as the means of inferring purpose or intent; required an independent inquiry into intent; limited the *Zimmer* criteria to the extent that they are relevant to the factual context at hand; and somewhat increased the burden of proof on plaintiffs in dilution cases. However, and more significantly, *Lodge* held that proof of unresponsiveness is necessary to establish proof of the required discriminatory intent, and that absent such proof of unresponsiveness a prima facie case cannot be established. The Court rejected *Zimmer* to the extent it held otherwise. In *Lodge v. Buxton,* the Court pronounced the current state of the law as follows:

"A cause of action under the Fourteenth or Fifteenth Amendment asserting unconstitutional vote dilution through the maintenance of an at-large electoral system is legally cognizable only if the allegedly injured group establishes that such system was created or maintained for discriminatory purposes. A discriminatory purpose may be inferred from the totality of circumstantial evidence. An essential element of a prima facie case is proof of unresponsiveness by the public body in question to the group claiming injury. Proof of unresponsiveness, alone, does not establish a prima facie case sufficient to shift the burden of proof to the party defending the constitutionality of the system; responsiveness is a determinative factor only in its absence. The *Zimmer* criteria may be indicative but not dispositive on the question of intent. Those factors are relevant only to the extent that they allow the trial court to draw an inference of intent. The *Zimmer* criteria are not the exclusive indicia of discriminatory purpose and, to the extent they are not factually relevant in a given case, they may be replaced or supplemented by more meaningful factors. Even if all of the *Zimmer* and other factors are established, an inference of discriminatory purpose is not necessarily to be drawn. The trial court must consider the totality of the circumstances and ultimately rule on the precise issue of dis-

criminatory purpose. Finally, given the reality that each case represents an extremely unique factual context for decision, this Court will give great deference to the judgment of the trial court, which is in a far better position to evaluate the local political, social, and economic realities than is this Court."

7. On July 1, 1982, the Supreme Court affirmed *Lodge v. Buxton* in a 6–3 opinion written by Justice White, joined by Chief Justice Burger and Justices Brennan, Marshall, Blackmun, and O'Connor. *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. at 3275–76 (1982). There were strong dissenting opinions by Justice Powell, joined by Justice Rehnquist, and Justice Stevens. In *Rogers* the Supreme Court, by a convincing (6–3) majority, affirmed *Lodge v. Buxton* and its pronouncements as to the correct law to be applied in dilution cases. The Supreme Court: (1) held that dilution cases are "subject to the standard of proof generally applicable to Equal Protection Clause cases", —— U.S. ——, 102 S.Ct. 3275 and thus require proof of a racially discriminatory purpose in the creation or maintenance of the challenged at-large system in actions brought under both the 14th and 15th Amendments; (2) "rejected the notion that a law is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another; (3) held that the required "... discriminatory intent need not be proven by direct evidence", —— U.S. ——, 102 S.Ct. 3276 but may "... be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another"; (4) recognized that a judicial determination as to the existence of the required discriminatory purpose "... demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available"; (5) concurred with the opinion of the Court of Appeals in *Nevett v. Sides,* 571 F.2d 209 (5th C.C.A., 1978), that in dilution cases the District Court must determine under all the relevant facts "... in whose favor the aggregate of the evidence preponderates", —— U.S. ——, 102 S.Ct. 3278, and should therefore con-

sider not only the important evidentiary factors outlined in *Zimmer,* but any other relevant factors as well; (6) recognized that the factual determination of the required discriminatory purpose "... is peculiarly dependent upon the facts of each case", —— U.S. ——, 102 S.Ct. 3278, and should be made by the District Court as factual findings; (7) held that in dilution cases the factual findings of the District Court should be given great deference and should not be disturbed on appeal unless clearly erroneous, because such factual findings represent "... a blend of history and an intensely local appraisal of the design and impact of the ... multimember district in the light of past and present reality, political and otherwise". —— U.S. —————, 102 S.Ct. 3278; and (7) refused to disturb the factual findings of the District Court, holding that such findings were entitled to deference under Rule 52, F.R.C.P., and were not clearly erroneous on the record.

8. In *Rogers,* the Supreme Court afforded great deference not only to the factual findings of the District Court, but also to the refusal of the Court of Appeals to disturb those findings, emphasizing the Supreme Court's "... reluctance to disturb findings of fact concurred in by two lower courts". —— U.S. ——, 102 S.Ct. 3279. The Supreme Court discussed those factual findings, and held that they were legally sufficient to sustain the ultimate finding of the District Court that the challenged at-large system was maintained for a discriminatory purpose in violation of the 14th and 15th Amendments. The decision of the District Court was rendered before *Bolden,* but the District Court "... demonstrated its understanding of the controlling standard by observing that a determination of discriminatory intent is a requisite to a finding of unconstitutional vote dilution under the Fourteenth and Fifteenth Amendments". —— U.S. ——, 102 S.Ct. 3278. The District Court had recognized "that the evidentiary factors identified in *Zimmer* were to be considered", 50 L.W. 5043, but had not relied exclusively on the *Zimmer* factors and had considered "other relevant factors as

well". ——— U.S. ———, 102 S.Ct. 3278. The District Court had not treated "... the *Zimmer* criteria as absolute, but rather considered them only to the extent they were relevant to the question of discriminatory intent". ——— U.S. ———, 102 S.Ct. 3278, citing 639 F.2d at 1376. Speaking for the Supreme Court in *Rogers,* Justice White said: "Although a tenable argument can be made to the contrary, we are not inclined to disagree with the Court of Appeals' conclusion that the District Court applied the proper legal standard." ——— U.S. ———, 102 S.Ct. 3278.

The factual findings of the District Court were discussed at some length in *Rogers,* ——— U.S. ———, 102 S.Ct. 3280–81, and will not be repeated here. However, those factual findings in *Rogers* differ substantially and materially from the Findings of Fact made by the Court in the instant case, and serve to illustrate both the reasoning and impact of the holdings in *Rogers* and *Lodge* that "the task before the fact finder is to determine, under all the relevant facts, in whose favor the aggregate of the evidence preponderates", and that "this determination is peculiarly dependent upon the facts of each case". ——— U.S. ———, 102 S.Ct. 3278, citing 571 F.2d 224. Based on the Findings of Fact in the instant case, the Court has concluded that the evidence preponderates against the Plaintiff and in favor of the School Board. *Rogers, supra; Lodge, supra; Bolden, supra; Nevett, supra; Kirksey, supra.*

■ 9. Plaintiff has alleged a violation of 42 U.S.C., Section 1971. However, Plaintiff has failed to offer any evidence establishing a violation of that statute, either by the School Board Defendants or any other public officials in Dallas County. The factual findings made by this Court show clearly that blacks now register, vote, run for office, serve as election officials, and otherwise participate fully in the election process in Dallas County, without discrimination and without distinction of race, color, or previous condition of servitude; that the election laws, standards, practices, and procedures followed and applied in Dallas

County do not differ from those followed and applied elsewhere in the State of Alabama, including specifically those other 34 Alabama counties having the same at-large electoral system; that said election laws, standards, practices, and procedures have been applied in Dallas County fairly, equally, and without discrimination in determining voter qualifications; that in Alabama and Dallas County no literacy test is employed as a qualification for voting in any election; and that Plaintiff has failed to establish any actual or attempted threats, intimidations, or coercion of any black or white citizen of Dallas County for the purpose of interfering with the right of such citizen to vote or to vote as he might choose. The Court therefore finds and concludes that Plaintiff has failed to establish by a preponderance of the evidence that the totality of circumstances establish any violation of 42 U.S.C. § 1971, by the School Board Defendants. *Kirksey v. City of Jackson, Miss.,* 663 F.2d 659 (5th C.C.A., 1981), *reh. den.* 669 F.2d 316 (5th Cir. 1982).

■ 10. Plaintiff has also alleged violations of Section 2 of the 1965 Voting Rights Act, 42 U.S.C., Section 1973. As amended by Congress during 1982, Section 2 provides:

Section 2.

(a) No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the

political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one "circumstance" which may be considered, provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

It is this amended version of the Voting Rights Act which must be applied by the Court. *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ("[A] Court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."). The facts in this case show that the totality of the circumstances prove that the political process leading to a seat on the School Board is equally open to participation by Blacks in Dallas County. Blacks have the same opportunity to participate in the School Board elections as do Whites. While no Blacks have been elected to the School Board, the process leading to election is equally available. The vagaries which surround any political contest account for the absence of a Black Board Member over the years.

■ 11. It has been well established that in order to establish a 14th Amendment Equal Protection claim in a voter dilution action, Plaintiff must prove by a preponderance of the evidence that the challenged electoral plan was conceived or operated as a purposeful device to further racial discrimination, and that its purpose was invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. *City of Mobile v. Bolden, supra; Washington v. Davis, supra; Arlington Heights, supra; Rogers, supra.* It is now equally well established that in order to establish a 15th Amendment claim asserting unconstitutional vote dilution through the maintenance of an at-large election system, Plaintiff must prove by a preponderance of the evidence that the system was created or

maintained for discriminatory purposes. *City of Mobile v. Bolden, supra; Wright v. Rockefellar,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Lodge v. Buxton, supra.* Only if there is purposeful discrimination can there be a violation of the 14th Amendment or the 15th Amendment. See *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *City of Mobile v. Bolden, supra; Lodge v. Buxton, supra; Rogers, supra.* The required discriminatory purpose can be inferred from the totality of the circumstantial evidence, but the Court must "consider the totality of the circumstances and ultimately rule on the precise issue of discriminatory purpose." *Lodge v. Buxton, supra; Rogers v. Lodge, supra.* The required finding of discriminatory purpose "is a pure question of fact, subject to Rule 52's clearly erroneous standard". *Rogers, supra,* at —— U.S. ——, 102 S.Ct. 3278, quoting *Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Applying the foregoing legal standards to this action, the Court has found and concludes that the Plaintiff has failed to establish by a preponderance of the evidence that the at-large election system for the election of the School Board Defendants prescribed by Section 16–8–1, 1975 Code of Alabama, has been either created, operated, or maintained for discriminatory purposes. The Court therefore concludes that such at-large election system does not diminish or dilute the votes of black voters of Dallas County, and is therefore not violative of either the 14th or 15th Amendment, or Section 2 of the 1965 Voting Rights Act.

12. This Court has carefully considered and reviewed all of the evidence, and has made detailed and specific factual findings. To the limited extent that these factual findings (including specifically Findings numbered 22, 23, 86, and 109–116) may also embody Conclusions of Law, the Court now adopts those Findings of Fact as Conclusions of Law. In determining that Plaintiff has failed to establish the required discriminatory purpose, this Court has considered

and made specific factual findings with respect to all evidence and circumstances relevant to that issue, including the *Zimmer* criteria, the *Kirksey* elements, and all other evidence and criteria, considering all such evidence separately and also in the aggregate and as a whole. The *Zimmer* criteria, as well as the *Kirksey* elements and other evidence, have all been considered as evidence indicative but not dispositive on the question of intent, as required by *Lodge, Nevett,* and *Rogers.* The Court has considered the totality of the evidence and the totality of the circumstances, and based on the preponderance of the evidence has made specific factual findings. The Court has viewed those Findings as a whole, in the aggregate, and has given due regard to the strength and significance of each and all Findings, to determine whether the ultimate inference of dilution is permissible in this action, and if so, whether the evidence preponderates in its favor. As more specifically set forth in the factual findings, the Court has found and concludes that the evidence preponderates against any finding of an invidious or discriminatory purpose in either the enactment, operation, or maintenance of the at-large system prescribed for election of the School Board Defendants pursuant to Section 16–8–1, 1975 Code of Alabama, and also preponderates against any finding that such at-large electoral system unlawfully diminishes or dilutes the votes of black voters of Dallas County—or any other Alabama county—in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C., Section 1973, or the 14th or 15th Amendments. The Court therefore is of the opinion and concludes that judgment in this action should be entered in favor of the School Board Defendants and against the Plaintiff, *Bolden, supra; Lodge, supra;* and *Rogers, supra.*

▮ 13. In concluding that Plaintiff has failed to establish the required discriminatory purpose, the Court has considered the factual findings that the School Board Defendants have been responsive to the particularized needs of black students within the Dallas County School System as well as other black citizens of Dallas County. This finding—standing alone—defeats Plaintiff's claims against the School Board Defendants, since proof of unresponsiveness by the School Board is an essential element of Plaintiff's prima facie case. *Lodge v. Buxton, supra,* aff'd. *Rogers v. Lodge, supra.* However, the Court has not rested its decision on that basis alone, but has instead also considered and weighed all other evidence to determine whether the required discriminatory purpose may be inferred from the totality of the circumstantial evidence. In doing so, the Court has considered the *Zimmer* criteria, the eleven *Kirksey* elements, and other meaningful factors as "indicative but not dispositive on the question of intent". *Nevett, supra; Lodge, supra;* and *Rogers, supra.* Having done so, and having weighed and considered all of the evidence separately, and also in the aggregate, as a whole, the Court also has found and concludes that Plaintiff has failed to establish by a preponderance of the evidence that the at-large system prescribed for the election of the School Board Defendants has been adopted, operated, or maintained for discriminatory purposes in violation of the 14th or 15th Amendments, or Section 2 of the 1965 Voting Rights Act, 42 U.S.C., Section 1973, or 42 U.S.C., Section 1971, and that the "aggregate" of the evidence preponderates in favor of the School Board as to each of those ultimate issues. See *Rogers, Lodge,* and *Nevett, supra.*

▮ 14. The School Board Defendants have contended that Plaintiff, in order to prevail, must establish an invidious discriminatory purpose in either the adoption or operation of the at-large electoral plan, and that Plaintiff may not prevail merely by proof that such plan has been maintained for discriminatory purposes. The Defendants found some support—at least with respect to 14th Amendment claims—from the strict standards applied to Equal Protection claims. *Washington v. Davis, supra; Arlington Heights, supra; Personnel Adm'r of Mass. v. Feeney, supra.* Defendants also found some comfort and support in the plurality opinion in *Bolden.* 100 S.Ct. 1499, 1502–1503. However, *Lodge, supra,* and

*Rogers, supra,* expressly held that Plaintiff may prevail upon proof that the challenged system has been *either created or maintained* for discriminatory purposes, and this Court has therefore rejected the legal arguments of the School Board Defendants. Thus in concluding that Plaintiff has failed to establish its claims under Section 2 of the Voting Rights Act of 1965, 42 U.S.C., Section 1973, and the 14th and 15th Amendments, the Court has considered not only whether the at-large electoral system was *created* or *operated* in Dallas County for discriminatory purposes, but has also considered whether that system has been *maintained* for discriminatory purposes. Having done so, however, the Court has found and concludes that Plaintiff has failed to establish the required proof of discriminatory purpose, either in the creation, operation, or maintenance of that at-large electoral system in Dallas County, and that judgment is therefore due to be entered against Plaintiff and in favor of the School Board Defendants.

15. Based upon the Findings of Fact, the Court has concluded that the Plaintiff has failed to establish by a preponderance of the evidence that Section 16–8–1 unlawfully dilutes the black vote in Dallas County, or has been either enacted, operated, or maintained for discriminatory purposes in Dallas County. In reaching that conclusion, the Court has found and concluded:

a. Section 16–8–1 was not adopted or enacted for discriminatory purposes. Plaintiff not only has conceded its constitutionality, but has also failed to offer any evidence to establish a discriminatory purpose in the adoption of this state-wide law.

b. Section 16–8–1 has not been operated or applied in Dallas County for a discriminatory purpose or in a method or manner different from that by which it has been operated and applied in the other 34 Alabama counties subject to its provisions. That being true, Plaintiff has failed to establish by a preponderance of the evidence either an unconstitutional application of that statute in Dallas County, or the required discriminatory purpose in its operation and application in Dallas County.

c. Plaintiff has failed to establish by a preponderance of the evidence that Section 16–8–1 has been maintained for discriminatory purposes in Dallas County. The Court has found that the School Board Defendants have been responsive to the needs of blacks, and this finding—standing alone—precludes a finding of the required discriminatory purpose. *Lodge v. Buxton, supra,* aff'd *Rogers v. Lodge, supra.* However, the Court has gone further and has also reviewed the totality of the evidence, including the *Zimmer* criteria, the *Kirksey* factors, and all other circumstantial evidence, to determine whether the required discriminatory purpose may be inferred from the totality of the circumstances in Dallas County, as required by *Nevett, supra,* and *Rogers, supra.* Having done so, the Court has found and concluded that the Plaintiff has failed to establish by a preponderance of the evidence that Section 16–8–1 has been maintained in Dallas County for a discriminatory purpose, or that—as applied only to Dallas County—it unconstitutionally dilutes the voting strength of black voters in Dallas County, and that the aggregate of the evidence preponderates in favor of the School Board as to those ultimate issues.

16. The foregoing Findings and Conclusions compel entry of judgment against the Plaintiff and in favor of the School Board Defendants, without regard to the implications and further issues arising from the fact that Section 16–8–1 is not a local law applying only to Dallas County, but is instead a State law of state-wide application applying to a majority (35) of Alabama's 67 counties. However, the Court has also considered these further issues and implications, and has reached additional Findings and Conclusions which likewise compel entry of judgment against Plaintiff. Plaintiff has not only admitted the constitutionality of Section 16–8–1, but has also admitted the constitutionality of the at-large election system thereby prescribed for these other 34 counties. The Court has found that this state-wide statute has not been applied in

Dallas County in any method or manner different from that by which it has been applied in these other 34 counties. Further, the aggregate of the evidence preponderates against any finding that Section 16–8–1 has been adopted, operated, or maintained for discriminatory purposes in any of these other 34 counties. The evidence affirmatively shows that 5 of these counties have black superintendents, and that 7 of these counties have black school board members, with 5 counties having either 4 or 5 black members. In 1976, 14 (40%) of these counties had black populations of less than 17%, while more than half (18) had black populations of less than 22.5%. As to these other 34 counties, Plaintiff has also failed to establish by a preponderance of the evidence that blacks have been denied equal access to the political process, or that past discrimination has the present effect of discouraging participation by blacks in the political process, or that the at-large system of election is rooted in racial discrimination, or that their school boards are unresponsive to blacks. There is therefore absolutely no evidence of any facts or circumstances in these 34 other counties upon which the Court might make any specific Finding of Fact to support an inference of a discriminatory purpose in the enactment, operation, or maintenance of Section 16–8–1 in those counties. The Court therefore finds and concludes that Plaintiff has failed to establish that Section 16–8–1 unlawfully dilutes the black vote in any of these other 34 Alabama counties, or that it is unconstitutional in its operation, application, or effect in those counties, and that the aggregate of the evidence preponderates in favor of the School Board as to those ultimate issues.

■ 17. Plaintiff has selected and singled out Dallas County, and has attempted to establish that the impact, effect, or application of Section 16–8–1 in Dallas County produces an unconstitutional result, even though its impact in these other 34 counties is admittedly constitutional and has resulted in the election of blacks to 7 county Boards of Education, and the appointment of 5 black Superintendents. Indeed, applying Plaintiff's rationale, it might be similar-

ly argued that Section 16–8–1 produced an unconstitutional effect or impact in Bullock and Greene counties (which have all black Boards and black superintendents) as well as Lowndes, Macon, and Perry counties (which have black superintendents and 4 black school board members). Obviously, the Constitution neither requires nor permits this type of blind adherence to racial statistics. *City of Mobile v. Bolden, supra; Washington v. Davis, supra; Arlington Heights, supra; Personnel Adm'r of Mass. v. Feeney, supra; Rogers v. Lodge, supra.* Neither will the Constitution permit or compel a finding of the required discriminatory purpose merely from a showing that the group allegedly discriminated against has not elected representatives in proportion to its numbers. *White v. Regester, supra,* at 93 S.Ct. 2339; *Whitcomb v. Chavis,* 403 U.S. 124, 156–160, 91 S.Ct. 1858, 1877, 29 L.Ed. 363; *City of Mobile v. Bolden, supra; Lodge v. Buxton, supra; Rogers v. Lodge, supra.*

■ In this action, Plaintiff has attempted to challenge the at-large election system in Dallas County under which both the County Commission and the School Board have been elected. Since the County Commission is elected under a local Act, Plaintiff has properly limited its evidence against those Defendants to Dallas County. However, the School Board Defendants are elected under a state-wide statute prescribing the at-large election system for 35 of Alabama's 67 counties under a firm, well-established state policy existing at least since 1915. Under these circumstances, the Court is of the opinion and concludes that the Plaintiff, in order to prevail, must prove and establish by a preponderance of the evidence that Section 16–8–1 and the at-large system thereby prescribed in Dallas County for election of the School Board Defendants has been *either:*

a. Adopted or enacted for discriminatory purposes; or

b. Operated or applied unconstitutionally or for discriminatory purposes in Dallas County; or

c. Maintained as a state-wide statute for discriminatory purposes; or

d. Maintained in its application to Dallas County for discriminatory purposes.

The Court finds and concludes that Plaintiff has failed to establish any of the above prima facie elements, and that the aggregate of the evidence preponderates in favor of the School Board as to each of those ultimate issues, so that Plaintiff therefore may not prevail in this action. Plaintiff has admitted and conceded the constitutionality of this State law, as well as the constitutionality of its maintenance as a state-wide law in all counties except Dallas. The Court has made detailed and specific factual findings that Plaintiff has failed to establish by a preponderance of the evidence that this statute and the at-large election system thereby prescribed has been adopted, created, operated, or maintained for discriminatory purposes in any of these other 34 counties. While Plaintiff could properly single out Dallas County by proof that Section 16–8–1 has been unconstitutionally operated or applied in Dallas County for a discriminatory purpose, the evidence preponderates against Plaintiff on that issue. Finally, Plaintiff has failed to establish by a preponderance of the evidence that the at-large election system in Dallas County prescribed by Section 16–8–1 has been selected, affirmed, re-affirmed, or maintained for discriminatory purposes. Plaintiff has failed to establish that the Alabama Legislature has at any time since 1915 considered any amendment to Section 16–8–1 which would modify or alter that at-large election system, or remove Dallas County from its application and provisions. Plaintiff has failed to offer any evidence to show the intention, motives, or purposes of the Alabama Legislature, or any member thereof, in adopting, creating, or maintaining this State law or in maintaining and continuing its application to Dallas County. In short, Plaintiff has failed to show that the application of this State law to Dallas County has been maintained for discriminatory purposes, or that the inclusion or retention of Dallas County within its provisions has been selected, affirmed, re-affirmed, maintained, or even considered by the Alabama Legislature or any member thereof at any time since 1915. The Court has not considered the failure of Plaintiff to show the intention of the decision-makers as a compelling factor which—standing alone—would compel entry of judgment against Plaintiff, although there is certainly language in the plurality opinion in *Bolden* which suggests that result. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 1503–1504, 64 L.Ed.2d 47 (n. 20, 21). Instead, the Court has considered this finding along with all other circumstantial evidence in reaching the ultimate finding and conclusion that the votes of black voters in Dallas County have not been unconstitutionally diluted, and that Section 16–8–1 has been neither created, operated, nor maintained for discriminatory purposes in Dallas County.

18. There is yet another compelling reason why Plaintiff may not prevail in this action, although such additional reason was not essential, and thus was not utilized by the Court, in reaching its previous Findings and Conclusions which compel entry of judgment in favor of the School Board Defendants. At the very outset of this litigation, the School Board challenged Plaintiff's failure to join the school boards in the other 34 Alabama counties subject to the provisions of Section 16–8–1. To avoid the compulsory joinder of these other school boards, as required by Rule 19, F.R.C.P., Plaintiff made a voluntary and deliberate decision to admit and concede both the constitutionality of Section 16–8–1 and the constitutionality of the at-large election system thereby prescribed. The Court is convinced that Plaintiff's admission as to the constitutionality of Section 16–8–1 is inconsistent with, and therefore precludes, any inquiry as to whether that statute may have been either created or maintained for discriminatory purposes, since such an invidious discriminatory purpose in either creating or maintaining that statute would necessarily render it unconstitutional. Thus Plaintiff—by admitting the constitutionality of Section 16–8–1—has thereby necessarily admitted and

conceded that this statute has been neither created nor maintained for discriminatory purposes. Although Plaintiff could nevertheless prevail by showing that this statewide statute has been unconstitutionally operated or applied in Dallas County in a method or manner different from that by which it has been operated and applied in these other 34 counties, the evidence preponderates against and precludes any such finding. It is clear that Plaintiff made those damaging admissions to gain a procedural advantage by avoiding the compulsory joinder of these other 34 school boards. The Court is not unaware of the fact that Plaintiff's decision may have been—at least in part—influenced by the fact that 5 of these 34 counties have black superintendents, while 7 have black school board members. Although Plaintiff may have gained a procedural advantage by admitting the constitutionality of Section 16–8–1, in doing so Plaintiff severely limited the nature and scope of its claims against the School Board Defendants. Plaintiff did this consciously and deliberately, and despite the Court's warning that this increased burden of proof could pose substantial problems at trial (see Finding of Fact No. 23). The Court is of the opinion and therefore concludes that the Plaintiff—having conceded the constitutionality of Section 16–8–1 to gain a procedural advantage—should not now be permitted to challenge the constitutionality of that State law, and should therefore be limited to proof that it has been unconstitutionally applied or maintained in Dallas County. This result and conclusion is clearly permitted by exercise of the broad discretion granted this Court by Rule 83, F.R.C.P. 7 Moore's Federal Practice, Sections 83.03, 83.04; *Link v. Wabash R. Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). However, it is also required by application of basic equitable principles of estoppel. *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1920); *Texas Co. v. Gulf Refining Co.,* 26 F.2d 394 (5th C.C.A., 1928); 19 Am.Jur., Estoppel, Sections 2, 4, 34, 72. In the leading case of *Davis v. Wakelee, supra,* the Supreme Court pronounced the following rule of estoppel:

"It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds and maintains that position, he may not thereafter, simply because his interests have changed, assume a contrary position..."

In 19 Am.Jur., Estoppel, Section 2, it is stated:

"Perhaps no other technical legal term is more loosely used than the term 'estoppel'..... The term 'estoppel' is often held to apply only to matters of fact, but cases are not wanting in which one is said to be estopped ... to take inconsistent legal positions... Lord Coke's statement: 'It is called an estoppel or conclusion, because a man's own act or acceptance stoppeth or closeth up his mouth to allege or plead the truth', though sometimes criticized, has frequently been quoted or referred to by the courts. It has also been said that no more exact connotative definition covering all the cases can be attempted and that it is better to leave the definition of estoppel to the gradual process of judicial inclusion and exclusion. Speaking generally, however, it may be said that estoppel is a bar which precludes a person from denying or asserting anything to the contrary of that which has, in contemplation of law, been established as the truth, either by the acts of judicial or legislative officers or by his own deed or representations, either express or implied."

In 19 Am.Jur., Estoppel, Section 34, it is said:

"Equitable estoppel or estoppel in pais in a term applied to a situation where, because of something which he has done or omitted to do a party is denied the right to plead or prove an otherwise important fact."

See also 19 Am.Jur., Estoppel, Section 72:

"The rule that a party will not be allowed to maintain inconsistent positions is applied in respect of positions in judicial proceedings. As thus applied it may be regarded not strictly as a question of estoppel, but as a matter in the nature of

a positive rule of procedure based on manifest justice, and to a greater or less degree, on consideration of orderliness, regularity, and expedition in litigation."

In 19 Am.Jur., Estoppel, Section 4, it is stated: .

"Now estoppels, especially those known as 'equitable' or in 'in pais', are not deemed odious, but are said to be conductive to honesty and fair dealing and promotive of justice and to stand on the broad grounds of public policy and good faith."

The rule against taking inconsistent positions, and setting up estoppel with reference thereto, was succinctly stated by the Court of Appeals for the Fifth Circuit in *Texas Co. v. Gulf Refining Co.,* 26 F.2d 394 (5th C.C.A., 1928):

"A party, who in litigation with his adversary has, with knowledge of the fact, asserted a particular claim, title, or right, cannot afterward assume a position inconsistent with such claim, to the prejudice of the same adversary, who has acted in reliance on such claim in being as it was previously made; in other words, a party who, for the purpose of maintaining his position in litigation, has deliberately represented a thing in one respect, is estopped to contradict his own representation by giving the same thing another aspect in litigation with the same adversary as to the same subject matter."

Stated another way,

"Preclusion against inconsistent positions is designed to prevent a litigant from leading a court to find a fact one way in one proceeding, and then simply because his interests have changed lead the court to find another way in a subsequent proceeding... Having received a benefit in the first trial, a party is precluded from changing his position to obtain another benefit in the second trial." *Gottesman v. General Motors Corp.,* 222 F.Supp. 342.

As stated in *Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510 (3rd C.C.A., 1953):

"Such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate."

Based upon the foregoing principles, the Court concludes that Plaintiff is estopped to deny the constitutionality of Section 16–8–1. In reaching that conclusion, the Court has not only considered the procedural advantage gained by Plaintiff, but also the disruption in orderly trial procedures that would result should joinder of these other School Boards now be required or permitted after the commencement of trial. It should be emphasized that the Court has not found it necessary to rely on this estoppel in reaching its ultimate Findings and Conclusions that black votes are not unconstitutionally diluted in Dallas County and that Section 16–8–1 has been neither created, operated nor maintained for discriminatory purposes. Instead, those Findings have been reached by the Court after careful consideration of all of the evidence and testimony, and are based upon factual Findings and Conclusions that Plaintiff has failed to establish by a preponderance of the evidence the required discriminatory purpose in the creation, operation, and maintenance of the at-large system for the election of the School Board Defendants. Those Findings clearly compel entry of judgment against Plaintiff and in favor of the School Board Defendants, without consideration or regard to the further fact that Plaintiff has conceded the constitutionality of Section 16–8–1 and may thereby be estopped to deny that this state-wide law has been neither adopted, created, nor maintained for discriminatory purposes.

19. The Court has made detailed factual findings showing the timing of the various trial proceedings in relation to the decision of the Supreme Court in *Bolden, supra.* (See Finding of Fact No. 24) As in *Lodge v. Buxton, supra,* "much ado has been made..." about the timing of the *Bolden* decision in relation to these trial proceedings. See *Rogers v. Lodge, supra.* However, in this Action—as in *Lodge* and *Rogers*—the parties and the Court correctly anticipated how the intent requirement established in *Washington v. Davis* and *Ar-*

*lington Heights* would be applied to this voting dilution case, and there is therefore no significance to the timing of the *Bolden* decision. In *Lodge,* the Court of Appeals declined to send the case back to the District Court even though the decision had been rendered before *Bolden,* holding that there is no significance to that timing if the trial court correctly anticipated how the intent requirement earlier established in *Washington v. Davis* and *Arlington Heights* would be applied to voting dilution cases, and reasoning:

> Much ado has been made by appellants in this action about the fact that the District Court's order preceded the Supreme Court's decision in *Mobile v. Bolden.* Though this could make a difference in some cases, we do not find such timing controlling here. As we indicated earlier, the 'new rule' established in *Bolden* appears to be an expansion of the principles earlier established in *Washington v. Davis* and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.* A court that correctly anticipated how the intent requirement in those cases would be applied to voting dilution cases, as in *Bolden,* could correctly interpret and apply the law, without the benefit of the Supreme Court's recent opinion. This is precisely the type of foresight demonstrated by Judge Alaimo in the present case. At the outset of his order, Judge Alaimo refers to this Court's treatment of *Washington v. Davis* and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.* in *Nevett v. Sides,* ... and concludes that '... a demonstration of intention is necessary under both fourteenth and fifteenth amendments,' as a requisite to a finding of unconstitutional vote dilution... It is clear, therefore, that Judge Alaimo employed the constitutionally required standard in his evaluation of the present case...

In *Rogers v. Lodge,* the Supreme Court affirmed and concurred with the conclusions of the Court of Appeals in *Lodge* and *Rogers.* In this case—as in *Lodge* and *Rogers*—the parties correctly anticipated how the intent requirement established in *Wash-*

*ington v. Davis* and *Arlington Heights* would be applied to voting dilution cases. This Court has made specific factual findings to that effect (No. 24), and it is clear that at all stages of this litigation, as well as in the Pre-Trial Order, all parties recognized that proof of intentional discrimination was an essential element of the Plaintiff's claims. Furthermore, having admitted the constitutionality of Section 16–8–1, Plaintiff may be estopped and precluded from offering any evidence relating to the legislative purpose in creating or maintaining that state-wide statute. That being true, there is no just reason to delay entry of final judgment or to permit Plaintiff to offer further evidence.